## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

———————————————————————

| | |
|---|---|
| Ethan Daniel Marks, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | **Jury Trial Demanded** |
| John Doe 1, acting in his individual | **Under FRCP 38(b)** |
| capacity as a Minneapolis Police Officer; | |
| John Does 2-6, acting in their individual | |
| capacities as Minneapolis Police Officers; | |
| John Does 7 and 8, acting in their individual | |
| and official capacities as supervisory Minneapolis | |
| Police Officers; Medaria Arradondo, acting in his | |
| individual and official capacities as the Minneapolis | |
| Chief of Police; and the City of Minneapolis, | |
| Defendants. | |

———————————————————————

For his Complaint, Ethan Daniel Marks ("Ethan"), states and alleges as follows:

1.      This is an action for money damages for injuries sustained by Ethan Daniel Marks as a result of the unreasonable use of deadly force on May 28, 2020, in addition to other violations of his constitutional rights, by Defendants John Does 1-6, Minneapolis Police Officers.  The conduct of these Defendants violated Ethan's clearly established federal civil rights, all while acting under the color of state law.

2.      Ethan also asserts claims against John Does 7-8 (the supervisory defendants) and Medaria Arradondo (the Chief of the Minneapolis Police Department) with regard to their roles as trainers, supervisors and policymakers.

3.      Ethan further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

4.      These causes of action arise purely out of 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the United States Constitution.  State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

5.      Ethan is, and was at all times material herein, a citizen of the Unites States and a resident of the State of Minnesota.

6.      At the time of the incident, Ethan was a 19-year-old college student and was 6 feet tall, weighing approximately 205 pounds.

7.      Defendants John Does 1-6, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as officers of the Minneapolis Police Department.  They are sued in their individual capacities.

8.      Defendants John Does 7 and 8, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as supervisory officers of the Minneapolis Police Department.  They are sued in their individual and official capacities.

9.      Defendant Medaria Arradondo ("Chief Arradondo") was at all times material herein the Chief of the Minneapolis Police Department and a policymaker for the MPD.  He is sued in his individual and official capacities.

90911601.1

10.     Defendant City of Minneapolis is a municipality duly incorporated under the laws of the State of Minnesota.

11.     Ethan brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of the Court over this matter.

12.     The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper under 28 U.S.C. § 1391(b)(2).

## THE BACKDROP – THE MURDER OF GEORGE FLOYD BY MINNEAPOLS POLICE OFFICERS

13.     On May 25, 2020, just three days before the incident that is the subject of this lawsuit, George Floyd was killed by former Minneapolis police officer Derek Chauvin while three fellow former officers stood by and refused to intervene.

14.     Mr. Floyd was one of many tragic casualties of the Minneapolis Police Department's long history of racial bias and unchecked, unconstitutional use of force practices.

15.     The killing of Mr. Floyd was captured on video and was widely viewed, with horror and outrage.

16.     As such, the killing of Mr. Floyd sparked protests across the nation and calls to finally change systemic racism in our nation's police departments.

17.     Some of the protests nationwide, including in Minnesota and Minneapolis in particular, caused severe destruction.  But, most of this occurred during nighttime hours.

3

18.     During the daytime in Minneapolis, the vast majority of activity was peaceful and aimed at effecting change and restoration of the communities destroyed.

19.     But as was typical for the Minneapolis Police Department's heavy-handed tactics, the protests – peaceful or not – were met with force by the MPD, including the improper use of tear gas, 40 mm blunt impact projectiles, and other supposedly "less lethal" munitions.

20.     Minneapolis Councilmember Steve Fletcher described on May 28, 2020 that the police had flipped the script on peaceful protesters and clean-up crews: "The community gathered Tuesday night to mourn and express their outrage, peacefully.  Tactical decisions by MPD shifted the dynamic of the crowd…to confrontation."

21.     Days prior to Ethan's injury, Minneapolis Councilmember Jeremiah Ellison described the same phenomenon.  Councilmember Ellison said: "The police always respond this way to crowds, and things get out of hand…And I don't know how the strategy doesn't change.  And I'll tell you right now I've made calls requesting that the strategy change and it still has not."

22.     On May 26, 2020, another Minneapolis Councilmember denounced the police use of chemicals and projectiles.  Councilmember Andrew Johnson stated: "What I saw from some of the scenes last night looked to be disproportionate and escalating force…It's extremely concerning, and we need answers and accountability for that."

90911601.1

23.     Certain areas of Minneapolis incurred more destruction in the protests than others.  The Wall Street Journal described the Longfellow neighborhood as "the epicenter of protests over the death of George Floyd."[1]

24.     Ethan, being a long-term Twin Cities resident, decided to join his mother, Anne, in an effort to help to restore and heal their community and support the calls for systemic change.

25.     Ethan and Anne were informed about a community clean-up in the Longfellow neighborhood via Facebook.

26.     The pair was particularly interested in this area as it was close to where they lived in previous years.  The area was important to Ethan's youth, shaped who he is today and brought back memories of renting movies at the old Blockbuster (turned into the AutoZone that burned during the protests).

27.     In mid-afternoon on May 28, 2020, Ethan and Anne – a registered nurse – traveled to the Longfellow area, near the heavily damaged Target store located at 26th Avenue South and Lake Street, to assist other volunteers in clean-up efforts.  The clean-up was organized by MAD DADS and religious leaders.

28.     No curfew or restrictions were in place in Minneapolis on May 28, 2020.

29.     The first nighttime curfews in Minnesota were not announced until Friday, May 29.

---

[1] https://www.wsj.com/articles/george-floyds-death-the-minneapolis-neighborhood-at-the-center-of-protests-11590774160

90911601.1

30.    In his Emergency Executive Order 20-67, Minnesota Governor Tim Walz imposed nighttime curfews in Minneapolis, St. Paul and surrounding communities for May 29-30, 2020.

31.    As the Executive Order noted, "thousands of Minnesotans have expressed their frustration in a peaceful and constructive manner."

32.    Ethan and his mother were such individuals and engaged in a peaceful clean-up for several daytime hours on May 28.  They were there for two messages: 1) to support the calls for systemic change by protesters; and 2) to support the neighborhood.

33.    While areas shown by the media depict buildings ablaze and violence and chaos at each turn, video from the clean-up depicts an area very different.

34.    Video from the May 28 clean-up depicts an area that was not chaotic.

35.    Video from the May 28 clean-up depicts an area that was devoid of looting or people destroying property.

36.    Instead, video from the clean-up depicts music playing and the sun shining, with people working together to restore the Longfellow neighborhood.  Several Minneapolis police officers were present as onlookers, with no body language suggesting they faced any threat from the clean-up crew.

37.    Then, around 5:30 pm – everything changed – a number of Minneapolis police squad vehicles and officers urgently arrived at the area.  Whatever their reason, it was *wholly unrelated* to Ethan and his mother.

38.    Portions of the scene, as well as events leading up to and following the shooting of Ethan (including a portion of the shot itself), were captured on video by 9 News

– Australia, which had sent a crew to Minnesota in the wake of the killing of Mr. Floyd.

Australia and its inhabitants have been increasingly aware of and concerned about policing in

Minneapolis in particular because of the murder of one of their own, Justine Maia Ruszczyk,

by a Minneapolis police officer in 2017.

39.     Waves of MPD officers continued to arrive in the area, as depicted in the

below stills from the video captured by the Australian news team:





40.     It did not matter that Ethan and many other people were there to help

support the peaceful protesters and restore and heal the community, because the City's

severe and pervasive history of police misconduct and unchecked excessive force prevailed again.

41.     The City has long ignored the problem and, so, the outcome befalling Ethan was not surprising and was as City leadership seemed to implicate, as shown in the above quotes from Councilmembers.

## THE SHOOTING OF ETHAN

42.     On the video at approximately 8:26,[2] Ethan and Anne can be seen standing peacefully by as the MPD officer presence increased, as denoted by the red arrow below:



43.     At some point after the waves of officers swarmed the area, another individual went down and required medical attention.

---

[2] The timestamps referenced herein are from the video clip of the incident captured and aired on 9 News.  The times are elapsed times from the video play and are not references to the time of day.

90911601.1

44.     The individual requiring said medical attention was just west of where Ethan and Anne were standing at 8:26, depicted by the yellow arrow in the photograph in paragraph 42 and as noted in red on the map below:



45.     Anne, being a nurse, wanted to provide aid.

46.     At approximately 8:46 on the 9 News video, Anne went to do so, peacefully, and informed the group – including MPD officers – around the downed individual that she was a nurse, even offering to show her hospital identification badge:



47.     At approximately 8:54, the video depicted Ethan standing by, allowing his

mother to provide aid:



48.     Around 8:56 on the video, Ethan walked over to assist his mother, as depicted

below:



49.     Ethan had not committed any crime and was never charged with any crime.

50.     Ethan had not displayed any aggression.

51.     Ethan was unarmed.

90911601.1

52.     Ethan posed no threat to the officers or anyone at the scene.

53.     The scene depicted officers standing passively by.

54.     The scene was not chaotic.

55.     The scene, as visually depicted, does not contain rioters or looters.

56.     Yet, at approximately 9:01 on the video, Ethan was shot by Defendant Doe 1, who fired a tear-gas canister directly at Ethan's face.

57.     A cloud of tear-gas smoke erupted due to Defendant Doe 1's shot:



58.     None of the Defendants or any other MPD officer at the scene gave any warning to Ethan.

59.     None of the Defendants or any other MPD officer at the scene gave any directions to Ethan.

60.     None of the Defendants or any other MPD officer at the scene gave any commands to Ethan.

61.     In order to shoot Ethan with a tear-gas launcher, Defendant Doe 1 had to execute a series of volitional acts.

62.    Defendant Doe 1 volitionally held the launcher in firing position, requiring his non-firing hand to hold the foregrip of the launcher and placing his firing hand on the pistol grip of the launcher.

63.    Defendant Doe 1 volitionally moved the safety lever on the launcher from the "safe" position to the "fire" position.

64.    When the safety lever of the launcher is in the "safe" position, a finger cannot be placed on the trigger.

65.    When the safety lever of the launcher is in the "safe" position, the trigger is unable to be moved rearward.

66.    It is only when the safety lever is in the "fire" position that a finger can be placed on the trigger, making the launcher ready to fire.

67.    Defendant Doe 1 volitionally inserted his finger inside the trigger guard.

68.    Defendant Doe 1 volitionally aimed the weapon at his intended target – Ethan's face.

69.    Defendant Doe 1 volitionally placed his finger on the trigger.

70.    Defendant Doe 1 volitionally exerted sufficient trigger-pull pressure to fire the launcher loaded with tear-gas canisters at Ethan.

71.    Defendant Doe 1 volitionally fired at Ethan's face.

72.    Defendant Doe 1 volitionally did so while Ethan and others were in close range – within several feet.

73.    Ethan was struck in the right eye orbit and socket by the tear-gas canister fired by Defendant Doe 1 and the explosion knocked him out of his shoes.

74.     Ethan immediately fell to the ground and grabbed his face.

75.     Ethan experienced the deflation of his globe and immediate vision loss in his right eye.

76.     Tear gas "paste" entered his eye socket with the partial collapse of his globe and effaced the interior of the eyelids, as well as the socket.

77.     At 9:05 on the video, Ethan – still covering his eye and in excruciating pain – hobbled to safety, away from Defendant Doe 1 who had just severely and permanently injured him:



78.     Eventually, Anne located her son and realized the obvious and serious nature of Ethan's injuries.

79.     While bystanders were screaming at Defendants Does 1-6 and other MPD officers to render Ethan aid, they did nothing.

80.     Instead, his mother and another nurse (a stranger) began providing aid to Ethan.

81.     Another stranger – a teenager and aspiring medical worker – heard pops and then was drawn to Ethan as he retreated from the police presence and to safety.

82.     The teenager observed a significant amount of blood pouring from Ethan's head and face and she went to assist the two nurses.

83.     Ethan was in obvious and acute medical distress.

84.     Ethan was covered in the orange paste created by the tear-gas canister.

85.     Eventually, a good Samaritan located Ethan and his mother, who were loaded into his vehicle.  The good Samaritan then feverishly drove them to the Emergency Department at M Health Fairview.

## THE UNAUTHORIZED USE OF DEADLY FORCE

86.     Defendant Doe 1's actions contravened MPD training regarding the use of the launcher and the chemical agent.

87.     Defendant Doe 1's actions contravened MPD policies regarding the use of the launcher and the chemical agent.

88.     Defendant Doe 1's actions contravened numerous pertinent manufacturer guidelines with regard to the use of the launcher.

89.     Upon information and belief, Defendant Doe 1 was armed with and shot Ethan with a FN303 launcher or similar product.

90.     MPD Policy 5-313(A)(2), states as follows:

> Chemical agents, regardless of canister size, **shall only be used against subjects under the following circumstances**:

a) On subjects who are exhibiting *Active Aggression*,[3] or;

b) For *life saving purposes*, or;

c) On subjects who are exhibiting *active resistance* in order to gain control of a subject and if lesser attempts at control have been or would likely be ineffective, or;

d) During crowd control situations only when authorized in accordance with P&P 5-312 Force During Civil Disturbances

(emphases added).

91.     None of the permissible uses of the chemical agent in Policy 5-313(A)(2) applied to Ethan.

92.     Nor did any of the permissible uses of the chemical agent in Policy 5-312 apply to Ethan.[4]

93.     The applicable manufacturer guidelines, as well as MPD training and policies, mandate that the launcher **never** be aimed toward the neck or head of the target because engaging such regions of the body may result in permanent injury and/or death to the target.

94.     The applicable manufacturer guidelines, as well as MPD training and policies, mandate that when the shooter is in close range **(within 5 meters)** of the target, he or she must aim lower than center mass, preferably toward the thighs.

---

[3] "Active Aggression" is defined under MPD Policy 5-302 as "[b]ehavior initiated by a subject that may or may not be in response to police efforts to bring the person into custody or control. A subject engages in active aggression when presenting behaviors that constitute an assault or the circumstances reasonably indicate that an assault or injury to any person is likely to occur at any moment."

[4] If the MPD claims this policy applied to Ethan, then additional documentation for said use would be required under Policy 5-312(D).

95.     Defendant Doe 1, in contravention of policies, training and manufacturer guidelines for the launcher, aimed the launcher at Ethan's face while he was in close range.

96.     Defendant Doe 1 utilized deadly force when no force was authorized, and this was clearly established law as of May 28, 2020 in the United States America.

## CRAVEN COWARDS: THE POST-INCIDENT CONDUCT OF DEFENDANTS DOES 1-6

97.     The events surrounding the shooting of Ethan became particularly suspicious when all of the MPD officers at the scene, including Defendants Does 1-6, failed to render aid to a seriously injured person with blood and other fluids flowing from his right eye and nose.

98.     These actions and inactions were more than immoral; they were inhuman.

99.     The involved officers, who did not care about Ethan's constitutional rights, showed they had no concern about him as a human being who was acutely injured – a person they had sworn "to protect with courage and serve with compassion." While they abandoned their duty to the Constitution, they also abandoned their humanity in order to shield their identity and avoid the consequences of even providing aid for what could have been a fatal wound.

100.     Similarly, and not surprisingly, none of MPD's policies were followed by Defendants Does 1-6 in the moments *after* the shooting of Ethan.

101.     This was no isolated occurrence.  MPD has allowed its officers to get away with policy and constitutional violations without fear of repercussion for decades (at least).

102.    The failure to report, or to accurately report, the use of deadly force by MPD officers occurred repeatedly in the days following George Floyd's death by the Minneapolis Police Department.

103.    Indeed, the same pattern repeated with regard to the blinding of Soren Stevenson, a peaceful, law-abiding protester exercising his First Amendment rights during daytime hours on University Avenue on Sunday, May 31, 2020, a mere three days after Ethan was blinded, when an unknown MPD officer or officers fired without warning a "less lethal" projectile directly into Soren's eye, destroying it, then failed to render him any aid or properly document the incident.

104.    This was completely antithetical not only to the stated goals of transparency and accountability embodied in the MPD Policy and Procedure Manual, but also to Chief Arradondo's public pronouncements in the wake of George Floyd's murder.  Those pronouncements were mere lip service given MPD's long and unremedied history of flouting the Constitution.

105.    The central tenet of MPD's Policies and Procedures is to enable the MPD, the involved citizens, and the public to learn:

- What acts each MPD officer took
- What use of force was employed
- What weaponry was used and in what fashion
- If any MPD officer injured any individuals
- If and what aid was rendered by any MPD officer

106.    Yet, there has been *no* such transparency with regard to Ethan's incident, in an effort to *prevent* accountability.

107.     For example, under Policy 5-313, officers are to help those they injure with the use of their chemical agents.

108.     Policy 5-313(B)(1) states that "post exposure treatment for a person that has been exposed to the chemical agent **shall include one or more of the following**:

- Removing the affected person from the area of exposure
- Exposing the affected person to fresh air
- Rinsing the eyes and skin of the affected person with cool water (if available)"

(emphasis added).

109.     Under Policy 5-313(B)(2), "[s]worn employees shall keep a person exposed to the chemical agent under close observation until they are released to medical or other law enforcement personnel."

110.     Defendants Does 1-6 wholly failed to comply with Policy 5-313(B)'s requirements for the treatment and aid for chemical agent exposure.

111.     Additionally, upon information and belief, Defendants Does 1-6 either failed to follow MPD policies with regard to report writing and supervisor notification *or* falsified reports, utilizing systematic buzz words and phrases in an attempt to conceal the unauthorized use of deadly force on Ethan.

112.      Defendant Doe 1's unauthorized use of deadly force caused injury to Ethan and therefore, under Policy 5-306, Defendant Doe 1 was **required** to document the use of force in a CAPRS Report entitled "FORCE" *and* notify a supervisor.

113.     Additionally, Defendant Doe 1 was to remain on the scene during said required notification of the supervisor.

18

114.    The "FORCE" CAPRS report was to be "completed as soon as practical, **but no later than the end of that shift."**

115.    Further, Policy 5-306 required supplements describing the use of force incident, in detail, to be completed.

116.    And, Policy 4-602(A) mandated that "[a] short public narrative statement describing the offense or incident" shall be prepared.  Yet even this simple synopsis of events was not completed with regard to both Ethan and Soren Stevenson.

117.    If the applicable MPD policies outlined above had been followed, the following information would be readily available:

- A description of the scene and events leading up Defendant Doe 1 pulling the trigger
- The identity of shooter
- The identities of witness officers
- The identities of lay witnesses at the scene
- The treatment and aid rendered by MPD officers (if any)
- A description of the injuries Ethan suffered
- Identification of the launcher used and projectile deployed by the shooter

118.    But rank-and-file MPD officers have felt free to flagrantly violate subjects' constitutional rights under department-wide reporting methods to cover up their misconduct.

119.    Despite policies stating otherwise (*see* MPD Policy 5-105 – requiring officers to "immediately report any violation of rules, regulations or laws that come to their attention, including force-related misconduct"), candor with regard to fellow officers' obvious constitutional violations is nonexistent at the MPD.

120.    Instead, rank-and-file MPD officers (and beyond) have helped said unconstitutional actors to hide behind the Blue Wall of Silence, even where the officer becomes a convicted murderer.

121.    MPD officers have been instructed by their Union (the Minneapolis Police Federation) not to aid in investigations into other officers, and they follow said instruction.[5]

122.    The supervisory defendants and policymakers at the City of Minneapolis and the Minneapolis Police Department had actual knowledge of the constitutionally infirm reporting and lack of adherence to MPD policies among officers or were deliberately indifferent to the need for proper reporting by turning a blind eye.

123.    Not only are MPD officers routinely not disciplined when they fail to truthfully report the unauthorized use of deadly force or fail to cooperate with investigations into fellow officers, the Minneapolis Police Federation is actively encouraging them to do so.

124.    Other than lip service, there has been no response by the City and Chief Arradondo to curb this practice of behavior by MPD officers and the Minneapolis Police Federation.

125.    Consequently, Federation members know that they can act in the above-described ways with complete impunity.

126.    The actions of the uncooperative and policy-violating MPD officers, and the failures of the City and Chief Arradondo to discipline the officers for such conduct, fly in

---

[5] https://www.startribune.com/noor-trial-unfolding-amid-debate-over-blue-wall-of-silence/508574012/

90911601.1

the face of MPD's Code of Conduct, embolden officers to act without regard for the rights of citizens, and were a moving force behind the deprivation of Ethan's federal civil rights.

127.    Defendants Does 1-6's conduct toward Ethan on May 28 in the third precinct foreshadowed the officers' conduct toward Soren Stevenson in the first precinct on May 31.

128.    Some combination of the failure to report, the failure to report truthfully, the Blue Wall of Silence, and the failure to cooperate in investigations has occurred here.

129.    Defendants Does 2-6 actively encouraged Defendant Doe 1's use of excessive force by colluding with Defendant Doe 1 and one another to eschew report writing and supervisor notification, or to fail to report truthfully.

130.    Defendants Does 1-6 used the absence of report writing and supervisor notification or the absence of truthful report writing to frustrate Ethan's assertion of his civil rights.

131.    Defendants Does 1-6 used the absence of report writing and supervisor notification or the absence of truthful report writing to skirt responsibility and accountability for their actions and inactions on May 28, 2020.

132.    Defendants Does 7-8, the City and Chief Arradondo have acquiesced in said collusion by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

133.    Defendants Does 7-8, the City and Chief Arradondo have acquiesced in further frustration of Ethan's civil rights by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

21

134.   Defendants Does 7-8, the City and Chief Arradondo have acquiesced in the unauthorized use of deadly force by Defendant Doe 1 going unpunished by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

135.   Defendants Does 7-8, the City and Chief Arradondo have acquiesced in numerous additional policy violations by Defendants Does 1-6 going unpunished with regard to the events surrounding the shooting of Ethan.

136.   The supervisory defendants were causally and directly involved in the violation of Ethan's constitutional rights.

137.   As a result of the department-wide reporting and cover-up methods, Ethan has been unable to identify the shooter – Defendant Doe 1 – by name.

138.   Further, from the video captured by the Australian news team, it is clear that multiple officers in the area of the shooting of Ethan were equipped with body-worn cameras (BWCs).

139.   MPD policies required that the officers at the scene have their BWCs in recording mode because the following applied to the subject incident:  in-person contact by officers, use of force by officers, use of deadly force by officer and the situation amounted to a critical incident as defined by MPD policy.  *See* Policy 4-223.

140.   In the event that the BWCs were not in recording mode prior to the shooting of Ethan, they were required to be "activated as soon as it [was] safe to do so" under Policy 4-223(5)(6)(a)(vii).

22

141.    The digital audio-video evidence that the BWCs were to have collected from the scene was to be uploaded at the conclusion of the officers' shifts with the proper classification that linked it to the proper incident under Policy 4-223(8)(a)-(d).

142.    Failsafes in the MPD BWC policy also would ensure that some information regarding the event was reported in case all of the officers at the scene of Defendant Doe 1's shooting of Ethan had failed to put their BWCs in recording mode. *See* Policy 4-223(6)(d).

143.    However, rank-and-file MPD officers have felt free to violate MPD's policies with regard to BWC usage, which dovetails with the department-wide cover-up methods described above.

144.    The supervisory defendants and policymakers at the MPD and the City of Minneapolis had actual knowledge of policy violations among officers with regard to the BWCs or were deliberately indifferent to the need for proper use or reporting of the failure to activate the BWCs by turning a blind eye.

145.    To date, despite many efforts, Ethan has been unable to obtain any BWC footage of the incident from the MPD or the City.

146.    Ethan, by and through his counsel, has made repeated attempts to identify the officer or officers who fired at him.

147.    Ethan's counsel has sent letters describing these events in detail, with video imagery, and asked for assistance in locating all recordings and any reports relevant to the incident and the aftermath to Chief Arradondo, the City Attorney's Office and the Minnesota Bureau of Criminal Apprehension.

90911601.1

148.    Similarly, Ethan's counsel has made calls and sent emails to County and City officials inquiring what, if any, progress has been made in identifying the offending officers.

149.    Additionally, a public data request was submitted by Ethan's counsel, as they were instructed to do by the City.

150.    Despite these entreaties, Ethan has received nothing and therefore neither the shooter nor any of the other involved officers has been identified.

151.    Ethan's counsel has been informed by the City Attorney's Office only that a BWC video from the scene exists, and at least one report was written in which the shooter is identified.

152.    Yet, the City has not released this information, ostensibly due to the existence of an investigation into the circumstances surrounding Ethan's shooting.

153.    Such investigations have not prevented the City from releasing BWC footage or incident reports in the past when it was convenient for the City to do so, such as in connection with the death of George Floyd.

154.    The City, the City Attorney's Office, and the MPD have instead shielded this information from Ethan – the victim, blinded by Defendant Doe 1's unauthorized use of deadly force.  They have further blinded him from justice.

155.    The Blue Wall of Silence remains alive and well, operating as it has historically, within the MPD and the City.

156.    The lack of consequences imposed upon MPD officers who protect their own or who, in violation of their sworn duties as peace officers, fail to cooperate with

90911601.1

investigations into such matters ensures that the Blue Wall of Silence remains intact. Chief

Arradondo has repeatedly failed to hold such officers accountable.

157.    Numerous MPD officers and the City continue to hamper the Ethan's ability

to investigate and vindicate his civil rights.

158.    MPD Policy 5-101.01 provides that:

The integrity of police service is based on truthfulness. Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer.

MPD employees shall not willfully or knowingly make an untruthful statement or knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation.

These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business.

MPD employees are obligated under this policy to respond fully and truthfully to questions about any action taken that relates to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business

159.    The MPD's continued failure to discipline officers, through policymakers

Defendants Does 7-8 and Arradondo, causes MPD officers to act with impunity and without

due regard for the Constitution and laws of the United States. The consequences of this are

becoming all the more apparent and pervasive.

## ETHAN'S INJURIES

160.    Ethan presented to the West Bank Emergency Department, where he was evaluated emergently by Ophthalmology and brought to the operating room for immediate repair of his right eye globe rupture.

161.    The tear gas "paste" that remained inside Ethan's eye affected those attending to him in the ER.

162.    Ethan was then transferred to the East Bank and was admitted to the Trauma unit with the right globe rupture and the following additional injuries: right orbital floor fracture, nondisplaced right supraorbital fracture, nondisplaced right lateral orbit fracture, comminuted fracture of the right maxillary sinus and a minimally displaced nasal bone fracture.

163.    Imaging depicting Ethan's severe injuries, including the complete orbital floor fractures and permanent damage to the retina and cornea, is shown below:

90911601.1



164.     Ethan also suffered a complex and difficult concussion.

165.     The treatment of his injuries will be a long road – including numerous surgeries such as the removal of stitches on the injured right globe, cornea surgery, repair of his multiple fractures, retina surgery, tear duct surgery, a surgery to repair his double vision, and additional globe surgeries, among others.

166.     Dr. Koozekanani of the University of Minnesota has described Ethan's injuries as catastrophic and explained that he will most likely never have any vision in the eye.

167.     Because of the entry of chemical irritants into the eye socket and the interior of the eyelids, Ethan will have irritated eyelids for the rest of his life.

168.    A photograph depicting Ethan's external injuries shortly after the incident is included below:



169.    Ethan's face and eye remain physically different from what they looked like before he was shot, so much so that he does not even like to look at pictures of himself or look in the mirror.

170.    Further, Ethan's significant pain continues in many forms.

171.    Ethan's post-concussive symptoms continue.  He has begun treating with the concussion clinic at M Health.

172.   Ethan's eye itself aches constantly.

173.   The combination of monocular vision and post-concussive symptoms has been extremely difficult.

174.   Further, Ethan suffers from daily headaches, blurred vision, double vision, light sensitivity and the presence of a constant "black circle" in the center of what used to be his vision.

175.   The injuries have significantly and negatively affected Ethan's life.

176.   The combination of the changes to Ethan's vision and the pain make it difficult to focus and tire him quickly.

177.   The May 28 incident took a large toll on Ethan's mental and emotional health, for which he has sought counseling.  He often has severe nightmares and is more anxious, stressed and tearful.

178.    Further, the injuries and treatment therefor have forced Ethan to put his college education on hold.

179.   Additionally, Ethan has to constantly think about how to protect his one good eye.  This is true even when doing mundane daily activities, such as driving, because being rear-ended is an event that could cause his fragile globe to rupture.

180.   Ethan will require shatter proof glasses or goggles to protect his injured eye during many activities.  However, Ethan has not even reached that stage in his recovery because to wear goggles or glasses would be extremely painful at his fracture sites. Further, Ethan has not yet been cleared for the more strenuous activities that would require the protective eyewear.

90911601.1

181.    Ethan remains limited in the activities he can engage in because he cannot risk a left-eye injury.  This means no basketball, no baseball, no hockey – some of his favorite pastimes.  This also means Ethan is more isolated from his friends during this difficult time.

182.    Life as Ethan knew it changed due to the May 28, 2020 shooting.

183.    Ethan's extensive treatment, including surgical intervention during a global pandemic, continues and will for the foreseeable future.

184.    To date, Ethan's medical bills total more than $75,000.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendant John Doe 1*

185.    Ethan realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

186.    By the actions described above, Defendant John Doe 1, under color of state law, violated and deprived Ethan of his clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

187.    Defendant John Doe 1 subjected Ethan to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

188.    As a direct and proximate result of the acts and omissions of Defendant John Doe 1, Ethan suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

30

90911601.1

189.    Punitive damages in an amount exceeding $5,000,000 are available against Defendant John Doe 1 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

190.    Ethan is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – FIRST AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendants John Does 1-6*

191.    Ethan realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

192.    Ethan engaged in constitutionally protected acts of speech and assembly in the form of clean-up and restorative efforts in Minneapolis, in addition to observing the conduct of law-enforcement officers on duty in a public space.

193.    Defendants John Does 1-6, under color of state law, retaliated against Ethan for engaging in said constitutionally protected activity.

194.    Ethan's First and Fourteenth Amendment rights were violated when he was deliberately targeted and shot with tear gas during the course of his clean-up and restorative efforts, and in the cover-up perpetrated by Defendants John Does 1-6 afterward.

195.    The conduct of Defendants John Does 1-6 would chill a reasonable person from continuing to engage in constitutionally protected activity and certainly have chilled Ethan from continuing to participate in and observe any clean-up or restorative community

event, in addition to standing with his former Minneapolis community during this difficult time in the wake of the killing of George Floyd and observing MPD conduct.

196.   Defendants John Does 1-6 subjected Ethan to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

197.   As a direct and proximate result of the aforementioned unconstitutional conduct, Ethan has been damaged in an amount exceeding $5,000,000.

198.   Punitive damages in an amount exceeding $5,000,000 are available against Defendants John Does 1-6 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

199.   Ethan is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### 42 U.S.C. § 1983 – CONSPIRACY TO INTERFERE WITH THE ASSERTION OF ETHAN'S RIGHTS UNDER THE CONSTITUTION AND 42 U.S.C. § 1983
### *Plaintiff v. Defendants John Does 1-6*

200.    Ethan realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

201.   Defendants John Does 1-6 agreed either to improperly report, or not report at all, the incident regarding Ethan.

202.   Defendants John Does 1-6 improperly reported, or did not report at all, the incident regarding Ethan.

32

203.     Defendants John Does 1-6 did so in concert and with the intent to shield Defendant John Doe 1 and thereby prevent the assertion of Ethan's civil rights.

204.      Defendants John Does 1-6, under color of state law, committed the above misconduct maliciously or with reckless disregard for whether Ethan's rights would be violated.

205.     As a direct and proximate result of the actions described above, which are tantamount to obstruction of justice, Defendants John Does 1-6 have conspired to interfere with and interfered with the assertion of Ethan's civil rights, and Ethan was thereby damaged in an amount exceeding $5,000,000.

206.     Punitive damages in an amount exceeding $5,000,000 are available against Defendants John Does 1-6 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

207.     Ethan is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT IV

### SUPERVISORY LIABILITY
*Plaintiff v. Defendants John Does 7-8 and Medaria Arradondo,*
*in their individual capacities*

208.     Ethan realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

209.    Defendants John Does 7-8 and Medaria Arradondo at all times material hereto were members of the Minneapolis Police Department with supervisory responsibilities over Defendants John Does 1-6.

210.    These supervisory defendants at the City of Minneapolis had actual knowledge of the constitutionally infirm force reporting in widespread use among officers.

211.    As such, rank and file, such as Defendants John Does 1-6 with regard to Ethan, freely and fragrantly violate citizens' constitutional rights using department-wide reporting methods to cover it up.

212.    The supervisory Defendants had actual knowledge of the improper reporting by Defendants John Does 1-6 regarding the Ethan incident and other similar incidents, further evidencing a policy or custom of constitutional misconduct.

213.    These supervisory Defendants, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violation of Ethan's constitutional rights by Defendants John Does 1-6.

214.    As a direct and proximate result of the acts and omissions of Defendants John Does 7-8 and Medaria Arradondo, Ethan suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

215.    Punitive damages in an amount exceeding $5,000,000 are available against Defendants John Does 7-8 and Medaria Arradondo and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

90911601.1

216.     Ethan is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### COUNT V

**CIVIL RIGHTS VIOLATIONS**
**MONELL V. DEP'T OF SOCIAL SERVICES**
*Plaintiff v. Defendant City of Minneapolis, Arradondo and Does 7-8,*
*in their official capacities*

217.     Ethan realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

218.     Before May 28, 2020, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper use of force, including deadly force.

219.     Through policymakers Defendants John Does 7-8 and Chief Arradondo, and with the department's ratification and approval, by failing to discipline all officers consistently on this point, there has been an approval of a deficient policy, custom, or practice of the improper use of force, including deadly force.

220.     Ethan's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices and the City of Minneapolis is thereby liable in an amount exceeding $5,000,000.

221.     Ethan is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

90911601.1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ethan Daniel Marks prays for judgment as follows:

1.      That this Court find that the Defendants committed acts and omissions violating the First, Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count I, a money judgment against Defendant John Doe 1 for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against the Defendants John Does 1 through 6 for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendants John Does 1 through 6 for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendants John Does 7 and 8 and MPD Chief Medaria Arradondo for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

90911601.1

6.      As to Count V, a money judgment against the City of Minneapolis for compensatory damages in an amount in excess of $5,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

7.      For an order mandating changes in the policies and procedures of the Minneapolis Police Department requiring, among other things, policy and training measures in the proper use of "non-lethal weapons," the proper reporting of use of force, adherence to policies to ensure the identities of officer-shooters and witnesses are not shielded from victims, and relations and policing with those exercising their First Amendment rights; and

8.      For such other and further relief as this Court may deem just and equitable.

Dated:  September 8, 2020         **ROBINS KAPLAN LLP**

<u>s/Robert Bennett</u>
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com

*Attorneys for Plaintiff Ethan Daniel Marks*

90911601.1