UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ethan Daniel Marks,

      Plaintiff,

v.

John Doe 1, acting in his individual
capacity as a Minneapolis Police Officer;
John Does 2-6, acting in their individual
capacities as Minneapolis Police Officers;
John Does 7 and 8, acting in their individual
capacities as supervisory Minneapolis
Police Officers; Medaria Arradondo, acting in his
individual and official capacities as the Minneapolis
Chief of Police; and the City of Minneapolis,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 20-1913 ADM/ECW

---

Robert Bennett, Esq., Robins Kaplan LLP, Minneapolis, MN, on behalf of Plaintiff.

Kristin R. Sarff, Esq., Sharda Enslin, Esq., and Heather P. Robertson, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of Defendants City of Minneapolis and Minneapolis Chief of Police Medaria Arradondo.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Defendants City of Minneapolis (the "City") and Minneapolis Chief of Police Medaria Arradondo's ("Chief Arradondo") (collectively, the "City Defendants") Motion to Dismiss [Docket No. 12]. For the reasons stated below, the Motion is granted in part and denied in part.

## II. BACKGROUND

Marks, a 19-year-old college student, alleges his constitutional rights were violated when a Minneapolis police officer fired a tear-gas canister into his face from close range. Am. Compl. [Docket No. 6] ¶¶ 1, 6, 58, 74. The tear-gas canister struck Marks in his right eye, causing

severe injury, and will likely result in permanent vision loss in the eye.  Id. ¶¶ 161–62, 164–68.

The incident occurred on May 28, 2020, three days after George Floyd died while being restrained by a Minneapolis police officer.  Id. ¶¶ 1, 13.  Floyd's death was captured on video and sparked protests throughout the city, state, and nation.  Id. ¶¶ 15–17.  The protests caused severe property destruction in Minneapolis.  Id. ¶ 17.  Most of the destruction occurred during nighttime hours.  Id.  During the day, the majority of activity was peaceful and aimed at effecting change and restoring damaged communities.  Id. ¶ 18.  Marks alleges that the Minneapolis Police Department ("MPD") responded to the protests by using tear-gas, 40 mm blunt impact projectiles, and other "less lethal" munitions on the crowds, even when the protests were peaceful.  Id. ¶ 19.  Between May 26 and May 28, 2020, three Minneapolis council members publicly denounced the MPD's "disproportionate and escalating force" being used on the protesters.  Id. ¶¶ 20-22.

On the afternoon of May 28, 2020, a volunteer community clean-up event was held for Minneapolis' Longfellow neighborhood, which had incurred the most destruction during the protests.  Id. ¶¶ 23, 27.  Marks, a long-term Twin Cities resident, attended the event with his mother, a registered nurse.  Id. ¶¶ 24, 27.  The crowd did not include looters or rioters, and no curfew was in effect on that day.  Id. ¶¶ 28, 35.

Portions of the clean-up event were captured on video by an Australian news crew which had been sent to Minnesota to cover George Floyd's death.  Id. ¶ 38; Sarff Decl. [Docket No. 15] Ex. A (Video).  The video shows a crowd of several hundred people gathered in the area.  At approximately 5:30 p.m., while Marks and his mother were at the clean-up event, several police vehicles and officers urgently arrived on the scene.  Am. Compl. ¶¶ 36, 39; Video at 2:04–2:26,

3:53–3:59.  The reporter on the scene stated that a man had been stabbed and "really needs to be in a hospital."  Video at 0:19–0:22, 1:09–1:11.  The police entered the crowd and formed a ring around the injured person.  Id. at 4:25–4:36.  The video shows officers firing tear gas and yelling, "Get back!  Get back!"  Id. at 3:13–3:13, 4:03–4:18.  The injured person was eventually lifted into a police vehicle and transported from the scene.  Id. at 6:22–6:30; 7:08–7:15.

Minutes after the injured person was evacuated, another individual went to the ground and required medical attention.  Am. Compl. ¶ 43.  Several MPD officers and others formed a group around the downed individual.  Id. ¶ 46.  Marks' mother wanted to provide aid and peacefully approached the group to inform them she was a nurse.  Id. ¶¶ 45-46.  Marks followed behind to assist his mother.  Id. ¶¶ 47–48.  As Marks approached, Defendant Doe 2 pushed his mother away from the injured individual.  Id. ¶ 54.  Marks then walked up to Defendant Doe 2, who used his baton defensively to push Marks backwards, away from the officers and the injured person.  Id. ¶ 55.  Marks was unarmed and posed no observable threat to the John Doe officers or others.  Id. ¶¶ 50, 56.  One second later, while Marks and others were within close range, Defendant Doe 1 shot a tear-gas canister into Marks' face without warning.  Id. ¶¶ 58, 60, 74; Video at 9:01–9:06.  The tear gas canister struck Marks in the right eye, and the explosion knocked him out of his shoes.  Id. ¶ 75.

A stranger drove Marks and his mother to the hospital, where he underwent immediate surgery for a right eye globe rupture.  Id. ¶¶ 87, 159.  Marks also suffered complete orbital floor fractures, permanent damage to his retina and cornea, and a complex concussion.  Id. ¶¶ 161–63.  Marks' injuries will require future surgeries, and a doctor has informed him he will likely have permanent vision loss in his right eye.  Id. ¶¶ 164-65.  Due to his injuries and treatment, Marks

3

has been forced to put his college education on hold.  Id. ¶ 177.

Marks alleges that Defendant Doe 1's aiming and firing the launcher at Marks' face while he was in close range violated MPD training and policies, which mandate that the launcher never be aimed toward the neck or head, and must be aimed lower than center mass when the shooter is within 5 meters of the target.  Am. Compl. ¶¶ 88–89, 91–94.  Marks also alleges the MPD officers at the scene did not provide him with medical assistance and failed to document the use of force, in violation of MPD policies.  Id. ¶¶ 96, 105–15 .

Marks alleges Defendant Doe 1's misconduct was caused by MPD customs of tolerating excessive force and encouraging officers not to truthfully report unlawful uses of force.  Id. ¶¶ 117–27, 217.  Marks asserts that the MPD has permitted officers "to get away with policy and constitutional violations without fear of repercussion for decades," and that the failure to report unlawful uses of force by MPD officers against protesters occurred repeatedly in the days following George Floyd's death.  Id. ¶¶ 100–101.  Marks alleges that this pattern of conduct was repeated on May 31, 2020, when an MPD officer fired a "less lethal" projectile without warning into the eye of Soren Stevenson ("Stevenson"), who was attending a peaceful daytime protest, then failed to render him any aid or properly document the incident.  Id. ¶ 102.

On September 8, 2020, Marks filed this action pursuant to 42 U.S.C. § 1983.  The Amended Complaint asserts a claim against Chief Arradondo in his individual capacity for supervisory liability, and a claim against the City and Chief Arradondo in his official capacity for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).  Am. Compl. ¶¶ 207–20 (Counts IV and V).  The City Defendants move to dismiss the claims against them for failure to state a plausible claim.

### III.  DISCUSSION

**A.  Standard of Review**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  A pleading must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–'that the pleader is entitled to relief.'"  Id. (quoting Fed. R. Civ. P. 8(a)(2)).

Ordinarily, if a district court relies on matters outside the pleadings in considering a motion to dismiss, the motion to dismiss is converted to one for summary judgment.  Fed. R.

Civ. P. 12(d).  However, the Court may consider "materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." Illig v. Union Elec. Co., 652 F.3d 971, 976 (8th Cir. 2011).  Here, the Court has considered the news crew's video footage because the footage is referenced in the Amended Complaint and its authenticity is not disputed.  See Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (stating documents alleged in complaint are necessarily embraced by complaint and thus not outside pleadings).

### B. Monell Claims Against City Defendants (Count V)

In his Monell claims against the City Defendants, Marks alleges that the City has a custom of permitting the use of excessive force, and that Chief Arradondo endorses this custom by failing to discipline all MPD officers consistently for the improper use of force.  Am. Compl. ¶¶ 217-19.

A municipality cannot be held vicariously liable under § 1983 for the unconstitutional acts of its employees.  Monell, 436 U.S. at 694.  Rather, municipal liability for a constitutional violation will only attach if the violation resulted from "an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or an employee."  Bolderson v. City of Wentzville, 840 F.3d 982, 985 (8th Cir. 2016).

Marks' Monell claims are primarily directed at an unofficial custom.  To establish the existence of a municipal custom, a plaintiff must show:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That plaintiff was injured by acts pursuant to the governmental

>entity's custom, i.e., that the custom was the moving force behind the
>constitutional violation.

Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist. St. Louis Cty., 901 F.2d 642, 646 (8th Cir. 1990). The City Defendants argue that Marks has failed to plausibly allege the first two elements of an unlawful custom claim.

**1. Continuing, Widespread, Persistent Pattern**

"[T]o be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." Id. Proving the existence of a custom requires a plaintiff to show prior incidents of factually similar unconstitutional conduct. See Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999) (rejecting custom claim where plaintiff had not shown that prior incidents bore any factual similarity to the incident at issue). Although a single incident of unconstitutional conduct is not sufficient to demonstrate a custom, the Eighth Circuit has not determined whether some other minimum number of incidents is required. Tirado v. City of Minneapolis, No. 20-1338 JRT/ECW, 2021 WL 679261, at *5 (D. Minn. Feb. 22, 2021) (citing Bolderson, 840 F.3d at 986; Burbridge v. City of St. Louis, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019)). In addition to the number of incidents of misconduct, "courts also consider the timeframe or duration of incidents when assessing whether the pattern was widespread." Id. at *6 (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986)).

The City Defendants argue that Marks has not adequately alleged the existence of an unconstitutional custom because his general allegations of "excessive force" are too broad and generic to establish a pattern of prior unconstitutional conduct that was factually similar to the conduct at issue here—namely, the unlawful use of a tear-gas canister. The City Defendants also

contend that Marks has not alleged a sufficient number of instances involving the unlawful use of tear-gas canisters to establish a widespread pattern of misconduct. The City Defendants further argue that the one-week period during which tear-gas and projectiles were allegedly used on protesters is not of sufficient duration to constitute a continuing and persistent pattern.

The Court finds that Marks has adequately alleged a custom of using excessive force on protesters. In addition to his own incident, Marks alleges that MPD officers used improper force including tear-gas and projectiles at protests in the days following George Floyd's death. He also alleges that days before he was injured, Minneapolis council members publicly denounced the MPD's use of chemicals and projectiles on protesters. Marks further alleges that three days after his incident, MPD officers subjected protester Soren Stevenson to unlawful force in the same manner and under similar circumstances as Marks. Although Stevenson's incident occurred after Marks', the allegation lends further plausibility to the claim that a custom of excessive force against protesters existed at the time Marks' rights were violated. See Bordanaro v. McLeod, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what [customs or] policies existed in the city on the date of an alleged deprivation of constitutional right.").

The similar instances of misconduct alleged by Marks are minimally sufficient to withstand a motion to dismiss. As the Eighth Circuit has recognized, "requiring a plaintiff to allege particular instances of similar constitutional violations in order to defeat a motion to dismiss for failure to state a claim is inconsistent with the liberal system of 'notice pleading' set up by the Federal Rules." Kohl v. Casson, 5 F.3d 1141, 1148 (8th Cir. 1993) (quotations omitted). This is because "[w]hen a complaint is filed, a plaintiff may not be privy to the facts

necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." Doe ex rel. Doe v. Sch. Dist. of City of Norfolk, 340 F.3d 605, 614 (8th Cir. 2003).

Additionally, the one-week period during which similar instances of allegedly unlawful conduct occurred is long enough to plausibly allege a custom claim. A plaintiff can establish a custom "if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of" the unlawful conduct. Johnson v. Douglas Cty. Med. Dep't, 725 F.3d 825, 829 (8th Cir. 2013). Here, Marks alleges that Minneapolis council members were aware of and publicly criticized the MPD's use of force in the early days of the George Floyd protests. These alleged facts permit a reasonable inference that the City Defendants were also aware of the allegedly unlawful practice. See Tirado, 2021 WL 679261, at *7 (holding that the one-week time frame during George Floyd protests was long enough to place the City Defendants on notice of the MPD officers' alleged misconduct); Stevenson v. City of Minneapolis, No. 20-2007 SRN/TNL, 2021 WL 931186, at *4 (D. Minn. Mar. 11, 2021) (same); Armstrong v. City of Minneapolis, No. 20-1645 SRN/DTS, 2021 WL 931214, at *6 (D. Minn. Mar. 11, 2021) (same); Samaha v. City of Minneapolis, No. 20-1715 SRN/DTS, 2021 WL 931243, at *6 (D. Minn. Mar. 11, 2021) (same).

**2. Deliberate Indifference or Tacit Authorization**

To establish municipal liability based on an unconstitutional custom, a plaintiff must also show the similar incidents of unconstitutional conduct "occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." Johnson, 725 F.3d at 829. The City Defendants argue

that the temporal period of the protests that began on May 25, 2020 is too close in time to Marks' injury on May 28, 2020 to show that the City Defendants were on notice of and deliberately indifferent to the unconstitutional use of tear-gas canisters and projectiles.

The allegations in the Amended Complaint are sufficient to allege that the City Defendants had notice of the unlawful use of force on protesters and were deliberately indifferent to the alleged constitutional violations. As previously noted, multiple council members had publicly denounced the MPD's use of force against protesters days before Marks was injured. These allegations support a plausible inference that the City Defendants were on notice of the unlawful conduct and had the opportunity to change it. Although Marks does not allege specific facts about the City Defendants' deliberate indifference to or tacit authorization of the unlawful conduct, "this is likely too much to ask at the pleading stage, when all that is required is a 'possible custom.'" Tirado, 2021 WL 679261, at *8; accord Stevenson, 2021 WL 931186, at *5.

Resisting this conclusion, the City Defendants argue that the City was rocked by extreme chaos and destruction during the time frame of the George Floyd protests, and that under these circumstances a purported failure to remedy alleged misuses of tear-gas canisters or projectiles within a limited time frame does not give rise to a reasonable inference of deliberate indifference. At this stage in the proceedings, however, the Court views the pleadings in the light most favorable to Marks and concludes that the allegations in the Amended Complaint are sufficient to plausibly infer that the City Defendants were deliberately indifferent to the alleged constitutional violations.

Because the Amended Complaint plausibly alleges that the MPD had a custom of using

excessive force against protesters and that the City Defendants had notice of, but were deliberately indifferent to, the police misconduct, the City Defendants' Motion to Dismiss is denied as to the Monell claim (Count V).

## C. Supervisory Liability Claim Against Chief Arradondo (Count IV)

Marks also asserts a supervisory claim against Chief Arradondo in his individual capacity. Am. Compl. ¶¶ 207–15. Marks alleges that Chief Arradondo failed to enforce policies regarding report writing or to impose discipline for policy violations, which emboldened officers to violate citizens' constitutional rights. Id. ¶¶ 123, 125, 131–33, 155, 210, 212.

A supervisor may be individually liable under § 1983 if the supervisor "directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001) (quoting Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996)). Individual liability for a failure to properly supervise or train requires a plaintiff to show that the supervisor: "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [the plaintiff]." Perkins v. Hastings, 915 F.3d 512, 524 (8th Cir. 2019) (quoting Brewington v. Keener, 902 F.3d 796, 803 (8th Cir. 2018)). "To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) (quoting Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir.2006)) (alteration in original).

Here, Marks has not alleged factual content that would permit a reasonable inference that

Chief Arradondo directly participated or was personally involved in the alleged deprivation of Marks' constitutional rights. Although the Amended Complaint asserts that Chief Arradondo was "directly involved" in violating Marks' rights, no facts are alleged to support this conclusory allegation. Am. Compl. ¶ 135. Marks does not allege Arradondo was present when Marks was shot with the tear-gas canister or that he engaged in any other action that could be conceived as directly participating in the alleged violation of Marks' constitutional rights. See Brossart v. Janke, 859 F.3d 616, 627 (8th Cir. 2017) (holding sheriff did not directly participate in alleged use of excessive force because sheriff was not present when plaintiff was tased).

Nor has Marks alleged facts that would plausibly infer that Chief Arradondo had direct responsibility for the alleged violation. For example, Marks does not allege that Chief Arradondo personally trained or directly supervised the John Doe officers allegedly involved in his injuries.

In Stevenson, a supervisory liability claim against Chief Arradondo that was premised on nearly identical allegations to those asserted in this case, was dismissed. See Stevenson, 2021 WL 931186, at *6 ("Stevenson alleges that Chief Arradondo failed to enforce the MPD's policies regarding reporting the use of force, failed to discipline officers who used excessive force, and failed to adequately supervise the John Doe officers involved in Stevenson's injuries."). The Court in Stevenson noted that the "allegations regarding Chief Arradondo's enforcement of MPD policies and discipline imposed after instances of misconduct speak to Chief Arradondo's liability in his official capacity as Chief of Police—not his individual liability under § 1983." Id. The Court rejected the plaintiff's claim that because Chief Arradondo had supervisory responsibility over all MPD officers as Chief of Police, he may be held liable for

constitutional violations by any of the officers. The Court found that "this theory stretches § 1983 supervisory liability too far." Id. (analogously citing Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (stating "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement" for purposes of an individual capacity § 1983 claim). Similarly here, Marks' allegations that Chief Arradondo has a general responsibility for supervising all MPD officers are not sufficient to state a plausible claim for individual supervisory liability under § 1983.

Because the Amended Complaint does not plausibly allege that Chief Arradondo directly participated in the alleged violation of his rights or that he directly trained or supervised the John Doe officers allegedly involved in his injuries, the claim for supervisory liability against Chief Arradondo in his individual capacity is dismissed.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants City of Minneapolis and Minneapolis Chief of Police Medaria Arradondo's Motion to Dismiss [Docket No. 12] is **GRANTED IN PART** and **DENIED IN PART**; and

2. Plaintiff's claim against Minneapolis Chief of Police Medaria Arradondo in his individual capacity is dismissed without prejudice.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT COURT

Dated:  March 23, 2021

13