### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

Ethan Daniel Marks,                                        Civ. No. 20-1913 (ADM/JFD)

                              Plaintiff,

             v.

                                                    **PLAINTIFF'S MEMORANDUM OF
                                                    LAW IN SUPPORT OF HIS
                                                    MOTION TO EXCLUDE THE
                                                    TESTIMONY OF DEFENSE
                                                    EXPERT CHRISTOPHER GARD**

Benjamin Bauer, acting in his individual
capacity as a Minneapolis Police Officer,

                              Defendant.

---

## INTRODUCTION

Federal Rule of Evidence 702 sets standards for the admission of expert testimony. Christopher Gard—Defendant Benjamin Bauer's purported use-of-force expert—cannot meet those standards. His testimony is not helpful to the jury because his proffered opinions are pure advocacy on behalf of Bauer. If admitted, Gard will simply tell the jury who to believe, what facts to find, and what conclusions to reach. Nor are his opinions and testimony reliable, as Gard has not identified or applied any credible and verifiable generally accepted law-enforcement standards. Moreover, his testimony lacks a sufficient factual basis because he ignored critical evidence that fatally undermines his proposed conclusions. This is exactly the sort of dubious testimony that Rule 702, and Rule 403, counsel should not be allowed to improperly sway the jury. Plaintiff Ethan Daniel Marks ("Ethan") therefore moves to exclude Gard's testimony.

1

## CASE BACKGROUND

### A. Factual Background

On May 25, 2020, George Floyd was murdered in broad daylight by then-Minneapolis police officer Derek Chauvin, as his fellow officers looked on and refused to intervene. This was just one of many horrific acts of violence Chauvin committed against the community he was supposed to protect and serve. Sadly, it was also part of a pattern of unchecked racial bias and unconstitutional use of force by the Minneapolis Police Department (MPD). Video of Chauvin kneeing on George Floyd's neck until he died went viral. Protests spread throughout Minneapolis and across the world. Naturally, reactions to this appalling incident varied, including among the citizens of Minneapolis. Although some protesters caused severe destruction in Minneapolis, this occurred largely at night. In contrast, most of the daytime demonstrations involved peaceful activity calling for an end to systemic racism, particularly at the hands of police. In fact, many citizens were inspired towards healing and gathered to clean-up and restore communities damaged by rioting and looting.

On May 28, 2020, Ethan and his mother Anne joined one such volunteer clean-up event organized by MAD DADS and religious leaders in Minneapolis's Longfellow neighborhood. Bennett Decl. Ex. S, Deposition of Anne Marks ("Anne Depo.") 155-59. Anne is a Registered Nurse. *Id.* 23. Ethan was a nineteen-year-old college student at the time. Bennett Decl. Ex. O, Deposition of Ethan Marks ("Ethan Depo.") 19-20. The two spent several hours that sunny afternoon cleaning up outside the heavily damaged Target store at 26th Avenue South and Lake Street. *Id.* 186-87, 191-92. Though there were

sporadic incidents, the clean-up efforts were primarily peaceful and did not involve looting or property destruction.  *Id.* 188.  There was no curfew in place on May 28.  Second Amended Complaint ("Compl."), Doc. 51, ¶¶ 22-23.[1]

Nevertheless, around 5:30pm, waves of MPD squad vehicles and officers arrived in the area.  *Id.* ¶¶ 31, 33.  The MPD's drastically increased presence included SWAT officers, some armed with 40-millimeter "less-lethal" launchers, which are 25-inch-long firearms with 14-inch rifled barrels designed to fire a variety of less-lethal—but not *non*-lethal—munitions, including blunt-impact projectiles and projectiles containing chemical irritants. Bennett Decl. Ex. T; Ex. I, ("Training Review") MPLS_MARKS007652, 007700-007708; Ex. L, Deposition of Kevin Angerhofer ("Angerhofer Depo.") 9 (not non-lethal); Ex. M, Deposition of Benjamin Bauer ("Bauer Depo.") 23 (same).  Benjamin Bauer was one of these officers.  Compl. ¶¶ 39-40.  Bauer was assigned to SWAT 1280 as part of the Strike Team One.  *Id*.  He was armed with a 40-millimeter less-lethal launcher, enhanced with an optical sight for precision aiming, and was carrying various direct-impact rounds.  *Id.* Bauer had no qualms about using this weapon.  He fired approximately 500 hundred less-lethal rounds from May 26 to May 31, 2020.  Bauer Depo. 27-29.  For perspective, that is about 13% of the total rounds fired by the entirety of MPD SWAT during the George Floyd protests.  Angerhofer Depo. 85.  Before he shot Ethan that day, Bauer had already fired on several other targets with his 40-millimeter launcher.  Bennett Decl. Ex. A, ("Bauer BWC")

---

[1] Citations to the Second Amended Complaint are to factual allegations that Bauer admitted in his Answer, Doc. 55, and are therefore undisputed.

17:34:39-17:35:06.[2]   Immediately when he arrived on scene, Bauer jumped out of the squad vehicle, said "fuck it," and started firing.  *Id.*

Meanwhile, an individual went down in the crowd and required medical attention near where Ethan and his mom peacefully stood by as MPD swarmed the area.  Compl. ¶ 36.  What follows was captured by the bodyworn cameras (BWCs) of Officer Jonathan Pobuda and Bauer, and by a bystander who posted a video to Twitter.  Bauer BWC 17:39:38-17:41:11; Bennett Decl. Ex. B, ("Pobuda BWC") 17:40:13-17:40:53; Ex. C, ("Twitter Video").  As the videos reflect, Anne went over to offer her help as a Registered Nurse.  No one in the group assisting or surrounding the injured woman was rioting or throwing projectiles.  In fact, helpful citizens made a perimeter to keep on-lookers back.  Ethan hung back and waited passively while his mom tried to render aid, as captured on Pobuda's BWC:



---

[2] The BWC videos are imprinted with a time stamp in the upper right corner.

Pobuda BWC 17:40:26.   Pobuda approached Anne and pulled her backwards.   *Id.* 17:40:23-17:40:33.   She turned and told him, "I'm a nurse. Let me help."   *Id.*   Rather than let her assist, Pobuda shoved Anne and ordered her back.   *Id.*   After Ethan saw Pobuda push his mother, he walked over and shouted, "back up, bitch" at Pobuda.   *Id.*   He grabbed hold of Pobuda's baton and a brief tussle ensued, during which Ethan made contact with Pobuda's helmet and gas mask.   *Id.* 17:40:34-17:40:36; Bennett Decl. Ex. N, Deposition of Jonathon Pobuda ("Pobuda Dep.") 20-21.   But Pobuda forcefully pushed Ethan backwards.   Pobuda Depo. 20-21.   Pobuda, who is six feet tall and weighs 265 pounds, easily distanced himself from the smaller Ethan.   *Id.* 4, 33.   At no point did he lose control of his baton.   *Id.* 2; Bauer Depo. 148.   Pobuda was not injured in the momentary struggle. Pobuda Depo. 20, 26.   Pobuda thought a forceful shove was the appropriate level of force to handle Ethan's actions.   *Id.* 42, 69.   He did not think it was necessary to hit Ethan with his baton.   *Id.* 33.   After he successfully pushed Ethan away, Pobuda did not perceive Ethan as a threat, and he determined that no additional force was needed.   *Id.* 41-42.

Nevertheless, Bauer chose to raise and fire his 40-millimeter launcher at Ethan from close range.   Bauer BWC 17:40:34-17:40:37.   Bauer did not warn Ethan or give him any commands prior to firing the less-lethal launcher.   *Id.*; Compl. ¶¶ 74-75.   Bauer's weapon was loaded with a 40-millimeter Direct Impact OC gas round.   Bauer Depo. 17, 37, 113. The round struck Ethan in his right eye and exploded. *Id.* 202; Bauer BWC 17:40:36-17:40:39; Pobuda BWC 17:40:36-17:40:37.   As can be seen on both Bauer's BWC and the Twitter video, Bauer raised his 40-millimeter launcher until it was above parallel to the ground, ultimately pointing it at Ethan's eye before he fired:



Twitter Video 0:00:22; Bauer BWC 17:40:34-17:40:37; Bauer Depo. 201-02.  In Bauer's BWC video, Ethan can be seen directly in front of Bauer's weapon, which is pointed at Ethan's head when Bauer pulls the trigger:



Bauer BWC 17:40:36.  When Bauer shot Ethan, he was already separated from Pobuda. Bauer Depo. 198-99.  Indeed, the picture immediately above reflects that separation, showing Pobuda (wearing a helmet) to Bauer's right, visible just under the stock of Bauer's launcher, with Ethan to Bauer's left.   Additionally, a civilian in overalls and a neon vest had stepped between Ethan and Pobuda after he had shoved Ethan backwards. Pobuda BWC 17:40:36-17:40:40.  The civilian held their arms up and repeatedly told Pobuda, "It's okay" and "we're alright."  *Id.*  Over the civilian's right shoulder, the BWC captured the puff of gas as Bauer's round exploded in Ethan's right eye, causing him to fall the ground:







*Id.* Another bystander confronted Bauer immediately after he shot Ethan in the face, shouting, "Hey! Hey! Point-blank?" Bauer BWC 17:40:37-17:40:52. Bauer yelled back at the woman, "Yes!" *Id.* She repeated twice that the shot was "point-blank." *Id.*

Ethan stumbled away from the scene holding his face after Bauer shot him. *Id.* 17:40:36-17:40:44. Anne chased after him. *Id.* Neither Bauer nor Pobuda pursued Ethan to render aid or make an arrest. Pobuda Depo. 42; Compl. ¶ 87. Even after Ethan was identified as Bauer's victim months later, he was never charged with any crimes based on his brief altercation with Pobuda. Bennett Decl. Exs. J, K. Bauer caused catastrophic injury to Ethan's right eye, including a fractured eye socket and ruptured globe, as well as injuries to his head, face, nose, and a traumatic brain injury. Bennett Decl. Ex. G. His face and eye injuries cause Ethan difficulty focusing, headaches, decreased visual motor skills and depth perception, and balance problems. Damage to his trigeminal nerve—a nerve

9

that gives sensation to a large portion of his face—often becomes inflamed and causes him pain. *Id.* Ethan is in pain every single day. Ethan Depo. 314-333. In turn, these symptoms affect Ethan's ability to work, study, drive, and enjoy his daily life. *Id.* Ethan has suffered emotional distress, mental pain and anguish, anxiety, depression, and PTSD. *Id.*

MPD trained Bauer on the use of 40-millimeter less-lethal launchers and the various chemical munitions the launcher can fire. Bauer Depo. 109-121; Training Review MPLS_MARKS007699-7716. According to that training, officers should first consider targeting "Zone 1" (areas below the belt including the buttocks, thigh, calf), followed by "Zone 2" (the abdominal area):





*Id.* MPLS_MARKS007713-15; Bennett Decl. Ex. U, Deposition of Ryan McCann ("McCann Depo.") 33, 113-14.  Zone 3 (chest, spine, head, and neck) carries the greatest potential for serious or fatal injury and should *only* be targeted in a deadly force situation:



*See also, e.g.,* Angerhofer Depo. 138; McCann Depo. 17-18, 113-14.   Indeed, it is undisputed that shooting a person in the head or face with a 40-millimeter launcher is inappropriate unless deadly force is authorized.  *See, e.g.,* Angerhofer Depo. 17-18, 38, 131-32; Bauer Depo. 65, 77-78, 101, 120.

Bauer intentionally shot Ethan with his 40-millimeter launcher.   Bauer Depo. 20-24, 33-3, 143.   He has admitted, and his BWC confirms, that both Zone 1 and Zone 2 were available to him at the time he shot Ethan.  *Id.* 154-55.   Still, he shot Ethan in deadly force Zone 3—his right eye.  *Id.* 202.   According to Bauer, the 40-millimeter round "went where the barrel was pointed."  *Id.* 201-202.   And it is apparent from the multiple video angles of the shooting that the barrel was pointed at Ethan's head.   However, this was not a deadly force situation; Ethan's actions toward Pobuda would not justify the use of deadly force against him.  *See, e.g.,* Pobuda Depo. 33-34, 37; Angerhofer Depo. 77, 131.

Although Bauer informed the leader of SWAT 1280, Sergeant Ryan McCann, that he fired 40-millimeter rounds on May 28, he provided no other information, including that he had shot someone in the face from close range and caused a serious injury.  Bauer Depo. 92, 136-37, 159-60.   Nor did he provide that information in the report he wrote after his shift ended on May 28.   Indeed, Bauer mentioned only that he "deployed a 40-millimeter less-lethal round at" Ethan, "striking him."  Bennett Decl. Ex. V MPLS_MARKS00585; Bauer Depo. 123-25.   He made no mention that he fired at Ethan from close range ("point-blank"); he made no mention that the round blew apart in Ethan's right eye; and he made no mention that Ethan appeared to be seriously injured. Bennett Decl. Ex. V MPLS_MARKS00585; Bauer Depo. 124-25, 159-60; McCann Depo. 46.   Most critically,

in neither his written report nor in his report to McCann did Bauer mention that he was aiming for someplace other than Ethan's eye, but the round went astray because Ethan moved.

That all changed, however, once Internal Affairs began to investigate. On January 26, 2021 – eight months after the incident, and long after Ethan had commenced the instant lawsuit – Bauer was summoned to provide a statement to Internal Affairs investigator Sergeant Aimee Linson. Bennett Decl. Ex. H. Bauer appeared for the statement along with counsel. *Id.* He then told Linson, for apparently the first time:

> Q: Okay, okay, did you recall seeing where he, where were you aiming?
> A: Uh, I was aiming more towards his torso area, um, and he was kind of falling.
>
> Q: Okay.
> A: Falling over and then it deployed.

*Id.* MPLS_MARKS007338.

### B.   Expert Report of Christopher Gard

Bauer retained Christopher Gard as a police-practice and use-of-force expert. Bennett Decl. Ex. D, Expert Report of Christopher Gard ("Gard Report"). Gard is a former police officer who spent his entire career with the Orting Police Department—a 10-officer operation in a small town outside Tacoma, Washington—including serving as chief of police from 2018 until he retired earlier this year. Gard Report Appx. 4; Bennett Decl. Ex. P, Deposition of Christopher Gard ("Gard Depo.") 48-49, 117. Now, Gard is a consultant on police use-of-force matters. *Id.* 116; Gard Report Appx. 4. This is Gard's first time testifying as a use-of-force expert. Gard Depo. 93-94. He was trained in use-of-force

analysis by the controversial Force Science Institute and its founder Bill Lewinski.[3]  *Id.* 22, 116-17.  In fact, Gard discussed and reviewed evidence regarding this case with Lewinski. *Id.* 20.

The cornerstone of Gard's expert report is that Bauer did not intentionally shoot Ethan in the eye.  He vehemently and repeatedly testified during his deposition that he would have refused to testify if he believed Bauer intentionally targeted Ethan's head.  *See* 15-16, 69, 93.  Gard reached his personal conclusion regarding Bauer's intent based on his review of the evidence.  *Id.* 15-18, 40, 43, 53, 70-71, 92, 100-101.  However, Gard chose to ignore certain portions of the record, including the deposition testimony of Officer Pobuda and Sergeant Kevin Angerhofer.  *See, e.g., id.* 5-6, 14, 21, 36, 54, 69.  Notably, Angerhofer co-wrote the training materials and trained Bauer on the less-lethal weapons and munitions at issue.  Angerhofer Depo. 21-23, 54-55.  Because Gard's entire report is based on his finding that Bauer did not intentionally shoot Ethan in the head or eye, he does not discuss or opine on generally accepted law-enforcement standards regarding deadly force.  Gard Depo. 9-10.  His report does not even mention the words "deadly force."  *Id.*

Instead, Gard offers five "Professional Conclusions:"

---

[3] *See, e.g.,* Matt Apuzzo, *Training Officers to Shoot First, and He Will Answer Questions Later*, N.Y. TIMES, Aug. 1, 2015, https://www.nytimes.com/2015/08/02/us/training-officers-to-shoot-first-and-he-will-answer-questions-later.html?_r=0; Kelly McLaughlin, *Police Training Programs Have a Pseudoscience Problem*, INSIDER, Jun. 17, 2020, https://www.insider.com/police-training-programs-have-a-pseudoscience-problem-experts-say-2020-6.

- Ofc. Bauer reported seeing a man punching at police officers who were providing security for officers attempting to load and remove a woman in apparent need of emergency medical attention. Video recordings confirmed Ofc. Bauer's perception as a man later identified as Ethan Marks was recorded quickly approaching Ofc. Pobuda, ordering Ofc. Pobuda to "back up bitch," reaching toward Ofc. Pobuda, grabbing Ofc. Pobuda's riot baton, and punching Ofc. Pobuda. It would have been reasonable for an officer witnessing this conduct to believe that Mr. Marks posed an immediate threat of bodily injury to Ofc. Pobuda.
- It would have been reasonable for an officer witnessing Mr. Marks' conduct to believe that Mr. Marks was interfering with the time-sensitive rescue efforts of the police officers involved.
- It would have been reasonable for an officer witnessing Mr. Marks' conduct to believe that force was necessary to decisively stop the threat and overcome the resistance posed by Mr. Marks.
- There was nothing depicted in the video evidence to indicate that Mr. Marks has affirmatively surrendered, was incapacitated, or was compliant prior to the discharge of the impact weapon.
- A reasonable officer could have believed that the use of the 40mm impact round was a reasonable response to immediately and decisively stop the threat posed by Mr. Marks.

Gard Report 3. According to Gard, these conclusions are an application of generally accepted standards in use-of-force analysis identified in Appendix 5 to his expert report. In his "Methodology," Gard purports to conduct a "threat assessment" using these same "generally accepted police-practices and principles." *Id.* 4. Although Gard refers to one generic MPD use-of-force policy regarding 40-millimeter launchers, he does not discuss or apply MPD policies regarding target Zones 1-3. Gard Report 6; Gard Depo. 30-32.

## STANDARD OF REVIEW

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that a qualified witness may offer an expert opinion where:

1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2) the testimony is based on sufficient facts or data;

3) the testimony is the product of reliable principles and methods; and

4) the expert has reliably applied the principles and methods to the facts of the case.

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993), the trial court must act as the "gatekeeper" to ensure that expert testimony is only admitted pursuant to Rule 702 when it is both *relevant* and *reliable*. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (Court's gatekeeping function applies to all types of expert testimony, not merely scientific experts). The proponent of expert testimony carries the burden of proving its admissibility by a preponderance of the evidence. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig*., 9 F.4th 768, 776 (8th Cir. 2021), *cert. denied sub nom. 3M Co. v. Amador*, 142 S. Ct. 2731 (2022).

Although  Rule 702 generally favors admissibility over exclusion, *In re Wholesale Grocery Prod. Antitrust Litig*., 946 F.3d 995, 1001 (8th Cir. 2019), and the Court should not "invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence," *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003), it is equally important that the court not abandon its gatekeeping function.  *See Russell v. Whirlpool Corp*., 702 F.3d 450, 456 (8th Cir. 2012) ("[T]he assumption of the gatekeeper role is mandatory, not discretionary" (citing *Daubert*, 509 U.S. at 592-93)).  The trial court is therefore afforded "great latitude" in screening expert testimony. *Id.* (citation omitted); *see also United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004) ("The district court enjoys broad discretion in its determination of relevancy and reliability. Therefore, we will reverse the district court's decision to admit the detectives' expert testimony only upon the showing of an abuse of discretion").

This gatekeeping function is of the utmost importance given the power dubious expert testimony has to sway—and potentially mislead—the jury. *Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" (citation omitted)). *Daubert* therefore emphasized that, in addition to screening expert testimony under Rule 702, the court "should also be mindful" that "Rule 403 permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* Indeed, because the jury may be misled by the aura of authority granted to experts, courts have increased leeway to exclude experts, as compared to lay witnesses, under Rule 403. *Id.*; *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011) (no abuse of discretion in excluding expert testimony with "little probative value" under Rule 403 "because its probative value was outweighed by the danger of confusion of the issues, misleading the jury . . .").

## ARGUMENT

The Eighth Circuit has "boiled down" Rule 702's screening requirement to three components. *Bair Hugger*, 9 F.4th at 777. First, the testimony must be helpful to the jury in deciding a material issue of fact. *Id.* Second, the expert must be qualified. *Id.* "Third, the testimony must be reliable or trustworthy in an evidentiary sense." *Id.* Gard's expert testimony fails at every step. First, Gard's expert opinions are not helpful because Gard impermissibly testifies about the facts, evaluates witness credibility, and offers naked legal conclusions on Fourth Amendment liability. Gard's expert testimony and report simply vouch for Bauer. Second, Gard is not qualified to opine on the use and function of 40-

millimeter less-lethal launchers. Third, Gard's opinions are not reliable or trustworthy because he ignored crucial witness testimony, failed to identify reliable law-enforcement standards, and did not reliably apply the purportedly generally accepted standards he did identify. Allowing Gard to testify would only serve to confuse and mislead the jury.

## I.   GARD'S EXPERT OPINIONS ARE NOT HELPFUL TO THE JURY.

### A.   Gard offers impermissible fact determinations.

"The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010) (quoting *McKnight v. Johnson Controls, Inc*., 36 F.3d 1396, 1408 (8th Cir. 1994)). Because determining the facts is the exclusive province of the jury, experts may not offer opinions that purport to resolve factual disputes. *Id.* at 809. Expert testimony analyzing or interpreting objective evidence that is within the jury's knowledge and experience is the quintessential example of unhelpful, and impermissible, fact testimony. *Id*. In *Lee*, the plaintiff brought a Section 1983 suit on behalf of her son, Fong Lee, who was shot and killed by a police officer. *Id.* at 806-07. The Eighth Circuit excluded an expert's testimony that, based on his interpretation of the video evidence, Lee did not have a gun in his hand when the officer shot him. *Id.* at 808-09. Because "the jury was entirely capable of analyzing the images and determining whether [Lee] had anything in his hands," such testimony "would not have assisted the jury but rather would have told it what result to reach." *Id*. at 809.

Gard's expert testimony is riddled with impermissible fact determinations that merely tell the jury what result to reach. Gard explicitly analyzes video evidence

throughout his report.   In Opinion One, he opines that "[v]ideo recordings confirmed []
Bauer's perception" and further comments on the video.   Gard Report 3.   Opinion Four is
a textbook example of an impermissible evaluation of the objective evidence: "There was
nothing depicted in the video evidence to indicate that Mr. Marks has affirmatively
surrendered, was incapacitated, or was compliant prior to the discharge of the impact
weapon."   *Id*.   In his "Methodology," Gard opines that "based on video footage taken at
the scene, [] Officer Bauer was there to perform life savings duties during intense chaos."
*Id.* 4.   Later, he describes what he perceives "[b]ody-worn camera evidence from Officer
Bauer indicates and shows."   *Id.* 5.   Gard also opines that "[w]hen moving backwards the
apparent momentum caused Mr. Marks' head to dip, which can be depicted on the video
footage from Officer Bauer's body worn camera."   *Id.*   Similarly, throughout his
deposition, Gard analyzed the video evidence to opine on where Bauer was aiming and
suggest that Ethan was falling when Bauer shot him.   Gard Depo. 15-18, 40, 43, 53, 70-71,
92, 100-01.

None of this testimony is admissible. The jury is fully capable—and has the
exclusive right—to make fact determinations based on the video evidence.   Just as the
expert in *Lee* could not analyze the video evidence to opine on whether Lee was holding a
gun, Gard cannot analyze the video evidence to opine on where Bauer was aiming.   As this
Court explained in *Elex v. Glirbas*, a police-practice expert "may not testify about his
interpretation of the squad videos, because he has no special expertise in interpreting video
images.  Analyzing video images is within the jury's knowledge and ability, thus [expert]
analysis of the videos would not assist the jury."  No. CIV. 12-3206 ADM/JJK, 2014 WL

2462811, at *8 (D. Minn. May 29, 2014) (Montgomery, J.). Gard's interpretations of the video evidence and related fact conclusions would not assist the jury, but rather would tell it what result to reach. *Lee*, 616 F.3d at 809. Such pseudo-expert testimony must be excluded.

Even where Gard does not explicitly interpret the video evidence, he purports to resolve disputed factual issues. Courts routinely exclude expert testimony in police misconduct cases "that purports to resolve disputed factual issues." *United States v. Palkowitsch*, No. 19-CR-0013 (WMW/DTS), 2019 WL 5854059, at *2 (D. Minn. Nov. 8, 2019). Although experts may offer opinions based on factual assumptions that are disclosed to the jury, expert testimony that "appears to actually adopt and endorse" one side's version of events is an "improper usurpation of the jury's role." *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014). In *Thomas*, Judge Tunheim excluded improper factual conclusions offered under the guise of expert police-practice testimony, finding that the expert's report:

> includes inadmissible opinions, as it includes both statements that directly opine on what factually occurred, and otherwise permissible expert opinions which are too intertwined with Defendants' version of events and fail to clarify that assumption. His report includes many statements that, without a disclaimer as to any assumptions he is making, sound like factual statements.

*Id.* at 1060. As the court explained, "[n]ot only are these factual determinations that are the province of the jury, they are factual conclusions that are not within [the expert's] personal experience and instead are matters to which [the parties] could testify, testimony which the jury could choose to believe or not." *Id.* Even where the expert opined purportedly based on his expertise in police-practices, his opinions were "so intertwined

with [defendant's] version of events that a jury could easily mistake them for opinions as to what actually occurred." *Id.*

Gard's expert report epitomizes the deficiencies described in *Thomas*. *Id.* at 1059. His report openly adopts and endorses Bauer's version of events. In the section entitled "Case Evaluation," Gard recounts disputed facts from Bauer's perspective as if they are true. Gard Report 3-4.[4] Because it is for the jury, not Gard, to determine the facts, this entire section is inadmissible. Additionally, the section of Gard's report entitled "Methodology" is replete with Gard's inadmissible fact testimony. Like in *Thomas*, most of Gard's testimony is "not directly tied to any expertise in police-practices, but rather appear[s] to comment directly on what occurred during the incident," including inflammatory characterizations of Ethan and favorable portrayals of Bauer. 57 F. Supp. 3d at 1060. According to Gard: "Officer Bauer responded to a violent scene with a mission to help save a person" and "was there to perform life-saving duties during intense chaos," whereas "Ethan Marks, without provocation by Officer Pobuda, actively attacked Officer Pobuda." Gard Report 4-5. Again later, Gard states:

> Officer Bauer was forced to make a quick and decisive decision in a tense, uncertain, and rapidly evolving assault on a nearby officer. When Mr. Marks, without provocation, physically assaulted one of Officer Bauer's uniformed police partners nearby, Officer Bauer responded expeditiously within tight time constraints at a fast-moving target.

---

[4] Perhaps most egregiously, Gard states that "Bauer reportedly aimed his 40 mm barrel at Ethan Marks torso, and deployed his 40 mm OC round while Ethan Marks was in motion and moving backwards." Gard Report 4. As discussed *supra*, Gard cannot testify that Bauer's weapon was aimed at Ethan's torso or about the trajectory of Bauer's shot. Rather, the jury must make these fact determinations based on the evidence presented at trial.

*Id.*  Gard is merely offering his personal take on what happened, in a manner that effectively vouches for Bauer.  These are merely exemplars.  Gard's supposed "methodology" is predominantly "statements that, without a disclaimer as to any assumptions he is making, sound like factual statements." *Thomas*, 57 F. Supp. 3d at 1059. Indeed, nowhere does Gard clarify that his opinions are based on factual *assumptions* that the jury is free to reject.  *Id.*; *see also Palkowitsch*, 2019 WL 5854059, at *2 (use-of-force expert "shall not include statements that directly opine on whether a disputed fact occurred and shall not provide any opinion without clarifying that his opinion is based on factual assumptions that comport only with [defendant's] version of events.").  Instead, his methodology is an undisclosed endorsement of Bauer's version of events.  Such testimony usurps the jury's function to determine the facts.

In the rare moments where Gard attempts to invoke generally accepted police-practices, his opinions are inextricably entwined with his impermissible factual determinations so that "a jury could easily mistake them for opinions as to what actually occurred." *Thomas*, 57 F. Supp. 3d at 1060.  For example, Gard's opinion that "Bauer's use of the impact round to stop Mr. Marks' apparent assault and to prevent him from reinitiating that assault was reasonable and consistent with generally accepted law-enforcement practices" is a thinly veiled fact determination.  Gard Report 6.  Namely, Gard is testifying that Ethan assaulted Pobuda, intended to assault him again, and that Bauer only used his launcher to defend Pobuda.

Finally, Gard's testimony should be excluded under Rule 403 because it could sway the jury to give undue weight to Gard's interpretations of the evidence.  Gard's law-

enforcement experience places him in no better position than the jury to evaluate evidence. *See, e.g., Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 241 (D. Minn. 2020) ("[W]here the subject matter is within the jury's knowledge or experience, permitting an expert to testify about the subject matter improperly lends an expert's 'aura of expertise' to the subject, which in turn prejudices the opponent of the testimony" (quoting *United States v. Arenal*, 768 F.2d 263, 269-70 (8th Cir. 1985))); *Estate of Collins v. Wilburn*, 253 F. Supp. 3d 989, 992 (E.D. Ky. 2017) (excluding expert's testimony about events captured on video because "an expert, regardless of his credentials, is no more able than a jury to view and interpret the video" and therefore the testimony "may only confuse the jury or, at worst, mislead them with his characterizations of what is on the film").  It is the jury—uninfected by Gard's misleading characterizations—that must determine the facts.

### B.   Gard's opinions depend entirely on impermissible credibility evaluations.

Gard's testimony must be excluded because it is inextricably linked to his credibility assessment that Bauer did not intend to use deadly force on Ethan.  *See, e.g.,* Gard Depo. 10-12, 15-18, 43, 55, 68-70, 78, 91, 92. Gard unequivocally agrees that it would be unjustified for Bauer to use deadly force on Ethan under the circumstances.  *Id.* 27, 58, 67, 80.  Relatedly, Gard agrees that shooting Ethan in the eye (Zone 3) would only be justified where deadly force is authorized.  *Id.* 12, 32.  Yet, Gard's expert report renders no opinion on—and does not even *mention*—the concept of deadly force.  *Id.* 9-10.  Why? Because Gard concluded based on his personal review of the evidence that Bauer did not *intend* to use shoot Ethan in the eye.  This impermissible credibility evaluation is the *sine qua non*

of his analysis: "if Officer Bauer intended to use deadly force, I wouldn't be sitting here." *Id.* 15. Consequently, his opinions "are intertwined inextricably with, and rest entirely on, [his] improper credibility determinations." *Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 88158, at *6 (N.D. Ill. Jan. 11, 2012).

For much the same reasons experts cannot opine on disputed facts, experts cannot evaluate the credibility of witness testimony. "Making credibility determinations is the exclusive role of the jury, and a jury is capable of making such determinations without the aid of an expert." *Elex*, 2014 WL 2462811, at *8 (citing *United States v. Kime,* 99 F.3d 870, 884 (8th Cir. 1996)). It is therefore well-settled "that experts are not permitted to offer opinions as to the believability or truthfulness" of witnesses. *Jordan*, 2012 WL 88158, at *4. Expert testimony regarding a person's state of mind falls into this category. As the court explained in *Lombardo v. Saint Louis City*, No. 4:16-CV-01637-NCC, 2019 WL 414773, at *10 (E.D. Mo. Feb. 1, 2019), a police-practice expert may not "speculate[] about . . . whether [plaintiff] intentionally or unintentionally kicked an officer, such testimony invades the province of the jury and will be excluded." Likewise in *Sloan v. Long*, No. 4:16 CV 86 (JMB), 2018 WL 1243664, at *4 (E.D. Mo. Mar. 9, 2018), the court held that a police-practice expert's "conclusion that plaintiff was compliant and unlikely to be attempting to strike Deputy Butler improperly assesses the credibility of the witnesses and invades the province of the jury."

So too here. Gard cannot testify—as he did *repeatedly* during his deposition—that Bauer did not intend to shoot Ethan in the eye. *See, e.g.,* Gard Depo. 11-12, 15-17, 47, 55-56, 69, 78, 92, 97. Nor may Gard repeat his mantra that Bauer shooting Ethan in the eye

was an "unintended outcome." *Id.* 12, 16-17, 53, 55, 68, 91, 97. The same goes for Gard's opinions regarding Ethan's state of mind. Gard cannot testify that "one could assume that a subsequent intent to assault Officer Pobuda or another officer with that baton could have been a possibility," Gard Report 5, or that "[t]here was nothing depicted in the video evidence to indicate that Mr. Marks has affirmatively surrendered, was incapacitated, or was compliant prior to the discharge of the impact weapon." *Id.* 3; *see also* Gard Depo. 85, 97. Ironically, Gard conceded at his deposition that he has no basis no opine on *Ethan's* state of mind—"I can't get into Marks' head. I don't know if he intended to be compliant"—despite basing his *entire expert report* on his opinion regarding *Bauer's* state of mind. Gard Depo. 46, 81. Gard cannot get into Bauer's head either. His testimony regarding subjective intent must be excluded.

Even where an expert does not opine directly on credibility, expert opinions are subject to exclusion where "they are intertwined inextricably with, and rest entirely on, improper credibility determinations." *Jordan*, 2012 WL 88158, at *3-4. In *Jordan*, the plaintiff in a police misconduct case retained a police-practices expert. *Id.* at *3. After reviewing the record, the expert accepted the plaintiff's version of events and opined that the defendant officers' actions were not reasonable or justified. *Id.* The court rejected plaintiff's argument that the opinions were "not credibility determinations *per se*, but are rather expert opinions based on Plaintiff's version of the facts." *Id.* at *4. As the court explained, "[i]t is simply not feasible to extract non-credibility opinions from the credibility opinions in [the expert's] report given that the entire report is premised on his evaluation of which witnesses are believable." *Id.* at *6. "His conclusions, therefore, are inextricably

intertwined with his credibility determinations and are not . . . merely based on factual assumptions." *Id.* Relying on *Jordan*, Judge Tunheim reached the same conclusion in *Thomas*:

> As in Jordan, much of Lego's testimony is at least phrased in a way that makes no distinction between his opinion of what, assuming that the facts occurred as Barze described them, **would have been** appropriate and what **was** appropriate. At no point in his report does Lego establish that his opinions are based on an **assumption** that Barze and Mills' version of the facts is true, but rather, he repeatedly presents his opinions **based on** a version of the facts that appears to be his own conclusions about what occurred. Thus, his testimony is more comparable to an "expert testifying that a disputed fact actually occurred or that one witness is more credible than another," rather than "an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine."

57 F. Supp. 3d at 1061 (citation omitted).

There is simply no excising the rot from Gard's report—every conclusion is tainted by Gard's impermissible conclusion that Bauer did not intend to shoot Ethan in the eye. Gard's opinions are not based on a factual *assumption* about what occurred—they are based on his personal *conclusion* that Bauer did not intend to use deadly force. As in *Jordan* and *Thomas*, Gard evaluated the evidence and decided what he believed occurred: "[i]f it was one of my officers and I was able to determine that he intentionally tried to fire on someone's head in a nondeadly [force situation], I would fire him on the spot and make him walk home." Gard Depo. 93. Without any disclaimer that his opinions merely *assume* that Bauer did not intend to shoot Ethan in the face, Gard's report is "phrased in a way that makes no distinction between his opinion of what, assuming that the facts occurred as [Bauer] described them, **would have been** appropriate and what **was** appropriate." *Thomas*, 57 F. Supp. 3d at 1061. Accordingly, Gard's "testimony is more comparable to

26

an expert testifying that a disputed fact actually occurred or that one witness is more credible than another, rather than an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine." *Id.* This is pure advocacy, not expert testimony.

And all of Gard's "opinions rise and fall with his credibility determination." *Jordan*, 2012 WL 88158, at *6. Just as in *Jordan*, "[h]ad [Gard] reached the opposite conclusion" regarding Bauer's subjective intent, "his opinions would be the opposite of those in his report." *Id.* Gard explicitly conceded as much: "if Officer Bauer intended to use deadly force, I wouldn't be sitting here." Gard Depo. 15; *see also id.* 16, 69, 93. Moreover, Gard agreed that Opinion Five would not be true if "to the face and eye" was added: "A reasonable officer could have believed that the use of the 40mm impact round **[to the face and eye]** was a reasonable response to immediately and decisively stop the threat posed by Mr. Marks." *Id.* 65. Yet, Gard does not even discuss police-practices regarding deadly force, nor does he opine on whether shooting Ethan in the face and eye was justified. Where Gard's "entire report is premised on" his unqualified conclusion that Bauer did not intend to shoot Ethan in the eye, "[i]t is simply not feasible to extract non-credibility opinions from the credibility opinions." *Jordan*, 2012 WL 88158, at *6.

Even if the Court determines that Gard's testimony is of some marginal value to the jury under Rule 702, the Court should still exclude his opinions under Rule 403. *See Schinagel v. City of Albuquerque*, No. Civ. 07-481 LH/RLP, 2009 WL 10696215, at *4 (D.N.M. Feb. 10, 2009) (applying Rule 403 to exclude expert testimony that would merely "vouch for the credibility" of the plaintiff by endorsing her version of events). Gard's

testimony will inevitably confuse and mislead jury regarding the relevance of Bauer's subjective intent. Contrary to Gard's deposition testimony, Gard Depo. 22, an officer's *subjective* intent is irrelevant to the *objective* reasonableness standard under the Fourth Amendment. *Williams v. City of Burlington*, 27 F.4th 1346, 1351 (8th Cir. 2022) ("The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation."); *Lombardo*, 2019 WL 414773, at *10 (excluding expert testimony regarding the defendant officers' intent or motive for using force "as speculative and irrelevant" because the issue under the Fourth Amendment is whether the officer's actions were objectively unreasonable, without regard for the officer's underlying intent or motivation). Permitting Gard to testify will almost certainly pass his confusion regarding the objective Fourth Amendment standard on to the jury. That is, the jury could easily be misled to accept Gard's erroneous conclusion that, so long as Bauer did not intentionally shoot Ethan in the eye, he did not violate the Fourth Amendment.

### C.    Gard offers inadmissible legal conclusions.

The Eighth Circuit has held that expert opinions about the reasonableness of officer conduct under Fourth Amendment standards are inadmissible legal conclusions. *See, e.g., Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995). Such opinions are not helpful to the jury because it is the trial court, and not an expert, that explains the law. *Peterson*, 60 F.3d at 475. Courts in this Circuit consistently exclude expert testimony in police misconduct cases that opines on the reasonableness of an officer's actions. *See, e.g., Jones v. City of*

*St. Paul*, No. CV 20-707(DSD/ECW), 2022 WL 2375777, at *6 (D. Minn. June 30, 2022)

(holding that an expert "may not testify as to whether the officers' force was excessive or

reasonable under the Fourth Amendment or otherwise failed to meet legal standards. Nor

may he testify as to any legal conclusions he may have reached in any aspect of his

proposed testimony."); *Redd v. Abla–Reyes,* Civ. No. 12–465, 2013 WL 6036697, at *2

(D. Minn. Nov. 14, 2013) (same); *Thomas*, 57 F. Supp. 3d at 1062-63 (same); *Elex*, 2014

WL 2462811, at *8 (same); *Sloan*, 2018 WL 1243664, at *3 (same).

Three of Gard's opinions stand out as clearly impermissible legal conclusions

regarding the reasonableness of Bauer's conduct:

> It would have been reasonable for an officer witnessing Mr. Marks' conduct to believe that force was necessary to decisively stop the threat and overcome the resistance posed by Mr. Marks.

> A reasonable officer could have believed that the use of the 40mm impact round was a reasonable response to immediately and decisively stop the threat posed by Mr. Marks.

> Ofc. Bauer's use of the impact round to stop Mr. Marks' apparent assault and to prevent him from reinitiating that assault was reasonable and consistent with generally accepted law enforcement practices.

Gard Report 3, 6. These are naked legal conclusions on the reasonableness of Bauer's use-

of-force. Although a police-practice expert may opine on whether an officer's conduct

comported with generally accepted law-enforcement practices, here Gard offers no

explanation for his unadorned conclusions. *See Thomas*, 57 F. Supp. 3d at 1062-63

(distinguishing between permissible expert opinions comparing defendants' conduct to

standard police practices and inadmissible legal conclusions regarding reasonableness

under constitutional standards). At most, Gard includes a boilerplate reference to "generally accepted" law-enforcement standard and practices. That is insufficient. Nowhere does Gard's report explain what these "generally accepted" standards are, or where they came from. The Eighth Circuit in *Schmidt* affirmed the district court's exclusion of a police-practice expert where his report was "devoid of any standards and explanations that would assist the trier of fact in contextualizing his opinions." 557 F.3d at 570.

## II.   GARD'S TESTIMONY MUST BE EXCLUDED BECAUSE IT IS UNRELIABLE.

### A.   Gard's opinions lack a sufficient factual foundation.

According to Federal Rule of Evidence 702, an expert's testimony is only admissible if it is "based on sufficient facts or data." Although "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," testimony must be excluded if "the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Coutentos*, 651 F.3d at 820; *see also Bair Hugger*, 9 F.4th at 777-78. Without a sufficient factual basis, an expert's testimony is too speculative to be reliable for purposes of Rule 702. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) ("Because of the deficiencies in the foundation of the opinion, the experts resulting conclusions were 'mere speculation.'" (citation omitted)). As the court explained in *Kemp v. Tyson Seafood Grp., Inc.*, No. CIV.5-96-173 JRT/RLE, 2000 WL 1062105, at *7 (D. Minn. July 19, 2000), expert testimony that lacks a "competent factual basis . . . is of no assistance to the Jury and, if admitted, could supplant the Jury's factfinding function." *Id.* Accordingly, the court must exclude expert

opinions that are "too speculative to provide assistance to the trier of fact, in that they are unacceptably removed from a factual basis." *Id.* at *7, *9.

Here, Gard's expert testimony lacks a sufficient factual basis because he selectively ignored relevant and available evidence that did not support his predetermined conclusion. Gard listed the materials he considered in forming his opinions in Appendix 2 to his report. Conspicuously absent from this list is the deposition testimony of Officer Pobuda and Sergeant Angerhofer. As Gard testified during his deposition, he had additional materials, including the deposition testimony of Pobuda and Angerhofer, but he decided not to utilize them in rendering his opinions because he "didn't feel it was necessary." Gard Depo. 5-6. According to Gard, he did not *ignore* this evidence, but rather just "didn't look at" it. *Id.* 12. Semantics aside, Gard declined to base his expert opinions on this crucial evidence, rendering his testimony inadmissible under Rule 702.

Turning first to Pobuda, Gard conceded that he did not rely on—or even look at— Pobuda's deposition testimony in forming his opinions. *Id.* 14, 21, 35, 54. Gard is flat wrong that testimony from Pobuda—a witness to Bauer's shooting and the alleged victim of Ethan's so-called "assault"—is irrelevant regarding whether Bauer's conduct comported with generally accepted police-practices. After all, Pobuda was a trained officer on the scene reacting to the same circumstances as Bauer and subject to the same law-enforcement standards. In fact, Pobuda's testimony is vital to Gard's assessment since Pobuda is trained on MPD policies, whereas Gard relies on generic police principles extrapolated from his personal experience as a police officer in Washington. *Id.* 48.

Had Gard bothered to read Pobuda's deposition testimony, he would have discovered that it directly contradicts his analysis and undermines his expert opinions. *Cf. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict"). Gard's entire report is premised on his conclusions that Ethan posed an immediate threat to Pobuda at the time Bauer shot him, and, relatedly, that force was necessary and justified to stop Ethan from assaulting Pobuda. *See* Gard Depo. 108. For instance, Opinion One states that "[i]t would have been reasonable for an officer . . . to believe that Mr. Marks posed an immediate threat of bodily injury to [] Pobuda," and Opinion Three claims "[i]t would have been reasonable for an officer witnessing Mr. Marks' conduct to believe that force was necessary to decisively stop the threat and overcome the resistance posed by Mr. Marks." Gard Report 3. Likewise in his Methodology, Gard claims that "one could assume that a subsequent intent to assault Officer Pobuda or another officer with that baton could have been a possibility," *id.* 5, and that "Bauer's use of the impact round to stop Mr. Marks' apparent assault and to prevent him from reinitiating that assault was reasonable and consistent with generally accepted law-enforcement practices." *Id.* 6.[5]

---

[5] As aforementioned, many of these statements are also inadmissible legal conclusions, credibility assessments that opine of Ethan's state of mind, and/or fact determinations about what occurred.

However, Pobuda *disclaims* that any force was necessary to protect his safety. Pobuda—who is six feet tall and weighs 265 pounds—did not perceive Ethan as a threat after pushing him away.  Pobuda Depo. 4, 41-42.  Pobuda had no difficulty separating himself from Ethan.  *Id.* 33.  Once they were separated, he did not think that it was necessary to use any further force on Ethan.  *Id.* 41-42.  Rather, he concluded that putting distance between himself and Ethan by pushing him away was sufficient under the circumstances.  *Id.* 69.  He did not pursue Ethan and did not think an arrest was necessary.  *Id.* 42.  Ethan did not injure Pobuda, and Pobuda and did not seek any medical treatment after the so-called attack.  *Id.* 20, 26.  When asked if he would have been allowed to hit Ethan with his riot baton, Pobuda testified such a "level of force" was not needed.  *Id.* 33.  Indeed, he agreed at his deposition that he "didn't make anything of it at all."  *Id.* 21.

The factual foundation of Gard's opinions is further undermined by his decision to ignore evidence that both the Office of the Hennepin County Attorney and the St. Paul City Attorney's Office declined to prosecute Ethan for his conduct on May 28, 2020.  Bennett Exs. J, K.  Gard testified that he did not review the declination letters from either office.  Gard Depo. 6, 21-22.[6]  After reviewing the photos, reports, and the body-worn camera footage from Bauer and Pobuda, the St. Paul City Attorney's Office concluded that it lacked probable cause to charge Ethan with obstruction of legal process.  Bennett Decl. Ex. J.  The letter includes this telling passage:

---

[6] Although the St. Paul City Attorney Office declination letter is nominally listed in Appendix 2,  apparently Gard either did not actually review it or does not recall doing so. Either way, it obviously did not form a part of the factual basis for his opinions since he disclaims relying on it.

> within seconds of [Ethan's] actions, Officer Bauer fired a gas projectile at [Ethan] from less than 10 feet away, striking him in the head and causing what appears to be significant injury.  I see no way to sever the two events.  In the opinion of this prosecutor, the use of that level of force in response to the suspect's actions makes it prohibitively difficult to prove this case beyond a reasonable doubt.

*Id.*  Whereas Gard opines that Bauer shooting Ethan in the face was a reasonable use of force to stop an immediate threat, the St. Paul City Attorney's Office concluded that Bauer using "that level of force in response to [Ethan's] actions" *prohibited* the City from pressing charges.  The Office of the Hennepin County Attorney also declined to press charges, concluding it could not prove Ethan attempted to disarm a police officer because Ethan may have just "grabbed the baton in order to steady himself" after Pobuda pushed him.  Bennett Decl. Ex. K.

Furthermore, Gard refused to include the deposition testimony of Angerhofer in the factual basis for his opinions. Gard Depo. 6, 14, 69.  Although Gard opines on whether Bauer's conduct comported with police-practices, Bauer ignored the deposition testimony of the Sergeant who trained Bauer on the use of less-lethal launchers.  *Id.* 14; Angerhofer Depo. 54-55.  To exclude Angerhofer's testimony from his review is especially egregious where Gard is, concededly, woefully out of practice regarding the use of less-lethal weapons.  Despite testifying he has not taught or trained officers on the use of 40-millimeter less-lethal weapons "in a long time"—and in fact has only shot a less-lethal weapon "a few times" in the last sixteen years—Gard ignored the deposition testimony of the SWAT team leader who co-wrote, updated, and maintained the training materials for MPD officers regarding the use of the 40-millimeter launcher at issue.  Gard Depo. 61-62, 31; Angerhofer

Depo. 8, 21-23.  According to Angerhofer, the MPD policies which he trained Bauer on and discussed during his deposition meet nationally accepted standards and protocols regarding the use of less-lethal launchers, and he expected officers like Bauer to act in accordance with his training.  Angerhofer Depo. 54-55.  Crucially, Angerhofer testified that pursuant to training and policy, Bauer should have targeted Zone 1 (buttocks/thigh/calf) or Zone 2 (midsection/abdomen) under the circumstances.  *Id.* 138, 141.  Gard, on the other hand, makes no mention of the target Zones and does not discuss where Ethan was hit.  Without Angerhofer's testimony, Gard has no basis to opine on accepted police-practice standards regarding the use of 40-milimeter less-lethal launchers in the field.

Additionally, had Gard read and considered Angerhofer's testimony, he would know that Angerhofer testified that firing a 40-millimeter less-lethal projectile at someone's head constitutes deadly force because it could cause great bodily harm or death. *Id.* 17-18.  And, relatedly, that it would be objectively unreasonable to shoot someone in the eye with a 40-millimeter launcher without deadly force authorization.  *Id.* 19, 49, 138; *see also id.* 38 ("You would not intentionally target [the face, eyes, or head] unless it was a deadly force situation").  Angerhofer testified that Bauer did not have deadly force authorization when he shot Ethan,  *id.* 77, 131, and that both Zone 1 and Zone 2 were available to Bauer at the time he shot Ethan.  *Id.* at 93-94, 97, 103, 107, 138, 179.  Yet, Bauer shot Ethan in Zone 3, a shot which was not authorized because deadly force was not justified.  As Gard agreed, "that is not supposed to happen."  Gard Depo. 69.  Gard cannot testify that shooting Ethan in the head with a less-lethal launcher was reasonable and

consistent with generally accepted law-enforcement practices—an opinion even Gard disclaimed when confronted with Angerhofer's testimony.

Gard has built his expert testimony on a rotten factual foundation. Because Gard's opinions "are unacceptably removed from a factual basis," they are "too speculative to provide assistance to the trier of fact" and instead "could supplant the Jury's factfinding function." *Kemp,* 2000 WL 1062105, at *7, *9; *see also Concord Boat*, 207 F.3d at 1057.

### B.   Gard's expert testimony is not based on a reliable methodology that he reliably applies to this case.

Federal Rule of Evidence 702 provides that an expert's testimony must be "the product of reliable principles and methods" that "the expert has reliably applied . . . to the facts of the case." In short, "the testimony must be reliable or trustworthy in an evidentiary sense." *Bair Hugger*, 9 F.4th at 777. Expert testimony is not reliable where an expert "offer[s] only vague theorizing based upon general principles." *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006). As the Eighth Circuit has frequently put it, "a district court may exclude an expert's opinion if it is so fundamentally unsupported . . . that it can offer no assistance to the jury." *Bair Hugger*, 9 F.4th at 778 (cleaned up). In that regard, a court may exclude expert testimony as unreliable where "there is simply too great an analytical gap between the data and the opinion proffered," or where the expert's opinions are "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829-30 (8th Cir. 2019) (identifying cases where the Eighth Circuit affirmed the exclusion of expert opinions as "wholly speculative,"

36

"connected to the facts by only the expert's *ipse dixit*," "patent speculation," "pure conjecture," and "vague theorizing based upon general principles").

First, Gard has not identified any reliable principles in his expert report. Recall that a police-practice expert may only opine on whether an officer's conduct comports with accepted police-practices and standards. *Thomas*, 57 F. Supp. 3d at 1062-63. Here, Gard's alleged "generally accepted principles" do not withstand scrutiny. In Appendix 5, Gard lists twenty-one supposedly "generally accepted principles in use-of-force" but does not explain how he gathered these principles. He includes only a few citations, all but two of which are to legal cases or law review articles. But Gard may not opine on the case law nor instruct the jury on what the Fourth Amendment requires. *Id.* at 1063 (finding police-practice expert's opinion applying the *Graham* use-of-force standard inadmissible). At his deposition, Gard conceded that his "generally accepted" principles are based solely on his personal experience:

```
 6            And I think it's Appendix 5.  What -- what
 7   body generally accepts these principles?
 8       A   I'm sorry.  What --
 9       Q   Does any governing body -- does the IACP
10   accept the principles in Exhibit -- Appendix 5?
11       A   No.  No.  These are just analyses that are
12   generally accepted.
13       Q   Well, by who?
14       A   Well, if you -- you can pull research.  You
15   can add in compilations of years and years and years
16   of experience.
17       Q   Of who?
18       A   Of me.
```

Gard Depo. 24. Appendix 5 cites to no other law-enforcement training materials, police department policies, research studies, academic articles, or guidance from law-enforcement agencies. These purportedly generally accepted principles are not tethered to any specific jurisdiction or any reputable law-enforcement organization, such as IACP or PERF. Gard Depo. 24-26. It is simply not reliable for Gard to generate "generally accepted police practices" based exclusively on his own law-enforcement career in Orting, Washington. *Id.* 48-49. *See Shannon v. Koehler*, No. C 08-4059-MWB, 2011 WL 10483363, at *31 (N.D. Iowa Sept. 16, 2011) (Court could not determine if police-practice expert used a reliable method where his report did not clarify what standards he used to define "generally accepted practices and procedures"). As *Kemp* put it, an expert's "reliance upon factually unfounded extrapolations from his own personal experience, without more, is an insufficient footing upon which to premise an opinion." 2000 WL 1062105, at *7.

Gard's lack of support for his police principles is especially troubling when, upon closer examination, some of the principles contradict the Fourth Amendment. For instance, principle twenty-one says that officers need not resort to "verbal persuasion" when faced with "imminent threats." Gard Report Appx. 5. Actually, "where feasible, the officer must have given the suspect some warning" before using deadly force to "survive Fourth Amendment scrutiny." *Scott v. Harris*, 550 U.S. 372, 382 (2007); *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012) ("Before employing deadly force, an officer should give 'some warning' when it is 'feasible' to do so" (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)). Principles seven, eight, and eleven all suggest that whether the use-of-force is reasonable is evaluated from the subjective perspective of the officer on the scene, based

on his personal training, experience, and discretion.   That is wrong.   "The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts. . . have no proper place in that inquiry." *Graham v. Connor*, 490 U.S. 386, 399 (1989).  Not surprisingly, Gard apparently picked up these bogus principles from roundly discredited Force Science Institute founder Bill Lewinski, who trained Gard (incorrectly) "that the analysis of objective reasonableness ha[s] a subjective component." Gard Depo. 22; *see also id.* 11, 16.  Nevertheless, Gard would be hard-pressed to find reputable police agencies and departments training and instructing officers using principles directly at odds with the Constitution.

Even if Gard had identified reliable law-enforcement principles (he did not), he has failed to reliably apply any such principles to the facts of this case.   Gard's five "professional conclusions" do not rely on or apply specific police policies, standards, or practices to Bauer's conduct.  Gard merely includes a vague and conclusory reference to "generally accepted standards in law-enforcement" in the preface to his opinions.  Gard Report 3.  This is not sufficient.  His personal musings about acceptable police conduct are a prime example of "vague theorizing based upon general principles." *Lenan Corp.*, 469 F.3d at 1216.  The *only* identifiable police-practice principle Gard invokes is a generic MPD use-of-force policy regarding 40-milimeter launchers.  Gard Report 6.  But Gard's conclusion that Bauer's "use of the impact round. . . was reasonable and consistent with generally accepted law-enforcement practices" is simply a naked conclusion.  And his unadorned conclusion is especially meaningless where he ignored the testimony of the Sergeant who co-authored and trained officers on less-lethal weapons, Gard Depo. 62, and

he does not discuss the target Zones that are essential to MPD's policy. *Id.* 30, 44-45. Admitting this opinion also runs the risk of misleading the jury to conclude that Bauer had a blanket authorization to target Ethan in any manner if using his less-lethal launcher was authorized. *See Werth v. Hill-Rom, Inc.*, 856 F. Supp. 2d 1051, 1067 (D. Minn. 2012) ("Given the unreliable basis upon which Plaintiffs' experts' predicate their causation opinion, the Court believes there exists great potential to mislead the jury here."). Where Gard does not meaningfully apply any police-practice principles , "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

Next, the deceptively entitled "Methodology" section is really Gard's account of what he believes happened on May 28, mixed with his bare legal conclusions about whether Bauer's actions were reasonable.  Although Gard identifies something called a "threat assessment," he provides no explanation as to where this framework comes from and how it is applied.  There is no indication that a so-called "threat assessment" is a widely accepted law-enforcement principle.  Moreover, his supposed application of the threat assessment is "connected to existing data only by the *ipse dixit* of the expert." *Lenan Corp.*, 469 F.3d at 1216 (quoting *Joiner*, 522 U.S. at 146).  That is, based on his inadmissible interpretation of the video evidence, Gard concludes that Ethan is a threat and Bauer heroically protected Pobuda (who testified he did not need protecting).  Indeed, nearly every line of this section is inadmissible as fact determinations, legal conclusions, or credibility evaluations.

Finally, Gard's testimony regarding the 40-millimeter less-lethal launcher at issue is inadmissible.  Gard Report 6.  First, like the rest of his professional conclusions, his testimony regarding the 40-milimeter launcher and the EoTech holographic weapon sight

40

(HWS) is not supported by reliable principles nor a reliable methodology. His testimony about the HWS is not supported by a single citation or reference. It does not appear Gard examined the weapon, conducted any tests, or has even held or shot this specific model either in the field or in training. Gard offers only naked conclusions about how the HWS affected Bauer's firing on Ethan. Second, Gard is not qualified to offer this testimony. Gard's experience in law-enforcement does not automatically qualify him to testify about the technical operation of a specific weapon it is not clear he has ever fired. Far from an expert on 40-militmeter less-lethal weapons, Gard has only fired one a few times in the last sixteen years, Gard Depo. 61, has no field experience using less-lethal weapons under similar circumstances, *id.* 49, and has not reviewed the manufacturers' training materials in 15-20 years. *Id.* 31. Nor is Gard a human factors expert or an engineer. Nothing in his qualification summary, Appendix 3, or resume, Appendix 4, qualifies Gard to offer technical testimony about this particular weapon or the HWS. Allowing Gard to offer this testimony poses a serious risk of misleading the jury. Fed. R. Evid. 403.

In sum, Gard's expert report contains no reliable professional opinions. Rather, his testimony "is so fundamentally unsupported by its factual basis that it can offer no assistance to the jury." *Bair Hugger*, 9 F.4th at 778 (cleaned up).

## CONCLUSION

Because Gard inappropriately analyzes the evidence and determines the facts; entwines his expert conclusions with impermissible credibility findings; testifies about the constitutional reasonableness of Bauer's conduct; lacks a reliable factual basis for his testimony; fails to invoke and apply reliable principles and standards; and opines on matters

outside the scope of his expertise, Bauer cannot satisfy his burden to show that Gard's expert testimony is admissible pursuant to Rule 702. The Court should exercise its gatekeeping function to exclude Gard's expert testimony and opinions.

Respectfully submitted,

Dated: August 31, 2022

/s/ Robert Bennett

Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Greta A. Wiessner, #0401130
**ROBINS KAPLAN LLP**
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
gwiessner@robinskaplan.com
***Attorneys for Plaintiff Ethan Daniel Marks***