## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Ethan Daniel Marks,                                    Civ. No. 20-1913 (ADM/JFD)

                Plaintiff,

v.                                                     **PLAINTIFF'S**
                                                       **MEMORANDUM OF LAW**
                                                       **IN OPPOSITION TO**
Benjamin Bauer, acting in his individual               **DEFENDANT'S MOTION**
capacity as a Minneapolis Police Officer,              **FOR SUMMARY JUDGMENT**

                Defendant.

_____

## INTRODUCTION

*I shot Ethan Marks in the eye, but I didn't really mean to.*

      This, in a nutshell, is Defendant Benjamin Bauer's argument for summary judgment. And if it sounds ridiculous, it should: claiming "I didn't mean to" does not and cannot insulate a police officer from liability for excessive force under the Fourth Amendment. Imagine how toothless the Constitution would be if an officer could evade liability simply by disclaiming an intent to do what he actually did. Thankfully, the law is not so impotent, nor constitutional rights so easily discarded.

      Far more troubling, though, is that Bauer and his counsel have gone to great lengths to mislead the Court in his Motion. This occurs in two different ways, each equally improper.

      Legally, Bauer predicates his entire argument on his subjective intent – the Bart Simpson-esque "I didn't mean to" – despite admitting his force must be analyzed objectively, that is, *without regard to his intent or motivation*. He conceded this in his

deposition.  His own witnesses, including his use-of-force expert, testified in accord.

And the cases he cites say it, too.  In other words, Bauer and his counsel seek the Court's

absolution using a legal theory they know does not exist.  Of course, even if intent

mattered, overwhelming evidence in the record shows Bauer intended to accomplish

exactly what he did:  shooting Ethan in the face.

Factually Bauer fares no better, manipulating the record and ignoring evidence in

a gross perversion of Rule 56.  This is perhaps most egregious with regard to Ethan's

conduct before Bauer shot him.  Far from some "violent assault" justifying Bauer's use of

deadly force (more on this later), Ethan's interactions with the officer he supposedly

"assaulted" – Jonathon Pobuda – were little more than a fleeting tussle.  No weapon was

involved.  Pobuda was not injured.  It was over almost as quickly as it started, once the

larger Pobuda had shoved Ethan backwards with his baton.  Most notably, Pobuda

thought nothing of it – he made no attempt to arrest Ethan, nor did he believe any force

was necessary beyond pushing Ethan away.  And Pobuda was not alone:  two separate,

independent prosecutors reviewed Ethan's conduct and declined to pursue criminal

charges, concluding that the evidence did not support charging him with assault or even

obstructing legal process.  One of those prosecutors, in fact, determined that Bauer's use

of force – "fir[ing] a gas projectile at [Ethan] from less than 10 feet away, striking him in

the head and causing what appears to be significant injury" – was grossly

disproportionate to Ethan's conduct.

Of course, the Court would have no way to know any of this from Bauer's

submissions, because he ignored the prosecutors' declinations and Pobuda's deposition

testimony – indeed, he does not even identify Pobuda by name in his brief!  So, too, does Bauer ignore the testimony of his supervisor, Ryan McCann, and his trainer, SWAT Executive Officer Kevin Angerhofer, the latter of whom admitted that "according to policy, training, and the Constitution, this blinding of Ethan Marks' right eye should never have occurred."  There is much more, but the Court gets the point.  Bauer plays fast and loose with the facts because he knows he used excessive force.  This is the common refuge of Minneapolis police officers, ignoring objective evidence, overstating facts, and injecting non-existent drama into events to cover for their misconduct, much like Justine Ruszczyk's mythical car slap[1] or George Floyd's supposed "excited delirium."[2]  But Bauer cannot change what actually transpired, nor pick and choose the evidence he likes at summary judgment and ignore the rest, in the process turning Rule 56 on its head.  His Motion strays far beyond zealous advocacy into a dishonest one-sided presentation of the record.  It violates Rule 56 and wastes this Court's time with arguments doomed to fail.

Bauer's Motion enjoys neither legal nor factual support and he knows it.  His Motion should be denied.

[1] *See* https://abcnews.go.com/US/wireStory/prosecutors-target-officers-report-noise-shooting-62590765 (last visited September 19, 2022).
[2] *See* https://www.mprnews.org/story/2022/02/09/medical-expert-says-george-floyd-died-from-lack-of-oxygen-not-drugs-or-excited-delirium (last visited September 19, 2022).

# BACKGROUND

## I.    Bauer and SWAT training with "less-lethal" launchers

Bauer became a Minneapolis Police Department (MPD) officer in 2012, after graduating from the police academy.  Bauer Dep. 59-60.[3]  Prior to the academy, he served in the Army Reserve and was deployed to Iraq.  *Id.* 57.  In the military, Bauer rated as a Marksman with his M4 rifle.  *Id.* 90.

Bauer joined MPD SWAT in 2014.  *Id.* 60.  SWAT, or "Special Weapons and Tactics," is made up of MPD officers with specialized training and equipment to deal with a variety of situations beyond the ability of regular officers.  *Id.* 41-42.  SWAT comprises four teams:  the entry team, gas team, rifle team, and "comm log" or communications/logistics team.  *Id.* 61.  At all material times, SWAT's Executive Officer was MPD Sergeant Kevin Angerhofer, who oversaw its operations and training.  *Id.* 91; MPLS_MARKS007648-51.

As a member of the SWAT gas team, Bauer was trained to use the LMTS 40-millimeter "less-lethal" launcher.  Bauer Dep. 61-63, 108-22.  The launcher is a 25-inch-long firearm with a 14-inch rifled barrel:

---

[3] Unless otherwise noted, all evidence cited herein is submitted with the Declaration of Kathryn Bennett (hereafter, "Bennett Decl.").  Documents are identified by their Bates numbers, *e.g.*, MPLS_MARKS007652.  "BWC" refers to the body-worn camera video of the identified officer, cited by the time stamp in the upper-right corner.  A bystander's Twitter video capturing relevant events is denoted the "Twitter video," cited by the elapsed time in the video player.



Bennett Decl. Ex. 3.  As can be seen, it includes a front grip (foregrip) below the barrel, which aids in stability to make shots more accurate.  Bauer Dep. 9, 175.  The launcher can be fired in either single-action (with the hammer cocked) or double-action, Bennett Decl. Ex. 3; single-action lessens the force needed to pull the trigger and thus enhances accuracy.  Bauer Dep. 5-6, 175-76.  The launcher's sighting system includes a rear sight with a front post, although it also includes a Picatinny rail for mounting various "enhanced optics/sighting systems."  Bennett Decl. Ex. 3; Bauer Dep. 8-9.  Most SWAT 40-millimeter launchers, including Bauer's, had $600 adjustable EOTECH holographic weapon sights with a reticle that could be used for fast target acquisition.  *Id.* 9-11; Angerhofer Dep. 45.

The "less-lethal" launcher fires various 40-millimeter munitions at high speeds, including blunt-impact projectiles, some containing chemical irritants. MPLS_MARKS007652, 007700-08.  These "specialty impact," "high energy" munitions are designed to be "accurate through the optimum energy range," that is, from up to 90 feet from the target.  MPLS_MARKS007699-7710.  All of the munitions are intended to cause injury and pain, when the munition's "energy is transferred [] to the fluid mass of

- 5 -

the body." MPLS_MARKS007699-7703. Bauer shot Ethan with a Direct Impact #6320

OC round, which travels 295 feet per second out of the launcher's barrel. Angerhofer

Dep. 24, 40; MPLS_MARKS007707. The round contains OC (oleoresin capsicum), an

inflammatory chemical agent affecting the respiratory system, released when the round

impacts its target and "fragments" – blows apart. MPLS_MARKS007666-67; Bauer

Dep. 18-19, 113.

While MPD training indicates that the "maximum desired effect" with a 40-

millimeter round is blunt-force trauma that "leaves the body surface intact[] but causes

sufficient injury to incapacitate the subject," it also trains officers that specialty-impact

munitions can cause "abrasions, contusions, lacerations [and] fractures," as well as

"penetrating trauma," where the munition enters the target's body.

MPLS_MARKS007703-04. The launcher, therefore, while denominated "less-lethal," is

not *non*-lethal; it can kill people. Angerhofer Dep. 9; Bauer Dep. 23-24. And as a result,

MPD's training emphasizes that target area with the launcher "is critical to reduce injury

potential." MPLS_MARKS007703.

Specifically, MPD trains SWAT officers – per the warnings of the munitions'

manufacturer, Safariland – on three "impact areas." MPLS_MARKS007712-15.

According to that training, which was co-authored by Angerhofer, officers must first

consider targeting "Zone 1" (areas below the belt including the buttocks, thigh, calf),

followed by "Zone 2" (the abdominal area):

## Impact Areas – ZONE 1



- Consists of large muscle groups. Where the threat level is appropriate and this zone is viable, it should be considered first

  – Buttocks

  – Thigh

  – Calf

  – The groin area should not be intentionally targeted



ATTORNEY'S EYES ONLY

MPLS_MARKS007713

## Impact Areas – ZONE 2



- Consists of medium muscle groups
  – Abdominal area



ATTORNEY'S EYES ONLY

MPLS_MARKS007714

MPLS_MARKS007713-14; Angerhofer Dep. 21-22.  Zone 3 – including the chest, spine, head, and neck – carries the greatest potential for serious or fatal injury, and thus officers are trained it may *only* be targeted in a deadly force situation:



MPLS_MARKS007715; *see also* Angerhofer Dep. 138; McCann Dep. 17-18, 113-14. Every witness who testified about the target zones in this case agreed that shooting a person in Zone 3 (including the face) with a 40-millimeter projectile is inappropriate unless deadly force is authorized.  *E.g.*, Angerhofer Dep. 17-19, 38, 131-32; Bauer Dep. 65, 77-78; McCann Dep. 17-18, 113-14.

SWAT officers are required to qualify with the "less-lethal" launcher before being issued one and must re-qualify annually, given their potential to cause serious injury or

death.  Bauer Dep. 62-64, 72.  This involves written testing on the concepts outlined above, in addition to field testing where officers fire the launcher at designated targets, sometimes without using the EOTECH sight.  *Id.* 62-64, 74; *see also* MPLS_MARKS007653-55.  In certain qualifying exercises, officers are not permitted to miss; others require hitting small targets from more than 50 feet away.  Bauer Dep. 98-99.  The goal of this training and testing is to ensure SWAT members are "more proficient" than regular MPD officers with their weapons.  *Id.* 41-42, 89.

Bauer had been qualified to carry and use the "less-lethal" launcher for approximately six years when he shot Ethan in the face.  *See id.* 12.  He admits the launcher is an accurate weapon, and other than a few "duds" that fell directly to the ground, the rounds it fires are accurate, too.  *Id.* 14, 117; *see also* Angerhofer Dep. 80 (no reason to believe launcher isn't accurate).  And the evidence confirms that Bauer was an extremely accurate shooter.  He conceded in his deposition that he hit every person he intended to on the day in question, including Ethan.  Bauer Dep. 77.  Just a few months later, Bauer fired his "less-lethal" launcher from 50 feet away at a suspect who was scaling a fence in the dark of night.  *Id.* 16.  Bauer had no trouble hitting the suspect exactly where intended, his buttocks (Zone 1).  *Id.* 65-66.  Bauer was a prolific shooter of 40-millimeter "less-lethal" rounds:  he fired approximately 500 from May 26 to May 31, 2020, representing approximately 13% of the *total* rounds fired by *all* of MPD SWAT during the George Floyd protests.  *Id.* 27-32; Angerhofer Dep. 83-85.

## II.    George Floyd's murder and the community clean-up

On May 25, 2020, George Floyd was murdered by then-Minneapolis police officer Derek Chauvin, while his fellow officers refused to intervene.  Video of Chauvin kneeing on Floyd's neck until he died went viral, and protests spread throughout Minneapolis and the world.  Some of the protests, primarily at night, caused severe destruction in Minneapolis, while most of the daytime demonstrations involved peaceful activity calling for an end to systemic racism at the hands of police.  In fact, many citizens were inspired towards healing and gathered to clean-up and restore communities damaged by rioting and looting.

On May 28, 2020, Ethan and his mother Anne joined one such clean-up event organized by MAD DADS and religious leaders in Minneapolis's Longfellow neighborhood.  Anne Marks Dep. 155-59.  Anne is a Registered Nurse.  *Id.* 23.  Ethan was a nineteen-year-old college student at the time.  Ethan Marks Dep. 15, 19-20.  The two spent several hours that sunny afternoon cleaning up outside the damaged Target store at 26th Avenue South and Lake Street.  *Id.* 186-87, 190-92.  Though there were sporadic incidents, the clean-up efforts were primarily peaceful and did not involve looting or property destruction.  *Id.* 188.[4]

---

[4] Bauer describes the scene as a "large-scale riot" and a "warzone," based on the descriptions of an Australian news reporter.  Def. Mem. 6-11, 30.  Suffice it to say, Ethan disagrees with the reporter's sensationalizing, which is inconsistent with the on-scene videos and other evidence in the case.  There is nothing in the record, for example, indicating that anyone at the clean-up was charged with rioting.  MAD DADS is an *anti-riot* entity that "promot[es] peace," Pobuda Dep. 30-31, and it strains credulity to believe Ethan would have brought his mother to a violent riot.  *Id.*; *see also* Bauer Dep. 104-05.  Further, Bauer admits that not everyone present was hell-bent on attacking police.  *See*

Around 5:30 p.m., numerous MPD vehicles and officers arrived in the area in response to a report of a stabbing. *See generally* Bauer BWC; Pobuda BWC. Among them, in a white van, was SWAT 1280: eight SWAT officers including Bauer, led by MPD Sergeant Ryan McCann. *Id.*; McCann Dep. 4, 24; Bauer Dep. 92-93. Bauer was armed that day with his 40-millimeter "less-lethal" launcher with EOTECH sight, as captured on his BWC video:



Bauer BWC 17:33:34. He also had with him a variety of 40-millimeter direct-impact rounds, MPLS_MARKS007334-35, and he did not hesitate to use them. Indeed, he began firing the launcher shortly after arriving on scene, unleashing four rounds within

---

Def. Mem. 13 (admitting that people in the crowd "beckon[ed] him for help"); *see also* Bauer Dep. 159 (agreeing some people helped him establish a perimeter); McCann Dep. 74-75 (agreeing there were people on scene not engaged in violence or property damage). Regardless, neither Ethan nor Anne was engaged in any rioting. Pobuda Dep. 63.

52 seconds of exiting the van, Bauer BWC 17:34:40-17:35:32, and more over the ensuing minutes.

After officers had successfully removed the stabbing victim, Bauer and other officers assembled near the SWAT van before walking towards a portion of the crowd, where another person was on the ground requiring medical attention. *Id.* 17:39:09-17:39:50. Pobuda, who was also on scene, approached the area, too. Pobuda BWC 17:40:05-17:40:20. His BWC video shows that as he approached, Anne walked up to the injured woman, announced she was a nurse, and offered to help. *Id.* 17:40:20-17:40:30. The videos reflect that no one in the group assisting or surrounding the injured woman was rioting or throwing projectiles. *See also* Ward Dep. 59-60 (agreeing the videos do not show bottles or other objects being thrown at officers in the area of the injured woman). In fact, helpful citizens had made a perimeter to keep on-lookers back. Bauer Dep. 158-59. Ethan waited passively nearby as his mother tried to render aid:



Pobuda BWC 17:40:26.  Despite her entreaties to help, Pobuda pulled Anne backwards, then pushed her and ordered her back.  *Id.* 17:40:23-17:40:33.

After Pobuda pushed his mother, Ethan walked over and shouted, "back up, bitch" at Pobuda.  *Id.* 17:40:32-17:40:34.  Ethan had engaged in no unlawful activity and had made no aggressive moves towards Pobuda or anyone else until the officer laid hands on his mother.  Pobuda Dep. 48-52, 70.  But to hear Bauer describe what happened next, one might think Ethan a modern-day Genghis Khan.

Bauer claims Ethan used both of his hands to "punch[] and shove[]" Pobuda, who raised his baton "to protect himself."  Def. Mem. 14.  Ethan then purportedly "lunge[d] over the baton while continuing to assault" Pobuda, grabbed the baton, and then, after Pobuda pushed Ethan back, struck Pobuda a second time.  *Id.* 14-15.  He claims Ethan "jumped on top of" Pobuda and was engaged in a "bad assault" that required Bauer's heroic intervention.  *Id.* 16.  His later-written police report continued this dramatization, claiming Ethan "began to punch at officers" (plural) and was "clear[ly] trying to assault officers" (plural).  MPLS_MARKS00585.  This "violent" and "aggressive assault," claims Bauer, was the reason he decided to fire.  Def. Mem. 15-17.

The reality, however, is far more mundane, as shown not only in the relevant videos but also Pobuda's deposition testimony, which Bauer *intentionally failed to provide to the Court*.  After yelling "back up, bitch," Ethan grabbed at Pobuda's baton and a brief shoving match ensued.  Pobuda BWC 17:40:34-17:40:37; Bauer BWC 17:40:34-17:40:37.  Pobuda – who stands six feet tall, weighs 265 pounds, and regularly lifts weights – forcefully pushed Ethan backwards with the baton, easily creating distance

between the two.  Pobuda Dep. 4, 33, 42, 64; Twitter video 0:00:20-0:00:22; Angerhofer

Dep. 59.  Bauer's claim that Pobuda created only a "little bit" of space, Def. Mem. 15,

28, is belied by Pobuda's BWC video, which shows a substantial gap between the two,

big enough for a large individual in a neon vest to move into before the shot:



Pobuda BWC 17:40:36.  At no point in this fleeting scrap with Ethan did Pobuda lose

control of his baton.  Pobuda Dep. 21; Bauer Dep. 148.

> To be sure, Ethan briefly made contact with Pobuda's helmet and gas mask during

the tussle.  Pobuda BWC 17:40:34-17:40:36; Pobuda Dep. 20.  But this was no "punch,"

let alone multiple "punches" at multiple "officers," as Bauer dramatizes.  Pobuda later

reported that Ethan contacted him "us[ing] an open hand strike," not a punch (or more

than one punch).  MPLS_MARKS00596; *see also* Bauer Dep. 130-31 (agreeing his

report of plural "officers" was wrong).  The report makes no mention of Ethan "lunging

over" Pobuda's baton or "jumping on top of him," neither of which is reflected in the BWC videos, either. There is also no evidence Ethan made contact with any other officer on scene. And, Pobuda was not injured in the momentary struggle. Pobuda Dep. 20, 26.

Pobuda – the officer actually being subjected to the so-called "violent assault" – believed a forceful shove was the appropriate response to Ethan's actions. *Id.* 42, 69. He did not think it necessary to hit Ethan with his baton. *Id.* 33. After he successfully pushed Ethan away, Pobuda did not perceive Ethan as a threat, and he determined *no additional force was needed.* *Id.* 41-42. Nor did he think it necessary to place Ethan under arrest. *Id.* 42. Pobuda simply "didn't make anything of it at all." *Id.* 21. Bauer deliberately ignores all of this in his Motion.

## III. Bauer shoots Ethan in the eye with his 40-millimeter launcher

Despite the trifling nature of the shoving match between Ethan and Pobuda, Bauer nevertheless raised and fired his 40-millimeter launcher at Ethan from close range. Bauer BWC 17:40:34-17:40:37.[5] This was no accident; Bauer intentionally raised and fired the launcher. Bauer Dep. 20-24, 33-34, 143. His left hand was on the launcher's foregrip, and the hammer was cocked (single-action), when he pulled the trigger. *Id.* 143-44, 175-76. He did not warn Ethan, issue any commands, or announce he was under arrest prior

---

[5] Bauer's claim he was ten feet away when he fired, an approximation conjured more than a year after the shooting while in the midst of litigation, Def. Mem. 20, 33, is contrary to his earlier account of the incident. When questioned in January 2021, in the presence of counsel, Bauer stated he was "just, uh, beyond five feet" (the round's minimum safe range) when he fired. MPLS_MARKS007338. In fact, a bystander confronted Bauer immediately after the shooting, shouting, "Hey! Hey! Point-blank?" Bauer BWC 17:40:37-17:40:52. Bauer yelled back, "Yes!" *Id.* Colloquially, "point blank" means so close the shooter can't miss. Martin Rpt. 13.

to firing.  Bauer BWC 17:40:34-17:40:37; Pobuda Dep. 72-73.  He knew his weapon was

loaded with a 40-millimeter Direct Impact OC gas round before he fired.  Bauer Dep. 37-

38.  The round flew into Ethan's right eye and exploded, as shown below.



Pobuda BWC 17:40:37; *see also* Bauer Dep. 202; Bauer BWC 17:40:36-17:40:39.

Both Bauer's BWC video and the Twitter video reveal that Bauer raised the

launcher until it was above parallel to the ground, ultimately pointing it at Ethan's head

before he fired.  Bauer BWC 17:40:34-17:40:37; Twitter video 0:00:20-22; Sullivan

Decl. Exs. 1-2.  The Twitter video shows the launcher's barrel pointed upward at the time

of the shot:



Twitter Video 0:00:22; *accord* McCann Dep. 57 (agreeing barrel was above parallel to the ground). Likewise, Bauer's BWC video shows Ethan directly in front of Bauer's launcher, pointed upward at Ethan's head when Bauer pulls the trigger:



Bauer BWC 17:40:36; *see also* Bauer Dep. 200-02.  Bauer admits that his 40-millimeter round "went where the barrel was pointed."  Bauer Dep. 201-202.[6]  Bauer's expert shooting reconstructionist, Matthew Noedel, confirms that Bauer raised his launcher in "a continuous action" from "low-ready upward" before firing when pointed at Zone 3 (Ethan's face).  Noedel Dep. 40-41.  Noedel confirms what is obvious:  the videos "do not s[how] him aiming at Zone 1 or Zone 2."  *Id.*

When Bauer shot Ethan, he was physically separated from Pobuda as a result of being shoved backward.  Bauer Dep. 197-99.  The picture immediately above reflects that separation, showing Pobuda (in helmet) to Bauer's right, visible under the stock of Bauer's launcher, with Ethan to Bauer's left.  Additionally, the neon-vested bystander had stepped between Ethan and Pobuda, arms in the air and repeatedly proclaiming, "it's okay" and "we're alright."  Pobuda BWC 17:40:36-17:40:40.  As Pobuda testified, whatever minimal threat Ethan might have posed from the so-called "assault," it had dissipated once the two had separated.  Pobuda Dep. 41-42; *see also* Bauer Dep. 45-46 (agreeing separation can affect the force calculus); Robinson Dep. 67-68 (same).  Yet, Bauer shot Ethan in *deadly force* Zone 3 – his right eye.  Bauer Dep. 202.  Nothing Ethan did justified the use of deadly force against him.  Pobuda Dep. 33-34, 37; Angerhofer Dep. 77, 131; *see also* McCann Dep. 52 (agreeing that deadly force was not appropriate once Pobuda and Ethan had separated); Ryan Rpt. ¶ 144.

---

[6] Despite attempting semantic gymnastics in his deposition, Bauer ultimately conceded that "pointing" and "aiming" are the same thing.  Bauer Dep. 166; *see also* Angerhofer Dep. 177-78 (round hit Ethan's face through "a pointing-and-aiming process").

**IV.    The aftermath**

Ethan fell down, badly wounded, and stumbled away holding his face after Bauer

shot him.  Pobuda BWC 17:40:36-17:40:44.  Anne chased after him.  *Id.*  Bauer knew

Ethan had been hit in the face, and he saw Ethan holding his face as he ran away.

MPLS_MARKS007338; Bauer Dep. 82; McCann Dep. 53 (agreeing Bauer was aware

Ethan had been struck in the face); Gard Dep. 33 (same).  Indeed, the round exploded

into Ethan's eye directly in front of Bauer.  Bauer BWC 17:40:37; Angerhofer Dep. 157-

58.  Moreover, a few minutes later, a bystander apparently seeking help for Ethan

informed Bauer that "he got hit in the eye," but Bauer sloughed it off, responding "they

gotta go somewhere else."  Bauer BWC 17:42:00-17:42:04.  Neither Bauer nor Pobuda

pursued Ethan to render him aid (or to arrest him).  Pobuda Dep. 42; Answer (Dkt. No.

55) ¶ 87 (admitting this allegation in the Second Amended Complaint).[7]

Bauer told McCann that he fired 40-millimeter rounds on May 28, but he provided

no other information, including that he had shot someone in the face from close range and

apparently caused a serious injury.  Bauer Dep. 136-37, 159-60; McCann Dep. 46.  Nor

did he provide that information in the report he authored after his shift ended.  Bauer

wrote only that he "deployed a 40-millimeter less-lethal round at" Ethan, "striking him."

MPLS_MARKS00585; Bauer Dep. 123-25.  He made no mention that he fired from

---

[7] Bauer's claim he was unaware Ethan had been hit in the face, Def. Mem. 19, is beyond
disingenuous.  Not only is it inconsistent with his own admissions, but it defies common
sense when the round exploded at Ethan's head directly in front of him.  Critically, Bauer
admits that he "confirmed [] the projectile ultimately did not hit the torso area that he
[supposedly] aimed to hit."  *Id.*  How could he do so without seeing what the projectile
*did* hit?

close range ("point blank"), that the round blew apart in Ethan's face, or that Ethan appeared to be seriously injured. MPLS_MARKS00585; Bauer Dep. 123-25. And in neither his written report nor to McCann did Bauer state he was aiming someplace other than Ethan's face but missed because Ethan moved.

Pobuda, too, authored a report about the incident; in fact, several reports. In the first, as noted above, he stated only that he was "struck in the head by a protester. The protester used an open hand strike to the left side of my head and fled." MPLS_MARKS000596. He did not mention that Ethan punched him, laid hands on his baton, or purportedly attempted to disarm him. *Id.* Five days later, Pobuda wrote a second report. MPLS_MARKS000505. This time, he labeled Ethan a "rioter" rather than a "protester," even though he was unaware of any evidence Ethan had been "rioting." *Id.*; Pobuda Dep. 23-24, 63. Still, Pobuda once again did not report that Ethan had grabbed his baton or attempted to disarm him. MPLS_MARKS000505; Pobuda Dep. 21-25.

On June 8, 2020, Ethan's counsel contacted then-MPD Chief Medaria Arradondo and acting Minneapolis City Attorney Erik Nilsson, informing them of the shooting and asking them to identify Ethan's then-unknown shooter. Bennett Decl. Ex. 22. Two things then happened.

*First*, the City retaliated against Ethan by pursuing criminal charges against him. MPLS_MARKS006912-34. Lieutenant Matthew St. George assigned Sergeant Bryce Robinson to "investigate" Ethan for assaulting Pobuda and attempting to disarm him. St. George Dep. 10-11; Robinson Dep. 14, 18. Robinson contacted Pobuda and informed

him "that, you know, this guy was possibly trying to disarm you," and he ordered Pobuda

to supplement his prior written reports.  Robinson Dep. 16-20; MPLS_MARKS006931.

Pobuda then authored yet *another* report about the incident, this time adding previously

unstated details:

A second victim was located. I walked over to the where the victim was lying, because I observed a
crowd was starting to encircle officers who were rendering aid to the victim. As I was directing an
unidentified woman to back up from the officers, the suspect, a white male wearing a face mask
and dark clothing, was standing near the Target parking lot approached me and stated, "back up
bitch." The suspect pushed me. I directed the male back with my riot baton to gain distance

| For 133099    Printed On May-10-2021 (Mon.) | | Page 6 of 22 |
| --- | --- | --- |
| | CONFIDENTIAL | MPLS_MARKS006918 |



**MINNEAPOLIS POLICE DEPARTMENT**

GO# MP 2020-259360
OPEN/ACTIVE

**GENERAL OFFENSE HARDCOPY**

Incident Date 05/28/2020

(ASLT4-LESS THAN SUBST HARM)

between him and myself. The suspect grabbed onto my riot baton and I felt him pull the baton
towards him and away from me. I feared he would gain control of my baton and use it as a weapon
towards me, other officers, or protesters. The male then pulled his right hand back and with an
open hand, struck me on the left side of my head. I was able to pull the baton free from his grip.

MPLS_MARKS006918-19.  Only in this third report – at Robinson's direction, after

Ethan had accused his brother-in-blue of misconduct – did Pobuda state that Ethan had

grabbed his baton and he feared Ethan would take it away and use it against him.

After receiving Pobuda's report, Robinson passed it and several BWC videos to

the Hennepin County Attorney's Office for charging.  Robinson Dep. 11-16, 30.  That

office, however, reviewed the evidence and declined to prosecute, concluding no felony

charges were warranted and it could not prove either attempting to disarm a police officer

or assault.  MPLS_MARKS008151-52.  Undeterred, Robinson sent the matter to the

Minneapolis City Attorney's Office for misdemeanor charges; due to a conflict of

interest, that office passed it on to the St. Paul City Attorney's Office for review.

Robinson Dep. 38-39. But there, too, an independent prosecutor declined to charge

Ethan with obstructing legal process (OLP), concluding there was "insufficient evidence"

and the "facts/circumstances do not support charges." MPLS_MARKS008154. In a

particularly pertinent passage, the prosecutor noted:

> I have reviewed the photos, reports, other evidence, and BWC video of both officers Pobuda and Bauer. Officer Pobuda is engaged in the performance of official duties, as he is aiding in providing emergency services to a stabbing victim. But proof of this element is hindered by the fact that he does not announce what he is doing until *after* he begins pushing and physically moving suspect's mother away. Suspect then responds to Officer Pobuda's actions by approaching and attempting to grab/push at Officer Pobuda. The evidence, however, is extremely limited and it is difficult to prove "what" the suspect actually did. A review of the BWC suggests that the suspect may have obstructed, resisted or interfered with the officer. However, proof of this element is also complicated, as the suspect would likely claim he is acting in defense of his mother. Thus, while the OLP elements may be present, it is a borderline case, at best, which does not rise to the level of probable cause to support the charge. Then, within seconds of the suspect's actions, Officer Bauer fired a gas projectile at the suspect from less than 10 feet away, striking him in the head and causing what appears to be significant injury. I see no way to sever the two events. In the opinion of this prosecutor, the use of that level of force in response to the suspect's actions makes it prohibitively difficult to prove this case beyond a reasonable doubt.

*Id.* (highlighting added).

Second, MPD Internal Affairs (IA) began investigating the shooting – in theory,

anyway. MPLS_MARKS007280. On January 26, 2021 – eight months after the

shooting, and long after Bauer had been sued – Bauer was summoned to provide a

statement to MPD Sergeant Aimee Linson. MPLS_MARKS007332-39. He appeared for

the statement along with counsel. MPLS_MARKS007332. He told Linson:

Q:  Okay, okay, did you recall seeing where he, where were you aiming?
A:  Uh, I was aiming more towards his torso area, um, and he was kind of falling.

Q:  Okay.
A:  Falling over and then it deployed.

MPLS_MARKS007338.  There is no evidence in the record that Bauer previously told

anyone he was attempting to hit Ethan in the "torso area" on May 28, 2020.  Nor is there

any evidence that Linson challenged Bauer's newfangled claim with the contradictory

BWC videos.  She simply accepted his *post hoc* assertion that he was aimed somewhere

other than where Ethan was struck.

    During the IA process, Angerhofer was asked to perform a "training review" of

Bauer.  MPLS_MARKS007645-7736.  He had never before been asked to conduct such a

review, nor has he done one since.  Angerhofer Dep. 142-43.  This "review" was nothing

of the sort, but rather a rubber-stamp of Bauer's conduct by the SWAT Executive Officer

who trained him.  It did not mention Pobuda had simply pushed Ethan away; it did not

mention Ethan was struck in the face – deadly force Zone 3 – by Bauer's round; and it

did not mention Ethan had done nothing to justify the use of deadly force.  *Id.* 56-57, 59,

63.  The "review" failed to offer any explanation why Ethan had been struck where he

was.  Angerhofer, like Linson, simply accepted Bauer's claim he was aimed for the

"torso" despite objective evidence to the contrary.  MPLS_MARKS007647.

## V.    Ethan's devastating injuries

    Shooting a 40-millimeter, direct-impact OC projectile at 295 feet per second into

Ethan's eye from close range unsurprisingly caused him catastrophic injuries.  It ruptured

his right eye globe (eyeball), detached his retina, and fractured his right eye socket, while also causing injuries to his head, face, and nose, and a traumatic brain injury. Koozekanani Rpt. 2-10; Weingarden Rpt. 3-5; Mokhtarzadeh Rpt. 1-2.  The trauma was so severe, in fact, that it caused pneumocephalus, or air in the cranial (brain) cavity. Mokhtarzadeh Rpt. 1.  He has undergone multiple surgeries to attempt to repair some of the damage and restore his vision, with very limited success.

Ethan continues to struggle with his injuries and will in the future.  *Bauer's* independent medical examiner, neuro-ophthalmologist Alan Weingarden, MD, opines that Ethan is "legally blind" in his right eye and will be permanently.  Weingarden Rpt. 5; Weingarden Addendum 3.  His facial and eye injuries cause difficulty focusing, headaches, decreased visual motor skills and depth perception, and balance problems. Ethan Marks Dep. 314-33; Glass Rpt. 4-7.  Damage to his trigeminal nerve—which provides sensation to a large portion of his face—often causes inflammation and pain. Mokhtarzadeh Rpt. 2.  Indeed, Ethan is in pain every day.  Ethan Marks Dep. 314-33. His symptoms affect his ability to work, study, drive, and enjoy his life.  *Id.*; Weingarden Rpt. 7.  Ethan also has suffered emotional distress, mental pain and anguish, anxiety, depression, and PTSD.  Ethan Marks Dep. 314-33.

## STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and Bauer is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Bauer bears the burden of showing no reasonable jury could find in Ethan's favor based on the record evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court "view[s] the

facts and draw[s] reasonable inferences in the light most favorable to" Ethan. *Scott v.*

*Harris*, 550 U.S. 372, 378 (2007) (cleaned up). "Credibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury

functions" not to be resolved by the Court at summary judgment. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

Bauer moves for summary judgment on Ethan's Fourth Amendment[8] claim based

on qualified immunity, which shields a state actor from liability unless his conduct

violated a clearly-established constitutional right of which a reasonable official would

have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Bauer is *not* entitled to

qualified immunity if: 1) the facts, construed in the light most favorable to Ethan, show

Bauer's conduct violated a constitutional right; and 2) that right was clearly established at

the time of Bauer's misconduct, meaning a reasonable officer would have known his

actions were unlawful. *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 456 (8th Cir. 2011).

If there exists a genuine issue of material fact as to whether Bauer violated Ethan's

constitutional rights or whether a reasonable officer would have known his actions were

unlawful, qualified immunity must be denied. *Nance v. Sammis*, 586 F.3d 604, 609 (8th

Cir. 2009). In other words, Bauer is not entitled to summary judgment if qualified

---

[8] Ethan invokes the Fourteenth Amendment in his Complaint only because it makes the
Fourth Amendment applicable to state actors such as Bauer. *Mapp v. Ohio*, 367 U.S.
643, 655 (1961). The Fourth Amendment's "objective reasonableness" standard applies.
*Graham v. Connor*, 490 U.S. 386, 395 (1989).

immunity is entwined with fact disputes and credibility assessments reserved for the jury. *See Aaron v. Shelley*, 624 F.3d 882, 884 (8th Cir. 2010).

**I.    Bauer's intent arguments are frivolous**

The crux of Bauer's Motion is that he did not violate Ethan's rights because he didn't intend to hit Ethan's face. *See* Def. Mem. 3 (arguing Ethan was "struck in an unexpected location"); *id.* 36 ("That the projectile unexpectedly and unintentionally hit Marks' [*sic*] higher than targeted, striking Zone 3, does not alter the reasonableness of Officer Bauer's use of force."). This is just the latest in his ongoing, concocted effort to minimize his actions and distract from the fact that he used deadly force.[9] The problem, however, is that Bauer's supposed intent is legally irrelevant and factually disputed.

**A. Bauer's subjective intent does not matter**

The Supreme Court has held time and again that the Fourth Amendment analysis is *objective*; an officer's subjective intentions are meaningless. In *Whren v. United States*, for example, the Court stated that "[s]ubjective intentions play no role" when analyzing whether a police officer violated the Fourth Amendment. 517 U.S. 806, 813 (1996). Likewise, in *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000), the Court

---

[9] This dumbing-down explains why Bauer claims he "deployed" the launcher rather than "fired" or "shot" it. *See* Angerhofer Dep. 29-30 (noting "shot" "describes th[e] process a lot more accurately"). It also explains the defense's reluctance to call the "less-lethal" launcher a firearm, *see id.* 9; McCann Dep. 29, despite it being labeled as such in MPD training materials, MPLS_MARKS007701, and despite the launcher propelling munitions from the barrel by an explosion, Angerhofer Dep. 14; *see* 18 U.S.C. § 921(a)(3) (defining "firearm" as any weapon that will "expel a projectile by the action of an explosive"). This is all a designed play, hoping to suggest the rules of firearm safety and responsibility somehow don't apply to less-lethal launchers. That simply is not the case. *See* McCann Dep. 44-45; Angerhofer Dep. 38-39; Gard Dep. 32-33; *see also* Martin Rpt. 13.

stated, "the subjective intent of the law enforcement officer is irrelevant in determining

whether that officer's actions violate the Fourth Amendment."  And in *Graham v.

Connor*, the Court's seminal excessive-force case, it stated:

> As in other Fourth Amendment contexts, . . . the "reasonableness" inquiry in
> an excessive force case is an objective one:  the question is whether the
> officers' actions are "objectively reasonable" in light of the facts and
> circumstances confronting them, without regard to their underlying intent or
> motivation.  An officer's evil intentions will not make a Fourth Amendment
> violation out of an objectively reasonable use of force; *nor will an officer's
> good intentions make an objectively unreasonable use of force constitutional*.

490 U.S. 386, 397 (1989) (emphasis added) (citations omitted); *see also Brower v. Cnty.

of Inyo*, 489 U.S. 593, 598-99 (1989) (rejecting inquiry allowing an officer to argue "a

bullet in the heart [] was meant only for the leg").  The same has long been recognized in

the Eighth Circuit.  *E.g.*, *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1079 n.4 (8th

Cir. 1990) (the "fourth amendment . . . 'objectively reasonable' standard . . . leaves no

room for consideration of the officer's subjective intentions or motives").

Bauer and his counsel know this.  Indeed, Bauer *admitted* in his deposition that

force is "judged by an objective reasonableness standard."  Bauer Dep. 43.  His

supervisor (McCann), his trainer (Angerhofer), and his use-of-force expert (Christopher

Gard) said so, too.  McCann Dep. 43-44; Angerhofer Dep. 47-48; Gard Dep. 60-61.  And,

the cases Bauer cites say this explicitly.  *See, e.g.*, *Loch v. City of Litchfield*, 689 F.3d

961, 965 (8th Cir. 2012); *Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012);

*Wilson v. City of Lafayette*, 510 F. App'x 775, 780 (10th Cir. 2013).  There cannot be any

reasonable dispute otherwise.

Bauer's citation to *Wilson* – authored by now-Justice Gorsuch – lays bare that he is barking up an irrelevant tree. There, officers chased a fleeing suspect before one shot him with a TASER. 510 F. App'x at 776. The TASER triggered cardiac arrythmia and killed him, and his parents brought an excessive-force claim, which the district court dismissed based on qualified immunity. The parents appealed, arguing the force was excessive because the officer "intentionally or at least recklessly aimed the TASER at Mr. Wilson's head." *Id.* at 780. *Wilson* cast that argument aside because "under long settled Fourth Amendment law, *our analysis may not be informed by the officer's subjective intent* or motives in deploying th[e] force." *Id.* (emphasis added).[10]

"[T]he issue" under the Fourth Amendment, the Supreme Court tells us, "is not [the officer's] state of mind, but the *objective effect* of his actions," *Bond*, 529 U.S. at 338 n.2 (emphasis added); not what he intended, but what he *did*. This makes perfect sense. Excessive-force claims balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). This "intrusion" necessarily means the effect, not the object, of the officer's actions, which is why the extent of the injuries inflicted informs the analysis. *E.g.*, *Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012); *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009). Stated

---

[10] Bauer's reliance on *Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010), is even further afield. That case involved excessive force under the *Eighth* Amendment, for which "[o]nly force *intended* 'maliciously and sadistically' to cause harm" suffices. *Id.* at 744 (emphasis added).

differently, the extent of injuries would have no role to play if the officer's intent were what mattered.

Just as the officer's "intentional" aim-point in *Wilson* or his "good intentions" in *Graham* made no difference, Bauer's supposed aiming at Ethan's torso makes no difference here. *See also Howard v. K.C. Police Dept.*, 570 F.3d 984, 989 (8th Cir. 2009) (where plaintiff was forced face-first onto hot asphalt, it made no difference that officers did so "not with an intent to injure him"); *Dancy v. McGinley*, 843 F.3d 93, 115-18 (2d Cir. 2016) (dismissing officer's argument that "he never intended [the plaintiff] any harm" because "once a seizure is initiated, an officer's objectively unreasonable conduct may violate the Fourth Amendment regardless of whether the officer intended any injury to result"). Whether Bauer was *trying* to hit Ethan in the face has no bearing; all that counts is that he was struck there. As McCann acknowledged, "it doesn't matter what's in your heart of hearts or your mind. What matters is, is where your gun is pointed and where the projectile goes." McCann Dep. 44; *accord* Angerhofer Dep. 39 (agreeing that when an officer fires a weapon, he is "responsible for [] where the round goes").[11]

---

[11] Bauer's argument that his shot was simply a "mistaken placement" of the round, Def. Mem. 38 (citing cases), is just another way of arguing he did not intend to shoot Ethan in the face. None of the cases he cites stands for the proposition that an officer avoids Fourth Amendment liability when he purports to shoot at Point A but "mistakenly" strikes Point B. *But see Brower*, 489 U.S. at 598-99 (eschewing allowing officer to argue "a bullet in the heart [] was meant only for the leg").

**B.  Even if Bauer's intent mattered, there is a genuine issue of fact where he aimed**

Throughout his brief, Bauer asks the Court to blindly accept that he aimed at Ethan's torso.  *See* Def. Mem. 2-3, 16-17, 19-20, 34-38.  Careful scrutiny, however, reveals that the only evidence he cites in support are his own self-serving statements.  *See, e.g.*, *id.* 16 (citing his deposition testimony); *id.* 17 (citing his IA statement).  In other words, Bauer winks and nods and asks the Court to just take his word for it.

Bauer is free to use this strategy at trial, but cherry-picking is not allowed for Rule 56 movants.  And a jury could easily see through this.  Bauer never informed McCann, nor put in writing, that he was trying to hit the torso, or even that he struck Ethan in the face, thus failing to comply with MPD reporting policies.  Angerhofer Dep. 152-54.  Indeed, he first claimed to have aimed for the torso some eight months post-shooting, *after* he was sued and *after* IA began asking questions.  *See Anderson v. Charles*, 447 U.S. 404, 408-09 (1980) (prior statement admissible to impeach when it omitted facts defendant later offered in trial testimony).  Failing to provide relevant information, McCann acknowledged, is a "red flag that something might be going on."  McCann Dep. 107.

Regardless, Bauer's "trust me" argument flouts Rule 56 by asking the Court to construe the evidence in his favor, despite overwhelming *objective* evidence that he hit Ethan's face because **that's where he aimed**.  The best such evidence is the videos, which clearly show Bauer raising the launcher until above parallel to the ground, ultimately pointing at Ethan's head before he fired.  As noted above, the Twitter video

shows the launcher's barrel pointed *upward* at the time of the shot, and Bauer's BWC

video shows Ethan directly in front of the launcher, pointed at Ethan's head when Bauer

pulled the trigger:



Bauer BWC 17:40:36; *see also* Bauer Dep. 201-02.  This image, in fact, is particularly

telling.  On May 28, 2020, Bauer wore his BWC high on his body, just below his

neckline:



Kaminski BWC 17:56:42; Bauer Dep. 82-83, 164.  But as depicted above, the launcher

was raised *above* Bauer's extremely high BWC, and pointed further upward, when he

pulled the trigger.  The high BWC position forced Bauer to admit that at the time he

fired, the launcher was "*not pointing towards the torso or Zone 2*" because if it had been, "we wouldn't be able to see Zone 2 from this body-worn camera view" – yet Zone 2 is clearly visible.  Bauer Dep. 178-80 (emphasis added).  And lest there be any doubt, Bauer's shooting-reconstruction expert confirmed he raised the launcher in "a continuous action" from "low-ready upward" until pointed at Zone 3 (Ethan's face), never aiming at Zones 1 or 2.  Noedel Dep. 40-41.[12]

While video alone undermines Bauer's claim, there is much more.  For one thing, Bauer admits his 40-millimeter round "went where the barrel was pointed," that is, where he *aimed*.  *See also* Angerhofer Dep. 177-78 (round hit Ethan's face through "a pointing-and-aiming process").  By Bauer's own reckoning, he fired from just beyond five feet, an extremely close distance with a long gun firing a projectile traveling 295 feet per second; he acknowledged having fired from "point blank" – can't miss – range.  He conceded both the launcher and the round it fired were accurate, and he trained with it repeatedly, re-qualifying annually by passing tests requiring precision shots from long distances.  Indeed, it is easy to infer that Bauer – the military marksman – was extremely proficient with the weapon, especially when he fired approximately 500 less-lethal rounds during the George Floyd protests.  Moreover, Bauer took several steps to make his shot at Ethan even more accurate, firing in single-action and holding the foregrip when he did so.  All of this strongly indicates that Bauer could, and did, put the round precisely where he

---

[12] Indeed, Bauer's reliance on Noedel is curious.  Noedel opines that a small (5-degree) rotation of the launcher would explain a head shot instead of a torso shot.  Def. Mem. 20-22.  In other words, he intimates that Bauer did, in fact, rotate the launcher towards Ethan's head!

wanted. *See* Angerhofer Dep. 178 (agreeing the *objective* evidence shows Bauer "pointed his weapon where he wanted to point it" and "pulled the trigger at the point in time he wanted to pull it").[13]

Bauer offers two so-called explanations why he hit Ethan's face when he (purportedly) aimed for his torso, yet neither holds water. First, he claims the situation evolved so rapidly that he did not have time to use his optical sight. Def. Mem. 16; Bauer Dep. 33-34. But this is a red herring: Bauer does not dispute he had time to *aim*, he just claims he was aimed *somewhere else*. Moreover, from "point blank" range, Bauer did not *need* his optical sight. *See* Ryan Rpt. ¶ 141 (proper target acquisition can be "accomplished by pointing and shooting a subject who is [in] close proximity"; "Any reasonable and trained officer knows that a red dot site is not needed for target acquisition for close proximity shots."). In any event, there was no reason for Bauer to rush, especially after Ethan and Pobuda became separated by Pobuda's push.

Second, Bauer relies on his expert Parris Ward's opinion that Ethan "suddenly dropped" just before the shot. Def. Mem. 17-18. From this, Bauer argues, "a shot intended for Mr. Marks' upper torso would hit him higher on the body as he dropped." *Id.* 19 (quoting Ward Rpt. 9). But Ward admitted this is just a theory of what *could have*

---

[13] Bauer also admits, and his BWC video confirms, that Zone 1 – the *preferred* target area – was available when he fired. Bauer Dep. 154, 176-78. Bauer claims he skipped Zone 1 because he was concerned he might miss. Def. Mem. 16, 35. But when using a firearm, an officer must be cognizant of what is behind his target lest he injure someone downrange, and there were people downrange of Ethan. Bauer Dep. 22; Angerhofer Dep. 39, 153; Pobuda Dep. 89, 91. Hence, if an officer fears he might miss, he should try to miss *low*. Bauer Dep. 153. Here, however, Bauer supposedly "missed" *high* – suggesting this was no "miss" at all.

happened, Ward Rpt. 13; Ward Dep. 48-49, 53, and his theorizing is fraught with

problems including:[14]

- Ward made no effort to quantify the "sudden drop" and thus cannot know whether it was sufficient to change a torso shot into a head shot, Ward Dep. 61-62;

- Ward reached this conclusion by tracking an object on Ethan's *hip*, but movement at the hip doesn't necessarily translate to movement at the head, and Ward could not say whether Ethan's head dropped into the supposed target zone, *id.* 60-63;

- Ward's opinions are based on a hypothecated shot at Ethan's "upper" torso, but Bauer never used the term "upper" to describe where he had supposedly aimed.

- Bauer never told anyone that something made his shot inaccurate or affected his aim.  Angerhofer Dep. 181-82.

Simply put, whether the videos depict a "sudden drop" is a fact question for the jury.

The biggest problem for Bauer, however, is that he admitted in his deposition that

he aimed at deadly-force-only Zone 3 when firing.  Though he now tries to muddy the

waters about where the "torso" is located, *see* Def. Mem. 34; Bauer Dep. 109, 119, he

clarified in his deposition:  "I aimed for the spot that I thought for sure I'd hit, sir, which

would be *center mass*."  Bauer Dep. 154 (emphasis added).  Per his training, Bauer knew

"center mass" to be no-go unless deadly force was justified.

---

[14] These issues are explored in greater detail in Ethan's Motion to Exclude the Testimony of Parris Ward and Matthew Noedel (Dkt. Nos. 85, 87).

## Impact Areas



ATTORNEY'S EYES ONLY

MPLS_MARKS007712

- Consider the need for immediate incapacitation as well as the potential for causing injury – then balance these factors while making the point of aim decision.

- Shots to "Center Mass" provide for the highest probability of causing immediate incapacitation, but also have the potential to cause serious injury or death.

- Areas such as the head, neck , spine, and groin should be avoided if possible.

## Impact Areas – ZONE 3



ATTORNEY'S EYES ONLY

MPLS_MARKS007715

- This zone carries the greatest potential for serious or fatal injury and should be avoided when possible. It should only be considered when maximum effectiveness is desired to meet a level of threat escalating to deadly force.

  — Chest (center mass)

  — Spine

  — Head and Neck



- 36 -

MPLS_MARKS007712, 7715 (highlighting added).  Bauer testified consistently with this training, acknowledging that Zone 2 is the "stomach area," while Zone 3 includes the chest and up – and as the training reveals, the chest is clearly demarcated "center mass." Bauer Dep. 64-65.  Thus, his arguments about a sudden drop are simply smoke and mirrors, hoping to distract from his own admission that he aimed at Zone 3.

## II.     The force Bauer used was excessive

As noted above, the Fourth Amendment inquiry balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (cleaned up). Put another way, an officer's use of force must be proportional to the need for that force. *Parrish v. Dingman*, 912 F.3d 464, 468 (8th Cir. 2019); *see also* Gard Dep. 26.  *Graham* identified three well-known factors courts consider when analyzing whether an officer's force was excessive:  (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  490 U.S. at 396.

Yet, the ultimate touchstone is whether the officer's actions were objectively reasonable, which is "not capable of precise definition or mechanical application."  *Id.* Thus, the *Graham* factors are not exclusive.  Other relevant considerations include "the availability of alternative methods of . . . subduing a suspect," *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014); the extent of the injuries inflicted, *Montoya*, 669 F.3d at 872; and whether a reasonable officer on scene, without the benefit of hindsight, would have used the same force under similar circumstances, Eighth Circuit Manual of Model Jury

Instructions (Civil) 4.40.  When all of the relevant factors are considered, it is apparent

Bauer's use of force was unlawful.

### A.    Bauer used deadly force when none was authorized

By repeatedly asserting he used "non-deadly force," Bauer tacitly concedes that as

a deadly-force case, he cannot possibly win.  This is why he tries to divert the Court from

considering deadly force at all; even his use-of-force expert refused to analyze the matter

as a deadly-force incident.  *See* Gard Dep. 9-10.  But Bauer cannot escape that he used

deadly force.  This can and should be the end of the Court's analysis.

#### 1.    Bauer employed deadly force

Deadly force is well-understood as force substantially likely to cause death or

serious physical injury.  *See* Eighth Circuit Manual of Model Jury Instructions (Civil)

4.40; Angerhofer Dep. 17-19.  Though many deadly-force cases concern bullets from

firearms, these are not prerequisites; *any* type of force will do if reasonably likely to

cause death or serious injury.  As but one example, in *Ludwig v. Anderson*, the Eighth

Circuit held that "attempt[ing] to hit an individual with a moving squad car is an attempt

to apprehend by use of deadly force."  54 F.3d 465, 473 (8th Cir. 1995); *see also, e.g.,*

*State v. Ortiz*, 626 N.W.2d 445, 449-50 (Minn. Ct. App. 2001) (bare hands can inflict

deadly force); *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005) (shot

from "less-lethal" baton launcher at suspect's head deadly force).  One need look no

further than Derek Chauvin's knee to George Floyd's neck to understand that deadly

force does not require a rifle or a handgun.  *See also* Bauer Dep. 23 (agreeing "you can

kill somebody with a less-lethal weapon"); Pobuda Dep. 37-38 (riot baton can impart

deadly force; it "isn't done with just your gun"); Robinson Dep. 76 (acknowledging 40-millimeter launcher can be deadly force).[15]

Shooting someone in the face from close range with a large, high-velocity projectile designed to fragment on impact is quintessential deadly force. Any reasonable officer would understand doing so likely will cause death or serious bodily injury; indeed, it is common sense. *See also* Angerhofer Dep. 17-19; Bauer Dep. 35; Ryan Rpt. ¶¶ 139, 143-44. This is why both the manufacturer and MPD training warn officers not to fire at the head without deadly-force authorization. As Angerhofer conceded, Ethan was subjected to deadly force "by use of a 40-millimeter orange crushable blunt impact projectile to his right eye." Angerhofer Dep. 131-32. There can be no reasonable contention otherwise.

### 2. Deadly force was undisputedly improper

Bauer's use of deadly force is game over. The defense witnesses agree that nothing Ethan did on May 28, 2020, justified deadly force:

- *Pobuda Dep. 33-34*: "Q: You certainly didn't think you had sufficient excuse to use deadly force on him, did you? A: No."

---

[15] Bauer intimates that a "less-lethal" weapon can never constitute deadly force, citing Minnesota Statues § 609.066. Def. Mem. 36. But that statute can no more insulate him from liability than a state statute providing, "Shooting a suspect with a rifle is not deadly force." *See Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) ("Conduct . . . which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law."); *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) ("Missouri law cannot give police officers a freestanding right to use excessive force"). Why, moreover, would MPD train that the launcher can inflict deadly force if it were not a potential deadly-force instrument? *See* Bauer Dep. 23-24. Regardless, even courts construing Section 609.066 recognize that deadly force need not involve a bullet. *Ortiz,* 626 N.W.2d at 449-50 (hands can administer deadly force "in many situations—for example by choking, pushing a victim into harm's way, or inflicting a severe beating").

- 39 -

- *Angerhofer Dep. 63*:  "Q:  And you'd agree with me, based on your review, that Bauer did not have deadly force authorization, did he?  A:  No."

- *Gard Dep. 80*:  "Q:  There's no evidence, objective or otherwise, that deadly force would be justified under the circumstances confronting Bauer.  Correct?  A:  Deadly force would not be justified."

They are undoubtedly correct.

In balancing the interests at stake under the Fourth Amendment, the "intrusiveness of a seizure by means of deadly force is unmatched."  *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).  Thus, deadly force is reasonable only to counterbalance the highest of governmental interests, namely, to stop a suspect who poses an "immediate and significant threat of serious injury or death."  *Thompson v. Murray*, 800 F.3d 979, 983 (8th Cir. 2015); *accord* Robinson Dep. 46-47.  Cases approving deadly force nearly universally involve a suspect with a weapon, but even being armed is not enough; a suspect must take some type of "menacing action" with a weapon before deadly force is allowed.  *Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020); *accord Ellison v. Lesher*, 796 F.3d 910, 916-17 (8th Cir. 2015) (if officer shot decedent "while he was empty-handed," then "there were not reasonable grounds to believe that [he] posed a serious threat of death or serious physical injury to the officers or others," even though he had previously fought with officers and supposedly threatened them with a cane); *Nance*, 586 F.3d at 610-11 (officers could not use deadly force on suspect failing to comply with commands if he never moved hands towards weapon); *cf. Loch*, 689 F.3d at 966 (deadly force permissible when officer reasonably believed suspect was armed, ignored officer's commands to get on the ground, yelled "kill" while advancing towards

- 40 -

officer, and moved his hands towards his sides). And here, no reasonable jury could

conclude the *unarmed* Ethan constituted an immediate threat sufficient to justify deadly

force. Again, Bauer does not argue otherwise.

In any event, the *Graham* factors make clear deadly force was unlawful. As to the

severity of the "crime," there was none: Ethan was never charged and Pobuda did not

even think an *arrest* necessary. Bauer asserts that Ethan "undeniably committed an

aggressive assault" and, "[a]t a minimum, [] committed the gross misdemeanor crime of

assault in the fourth degree." Def. Mem. 25. False. Bauer ignores that the Hennepin

County Attorney's Office determined it *could not prove an assault*, including a fourth-

degree assault. MPLS_MARKS008151-52. So much for "undeniable." And Pobuda,

the subject of Ethan's so-called "aggressive assault," thought nothing of it. "While a jury

may credit [Bauer's] characterization of the incident" as some "aggressive assault,"

ample evidence exists to the contrary, and it is "not [the Court's] function to remove the

credibility assessment from the jury." *Montoya*, 669 F.3d at 872 (cleaned up).

Regardless, assaulting a police officer is no get-out-of-jail-free card for police

misconduct. It simply is not the law that "once a person resists law enforcement, he has

invited the police to inflict any reaction or retribution they choose, while forfeiting the

right to sue for damages." *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006). Or as

Judge Schiltz once put it in terms particularly apt for this case, assaulting a police officer

is not "a talisman that justifies any and all physical force. To cite an extreme example,

the fact that an unarmed suspect pushes or kicks a police officer would not justify the

police officer taking out his gun and shooting the suspect." *Jones v. Dahlson*, No. 11-cv-

289 (PJS/FLN), slip op. at 16 (D. Minn. Mar. 1, 2011);[16] *accord Rohrbough*, 586 F.3d at 586 (officer used excessive force despite being pushed by suspect).  Claims of excessive force may proceed even when the plaintiff has been *convicted* of assault or resisting arrest.  *See Colbert v. City of Monticello*, 775 F.3d 1006, 1008 (8th Cir. 2014).  Here, by contrast, two independent prosecutors deemed Ethan's conduct insufficient to support even *misdemeanor* charges.  *Cf.* Def. Mem. 26 (baldly claiming Ethan "committed a gross misdemeanor offense of obstructing legal process").

Bauer also claims he *reasonably believed* Ethan engaged in an "aggressive assault."  But if *Pobuda* didn't think that true, why should Bauer?  And, the prosecutors' declinations undermine the reasonableness of Bauer's purported belief, as well as his claim that he reasonably believed Ethan attempted to disarm Pobuda – a "disarming" that Pobuda didn't even bother reporting until ordered to do so.  *See Marth v. Herman*, Civ. No. 10-4842 (ADM/TNL), 2012 WL 3079256, at *3-5 (D. Minn. July 30, 2012) (Montgomery, J.) (claim that suspect attempted to grab officer's gun did not support summary judgment when officer failed to report attempted grab in call with dispatch after shooting).  Whether Bauer's purported beliefs were reasonable are jury questions.  *See Ludwig*, 54 F.3d at 473 (reversing grant of qualified immunity where "material questions of fact remain[ed] as to whether [the suspect's] actions at the time of the shooting, *even if dangerous, threatening, or aggressive*, posed a threat of serious physical harm") (cleaned up) (emphasis added).

---

[16] A copy of *Jones* is attached to the Bennett Declaration.

The second *Graham* factor also weighs against Bauer.  He claims Ethan posed an immediate threat to Pobuda yet overlooks that his force must be analyzed *at the moment he fired*.  *See, e.g.*, *Gardner v. Buerger*, 82 F.3d 248, 253 (8th Cir. 1996) (the "focus [is] on the seizure itself—here, the shooting—and not on the events leading up to it").[17]  At that moment, the two were separated by a large distance due to Pobuda's shove, with a person between them.  Angerhofer Dep. 147 (admitting the so-called "assaultive behavior had already [] taken place" when Bauer fired).  There was no way the unarmed Ethan could injure Pobuda from that distance.  *See Ellison*, 796 F.3d at 916-17; *Montoya*, 669 F.3d at 872.  Just as a rapid escalation of circumstances may justify increased force, so too must officers temper their force where, as here, a threat abates.  *See Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018) ("a reasonable officer is not permitted to ignore changing circumstances"); *Cole*, 959 F.3d at 1133 ("force that is reasonable while [the] suspect poses [a] threat is no longer reasonable once [the] threat is no longer present").

Bauer retorts that Ethan "ke[pt] his right hand clenched in a fist" and "readied himself to continue assaulting" Pobuda once shoved backwards.  Def. Mem. 15.  Apparently Bauer is a mind-reader, able to discern what Ethan intended once Pobuda pushed him away – despite purportedly not even having time to aim!  Bauer's own use-of-force expert contradicts him:

---

[17] This is why Bauer's smear campaign against Ethan in his brief, and his discussion of events outside the Third Precinct at other times, Def. Mem. 4-5, 29-30, is meaningless.  Bauer knew nothing of Ethan before he shot him.  Bauer Dep. 50-51; *see* Pobuda Dep. 71.

```
     Q    And Pobuda had not -- there was no effort

to re-assault Pobuda, was there?

     A    Don't know what Marks' intent was after.

If he -- there was no evidence to support otherwise.

If he was going to re-attack Pobuda, if he was going

to lunge forward, if he was going to pick something

up, we don't know.

     Q    We don't know what was in his head, do we?

     A    We don't.
```

Gard Dep. 46.  Regardless, police officers cannot base force decisions on hypotheses. *See* Ryan Rebuttal Rpt. ¶ 81 ("Officers are trained that force must be supported by articulable facts and not the infinite world of possibilities.  Officers are not trained they can use force, and more importantly deadly force, based on 'apparent attempts' that one can 'assume' would lead to a 'possibility.'"); *Orsak v. Metro. Airports Comm'n Airport Police Dept.*, 675 F. Supp. 2d 944, 955 (D. Minn. 2009) (force inappropriate where suspect posed only a "theoretical threat to officer safety").

As Bauer's team lead admitted, once Ethan separated from Pobuda, there was no justification to use deadly force, McCann Dep. 52; even Bauer admitted this separation reduced any purported threat.  Bauer Dep. 45-47; *see also* Robinson Dep. 66-68; Pobuda Dep. 41-42.  In *Montoya*, the Eighth Circuit reversed the grant of summary judgment for an officer utilizing a "leg sweep" that broke the plaintiff's leg, despite the plaintiff raising

a fist at the officer, because she was "ten to fifteen feet away" at the time.  669 F.3d at

869, 871.  <u>Shooting</u> Ethan <u>in the face</u> was epically more unlawful.

    The final *Graham* factor supports Ethan, too.  Indeed, Bauer concedes it "cannot

strictly be said that [Ethan] evaded arrest."  Def. Mem. 29.  This is a wise concession

given no one told Ethan he was under arrest or issued him any commands.  *See Atkinson*

*v. City of Mountain View*, 709 F.3d 1201, 1210 (8th Cir. 2013) (officer "could not

reasonably think Atkinson was resisting arrest" when he "never gave Atkinson the

opportunity to comply"); *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013)

(plaintiff was not "in flight or resisting arrest" when officer "had not advised him he was

under arrest").

    Other relevant considerations also militate in Ethan's favor.  For one thing,

Pobuda's decision to simply shove Ethan highlights that "a reasonable officer on the

scene, without the benefit of hindsight, would [not] have used" the same force as Bauer.

Eighth Circuit Manual of Model Jury Instructions (Civil) 4.40.  Indeed, Bauer's entire

argument rests on an assumption that *Pobuda's* response to Ethan was <u>un</u>reasonable, a

surprising contention when Pobuda was the one allegedly being "assaulted."

Furthermore, Bauer did not issue any warnings to Ethan before firing, which

"exacerbate[s] the circumstances" and militates against finding his use of deadly force

reasonable.  *Ludwig*, 54 F.3d at 474; *see also Smith v. K.C. Police Dept.*, 586 F.3d 576,

581 (8th Cir. 2009) (failure to give plaintiff opportunity to comply supported excessive-

force claim).  Likewise, Bauer had available options besides shooting Ethan in the face –

he admits as much by claiming he was aimed elsewhere.  Contrary to Bauer's argument,

the availability of less-forceful measures is relevant.  *See, e.g.*, *Shelton v. Stevens*, 964 F.3d 747, 753 (8th Cir. 2020); *Retz*, 741 F.3d at 918.  Bauer could have called out "Stop!", tackled Ethan, or used pepper spray;[18] he chose instead to shoot Ethan in the face with a high-speed, fragmenting projectile causing devastating injuries.

The relevant factors tilt decidedly in Ethan's favor, or at a minimum, well far enough to require jury resolution.  The Court needn't proceed further.

### B.      Even if Bauer used non-deadly force, it was still unreasonable

The foregoing analysis applies nearly identically even if the Court were to entertain Bauer's claim he aimed for Ethan's torso.  There was no "crime," Ethan posed no imminent threat once he and Pobuda separated, and he was not evading or resisting arrest.  There simply was no need for *any* force once Ethan had been shoved away.  *See* Pobuda Dep. 41-42; Ryan Rpt. ¶ 146.  Yet, Bauer used significant force, firing a projectile he knew would injure Ethan even if it hit the "torso."  *See* MPLS_MARKS007699-7704 (munitions intended to cause injury and pain through blunt-force trauma).  Indeed, recall that by Bauer's own admission, his supposed "torso" shot was aimed at Ethan's *chest*, in deadly-force Zone 3.  Even if not deadly force, a torso shot – or *any* shot from the launcher – was disproportional to the "need" for force (or lack thereof) when he fired.  *See Johnson v. Carroll*, 658 F.3d 819, 827 (8th Cir. 2011) (unlawful for officers to throw to the ground and mace plaintiff, despite interfering in

---

[18] Indeed, Bauer claims another officer directed pepper spray at Ethan.  Def. Mem. 16 n.5.  Although unclear whether this is depicted on video, this highlights that options short of shooting Ethan were available and appropriate.

nephew's arrest, when she was unarmed and posed "at most a minimal safety threat to the officers and was not actively resisting arrest or attempting to flee").

Quoting *Graham*, Bauer argues his shot was lawful because he made a "split-second decision" in circumstances that were "tense, uncertain, and rapidly evolving." Def. Mem. 29-32.  He seems to suggest this authorized him to take any action he wanted, Constitution be damned.  *But see* Ryan Rebuttal Rpt. ¶ 87 (split-second decisionmaking "is not an all-cases excuse for improper force").  Simply incanting *Graham*'s buzzwords, however, does not make them applicable, nor shield Bauer's conduct from illegality.

According to Bauer, he made a "split-second" decision to shoot because, "[f]rom the perspective of a reasonable officer on the scene, an immediate response would have been necessary, and waiting could have been disastrous."  Def. Mem. 32.  Pobuda certainly thought otherwise.  *See Ngo v. Storlie*, Civ. No. 03-3376 (RHK/JJG), 2006 WL 1579873, at *5 (D. Minn. June 2, 2006) (denying qualified immunity where two officers "reacted differently under identical circumstances"), *aff'd*, 495 F.3d 597 (8th Cir. 2007).  Regardless, "[e]ven when making 'split-second judgments' in 'tense, uncertain, and rapidly evolving' circumstances, officers cannot ignore what they know."  *Banks v. Hawkins*, 999 F.3d 521, 530 n.8 (8th Cir. 2021).  And here, Bauer knew Pobuda had pushed Ethan backwards and gained separation before he fired.  The "threat" at that moment had dissipated; there was no reason for Bauer to rush to Pobuda's "aid" (which Pobuda says he did not need).  By Bauer's logic, the faster an officer fires, the more protected his conduct would be – a sort of legalized shoot first and ask questions later.  Endorsing such an outcome would leave no room for the *Graham* factors and gravely

undermine citizens' Fourth Amendment rights.  *See Skube v. Williamson*, Civ. No. 12-3185, 2015 WL 890363, at *8 (C.D. Ill. Feb. 27, 2015) ("[A] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.") (citation omitted); *Almond v. Butler*, No. 4:20-CV-04054-LLP, 2021 WL 4482164, at *6 (D.S.D. Sept. 30, 2021) ("the presence of a rapidly evolving situation does not preclude a[n] analysis under *Graham*").

Moreover, as already noted, the evidence belies Bauer's contention that the scene was "a large-scale riot," and there is no evidence Ethan engaged in any "rioting" anyway. *Johnson*, 658 F.3d at 826 (reversing grant of qualified immunity where "[t]he district court appears to have credited the officers' characterization of the crowd and determined that the circumstances were 'tense, uncertain, and rapidly evolving'").  Bauer startlingly argues that because there was a "dangerous protest" taking place, he was authorized to use "less-lethal projectiles on subjects that present[ed] a threat to officer safety, without any [] limitation about where the projectile[s] strike[] the subject[s]."  Def. Mem. 39-40. But Ethan was no threat when Bauer fired, and the cases he cites ostensibly supporting this proposition are distinguishable.  *See White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017) (rubber bullets allowed where officer reasonably concluded suspect was part of violent crowd *and* ignored officer commands not to approach); *Bernini v. City of St. Paul*, 665 F.3d 997, 1006 (8th Cir. 2012) (affirming qualified immunity where record did "not show that any of the defendants directly used force against any of the plaintiffs"). Again, Pobuda was subjected to the same so-called "tense, uncertain, and rapidly

evolving" circumstances and opted to use a simple shove; that he and Bauer reacted so differently highlights the issue must be decided by a jury. *Ngo*, 2006 WL 1579873, at *5.

## III. The law was clearly established

A right is clearly-established when its contours are "sufficiently clear that a reasonable offic[er] would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Notice is key: whether a reasonable officer "had fair notice [his] conduct was unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). This is a "flexible standard, requiring some, but not precise factual correspondence with precedent, and . . . appl[ication of] general, well-developed legal principles." *Stoner v. Watlingten*, 735 F.3d 799, 803 (8th Cir. 2013); *accord Banks*, 999 F.3d at 528 (plaintiff "does not have to point to a nearly identical case on the facts" because the clearly-established prong "does not set such a prohibitively difficult standard").

Bauer violated clearly-established law by using deadly force here. It was recognized long before May 28, 2020, that deadly force is appropriate only in response to an "immediate and significant threat of serious injury or death." *Thompson*, 800 F.3d at 983; *accord, e.g.*, *Ellison*, 796 F.3d at 916-17; *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015). For reasons already discussed, there was *never* a basis for Bauer to conclude the unarmed Ethan posed an imminent and significant threat of seriously bodily harm or death, and even if there were, the threat had diminished by the time Bauer fired. *See Ellison*, 796 F.3d at 916-17 (no reasonable grounds to believe suspect posed threat of death or serious injury when he was "empty-handed," despite earlier fighting with

officers). This is why the defense witnesses concede deadly force was inappropriate –
and why Bauer tries so desperately to frame this case as one not involving deadly force.[19]

As this Court has recognized, a police officer will not be immune "if, on an
objective basis, it is obvious that no reasonably competent officer would have concluded
that the defendant should have taken the disputed action." *Mann v. Shevich*, Civ. No. 08-
5202 (ADM/RLE), 2010 WL 653867, at *2 (D. Minn. Feb. 23, 2010) (Montgomery, J.)
(citation omitted). Bauer's claim that he could not possibly have understood the illegality
of shooting someone in the face with a less-lethal launcher from close range is belied by
his testimony, his witnesses, MPD training, his own use-of-force expert, and simple
common sense. His training officer and supervisor, Angerhofer, testified that per MPD
"policy, training, and the Constitution," Ethan never should have been blinded.
Angerhofer Dep. 141. His and all the other law-enforcement witnesses' consistent
testimony lays bare that no reasonable officer could have concluded it was proper to
shoot Ethan in the face. Bauer's actions were those of a "plainly incompetent" officer,
unentitled to qualified immunity. *Banks*, 999 F.3d at 527.

The outcome is no different even if Bauer employed something less than deadly
force by supposedly aiming for Ethan's torso. Viewed in the light most favorable to
Ethan, the evidence reveals he posed no threat to officers or anyone else at the time of the
shot, since Pobuda had pushed Ethan well away. Pobuda admitted he perceived no threat
at that juncture and made nothing at all of their shoving match, and he did not believe *any*

---

[19] It is also why Bauer's citation to *White* and *Bernini* misses the mark, as neither
involved the use of deadly force.

additional force necessary. And, neither he nor two prosecuting authorities believed Ethan's conduct criminal. A reasonable officer would have understood that using significant force in these circumstances was unlawful. *See Montoya*, 669 F.3d at 869-71 (leg sweep improper where plaintiff acted aggressively but ten to fifteen feet from officer); *Johnson*, 658 F.3d at 827 (being maced and thrown to the ground was excessive where plaintiff was unarmed and posed "at most a minimal safety threat to the officers and was not actively resisting arrest or attempting to flee"); *Rohrbough*, 586 F.3d at 586 (forceful takedown unlawful despite plaintiff having pushed officer).

True, none of these cases involved 40-millimeter launchers. But as already noted, Ethan is not required to point to an identical case for the law to be clearly established, particularly when the same considerations for bullet-shooting firearms apply to "less-lethal" ones. *See supra* note 9. "[B]ecause excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find qualified immunity wherever we have a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (cleaned up). In *Ludwig*, for example, the Eighth Circuit found an officer unlawfully used deadly force by attempting to strike the decedent with his car, despite not relying on any factually similar case. 54 F.3d at 473-74. So too here. Bauer knew from training that a round fired from the launcher, even if not aimed at the face, would cause significant blunt-force trauma and pain. A reasonable officer in his position would not "have needed to consult a casebook to recognize the unreasonableness of using [such]

- 51 -

force . . . against a man who" posed no threat at the time of the shot. *Atkinson*, 709 F.3d at 1212 (cleaned up); *accord Morris v. Zefferi*, 601 F.3d 805, 812 (8th Cir. 2010) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning that an official's actions are unlawful.") (citation omitted).

## CONCLUSION

The Court should reject Bauer's invitation to flout Rule 56 by ignoring the evidence in the record demonstrating the unlawfulness of his conduct. His Motion should be denied.

Dated: September 21, 2022

/s/ Robert Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Greta A. Wiessner, #0401130
**ROBINS KAPLAN LLP**
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
gwiessner@robinskaplan.com
***Attorneys for Plaintiff Ethan Daniel Marks***