# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ethan Daniel Marks,

      Plaintiff,

v.

      **MEMORANDUM OPINION AND ORDER**
      Civil No. 20-1913 ADM/JFD

Benjamin Bauer, acting in his individual
capacity as a Minneapolis Police Officer,

      Defendant.

_____

Greta Wiessner, Esq., Kathryn H. Bennett, Esq., Marc Betinsky, Esq., and Robert Bennett, Esq., Robins Kaplan LLP, Minneapolis, MN, on behalf of Plaintiff.

Kristin R. Sarff, Esq., Heather Passe Robertson, Esq., and Sharda R Enslin, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On November 16, 2022, the undersigned United States District Judge heard oral argument on Defendant Benjamin Bauer's ("Officer Bauer") Motion for Summary Judgment [Docket No 100] and Motion to Exclude the Report and Testimony of Thomas Martin ("Martin") [Docket No. 97].  The Court also heard oral argument on Plaintiff Ethan Daniel Marks' ("Marks") Motion to Exclude the Testimony of Defense Expert Christopher Gard ("Gard") [Docket No. 81] and Motion to Exclude the Testimony of Defense Experts Parris Ward ("Ward") and Matthew Noedel ("Noedel") [Docket No. 85].  For the reasons set forth below, the motion for summary judgment is denied, the motion to exclude Martin's expert report and testimony is granted in part and denied in part, the motion to exclude Gard's expert testimony is granted in part and denied in part, and the motion to exclude Ward and Noedel's expert testimony is denied.

## II.  BACKGROUND

This action arises from Officer Bauer's firing a less-lethal projectile at Plaintiff Ethan Marks from close range.  The chemical-filled projectile ruptured Marks' right eyeball, causing him to become legally blind in that eye.  Marks filed this 42 U.S.C. § 1983 lawsuit against Officer Bauer alleging a single claim of excessive force in violation of his Fourth and Fourteenth Amendment rights.  Second Am. Compl. [Docket No. 50] ¶¶ 133-38.

### A.  The Incident

The incident occurred in Minneapolis on May 28, 2020, three days after George Floyd was murdered by former Minneapolis police officer Derek Chauvin in the presence of additional Minneapolis police officers.  Floyd's death was captured on video and sparked protests throughout the city, state, and nation.  The protests caused extensive property destruction in Minneapolis.  Id. ¶ 12; Answer [Docket No. 55] ¶ 12; K. Bennett Decl. [Docket No. 121][1] Ex. 8 (Ethan Marks Dep.) at 93-96, 182, 203.

On the afternoon of May 28, 2020, Marks and his mother attended a clean-up event in Minneapolis' Longfellow neighborhood, which had been damaged by rioting and looting.  K. Bennett Decl. Ex. 7 (Anne Marks Dep.) at 155-59.  Marks was 19 years old at the time and was six feet tall and approximately 200 pounds.  Ethan Marks Dep. at 15, 19-20.  Marks' mother is a registered nurse.  Anne Marks Dep. at 23.

The area where Marks and his mother were cleaning was located near the Minneapolis Police Department's ("MPD") Third Precinct building, which was the "epicenter of protests over the death of George Floyd."  Second Am. Compl. ¶ 19.  When Marks arrived in the area, he saw a building that had been burned down, another that was still burning, and rubble from property

---

[1]  Unless otherwise noted, all exhibits to the K. Bennett Declaration are in Docket No. 121.

destruction.  Ethan Marks Dep. at 93-95, 182.  Hundreds of people, including protesters, were in the area.  Id. at 188-89, 197.

At approximately 5:30 p.m., several MPD vehicles arrived in the area in response to a report that a person in the crowd had been stabbed.  K. Bennett Decl. Ex. 10 (Bauer BWC) (filed under seal) at 17:30:57-17:31:30; id. Ex. 11 (Pobuda BWC) (filed under seal); Sarff Decl. [Docket No. 103] Ex. C at 2:04-2:26, 3:53-3:39.  Officer Bauer, who had been a member of MPD's SWAT team since 2014, arrived in a white SWAT van along with seven other SWAT officers and MPD Sergeant Ryan McCann.  See generally Bauer BWC; K. Bennet Decl. Ex. 1 (Bauer Dep.) at 92-93; K. Bennett Decl. Ex. 6 (McCann Dep.) at 4, 24;.  Officer Bauer was equipped with a 40-millimeter direct impact less-lethal launcher that was loaded with oleoresin capsicum ("OC"), an inflammatory chemical agent that is released when the round hits its target and breaks apart.  K. Bennett Decl. Ex. 4 [Docket No. 122] at MPLS_MARKS007666-67; Bauer Dep. at 18-19, 113.

As the SWAT team drove toward the scene, they were informed that a large crowd was in the area and that people were throwing rocks at officers as they approached.  Bauer Dep. at 150. When the SWAT van entered the area, Officer Bauer observed people throwing items, including a glass bottle.  Bauer BWC at 17:31:56-17:31:59.  The SWAT van was hit with frozen water bottles, a rock, and other objects.  Id. at 17:33:42-17:34:05; Bauer Dep. at 151.

After exiting the SWAT van, Officer Bauer moved toward the area where people were throwing objects at officers and deployed his launcher at the individuals from a distance.  Bauer BWC at 17:34:40-17:38:48; Sarff Decl. Ex. E (Police Report Suppl.).  Officer Bauer then offered protection as officers loaded the stabbing victim into the back of a police SUV.  Bauer BWC at 17:38:52-17:39:01; Police Report Suppl.

3

When Officer Bauer returned to the SWAT van, he learned that another victim had reportedly been struck by a baseball bat.  Police Report Suppl.  Officer Bauer ran toward the area where the injured woman was on the ground and positioned himself to establish a perimeter around the victim and the officers who were trying to evacuate her from the area.  Bauer BWC 17:39:35-17:39:45.  Officer Bauer was facing the crowd with his back to the injured woman and the other assisting officers.  Id. at 17:39:45-17:40:30.

Marks' mother tried to approach the injured woman to offer medical assistance while Marks stood nearby.  Pobuda BWC 17:40:24-17:40:28.  MPD Officer Jonathan Pobuda ("Officer Pobuda"), who was helping to form a perimeter around the victim, blocked Marks' mother with his arm and ordered her to stand back.  Id. at 17:40:28-32.   After Officer Pobuda's interaction with Marks' mother, Marks walked over to Officer Pobuda and shouted, "Back up, bitch!"  Id. at 17:40:33-34; Ethan Marks Dep. at 232.  One of Marks' hands was clenched in a fist.  Sarff Decl. Ex. G at 27-28.

Officer Bauer did not see the interaction between Officer Pobuda and Marks' mother because he was facing a different direction from them.  Bauer BWC at 17:40:31-17:40:32. However, at the sound of Marks' shouting, Officer Bauer turned and saw Marks strike Officer Pobuda.  Bauer Dep. at 139.  Marks shoved Officer Pobuda and briefly grasped his riot baton. Sarff Decl. Ex. G at 27-32, 38-39; Bauer BWC at 17:40:33-36.  Marks' actions knocked Officer Pobuda's police radio off his chest and disturbed his riot helmet. K. Bennett Decl. Ex. 31 (Ward Report) at 6 (Figure 6) (falling police radio); id. Ex. G at 35-36 (officer readjusting his riot helmet).

Officer Pobuda, who is six feet tall and weighs 265 pounds, retained control of the baton and pushed Marks backwards with it, creating several feet of space between himself and Marks.

Bauer BWC at 17:40:36; K. Bennett Decl. Ex. 9 (Pobuda Dep) at 4; Sarff Decl. Ex. G at 47-52.

Marks stumbled backwards over a large corrugated pipe that was on the ground behind him.

Sarff Decl. Ex. G at 51.  A bystander with outstretched arms stepped into the space between

Marks and Officer Pobuda.  Id. at 52; Pobuda BWC 17:40:36-17:40:40; Bauer BWC at 17:40:35.

After pushing Marks away, Officer Pobuda did not perceive Marks as a threat and determined

that no additional force was needed.  Pobuda Dep. at 41-42.

Officer Bauer, however, thought a "bad assault" was occurring.  Bauer Dep. at 154.  As

Marks was "kind of falling," Officer Bauer deployed the launcher without warning and shot

Marks in the face from close range.  Bauer BWC at 17:40:36-37; Bauer Dep. at 202.  The

chemical-filled projectile hit Marks' right eye and exploded.  Bauer BWC at 17:40:37; Bauer

Dep. at 202.

From the time Marks yelled "Back up, bitch!" to the time Officer Bauer fired the

launcher, less than 4 seconds had elapsed.  Pobuda BWC at 17:40:33-17:40:37.  Officer Bauer's

decision to shoot Marks occurred even more quickly---only half a second transpired from the

time Officer Bauer raised the launcher to firing it.  Ward Report at 10.

Immediately after the shooting, a bystander shouted, "Hey!  Hey!  Point blank?"  Bauer

BWC at 17:40:37-17:40:42.  Officer Bauer yelled back "Yes!"  Id. at 17:40:42.  Marks fell to the

ground and stumbled away, holding his face.  Bauer Dep. at 185; Pobuda BWC 17:40:36-

17:40:40.  Neither Officer Bauer nor Officer Pobuda pursued Marks to render aid or to arrest

him.  Poduba Dep. at 42; Answer [Docket No. 55] ¶ 87.

The OC round caused serious injury to Marks, including a ruptured right eyeball,

detached retina, fractured eye socket, and a traumatic brain injury.  K. Bennett Decl. Ex. 28

(Koozekanani Report) at 2-10; id. Ex. 29 (Weingarden Report) at 1-2; id. Ex. 34 (Mokhtarzadeh

Report) at 1-2.  Marks has undergone multiple surgeries to repair some of the damage and restore

his vision, with limited success.  He remains legally blind in his right eye and suffers from

headaches, decreased visual motor skills and depth perception, balance problems, and nerve

damage that causes inflammation and pain.  Weingarden Report at 5; Mokhtarzadeh Report at 2;

K. Bennett Decl. Ex. 36 (Weingarden Addendum) at 3; id. Ex. 37 (Glass Report) at 4-7; Ethan

Marks Dep. at 314-33.  Marks has also suffered emotional distress, mental pain and anguish,

anxiety, depression, and PTSD.  Ethan Marks Dep. at 314-33.

In 2021, the MPD provided body-camera footage and Officer Pobuda's police report of

the incident to the Hennepin County Attorney's Office to determine whether Marks should be

criminally charged with assault or attempting to disarm a police officer.  K. Bennett Decl. Ex. 19

(Robinson Dep.) at 11-16, 30.  After review of the evidence, the County Attorney declined to

prosecute, concluding no felony charges were warranted.  Id. at 38-39; R. Bennett Decl. Ex. K

[Docket No. 91-5].  The MPD then sent the materials to the Minneapolis City Attorney's Office

for consideration of misdemeanor charges.  Robinson Dep. at 39.  Due to a conflict of interest,

that office then forwarded the matter to the St. Paul City Attorney's Office for review.  Id.  An

independent prosecutor there declined to charge Marks with obstructing legal process,

concluding there was "insufficient evidence" and that the "facts/circumstances do not support

charges."  R. Bennett Decl. Ex. J [Docket No. 91-4].

**B. The Less Lethal Weapon and Zones of Impact**

The weapon used by Bauer was a LTMS 40-millimeter "less-lethal" launcher, which is

25 inches long and includes a front grip below the barrel to aid in stability and make shots more

accurate.  K. Bennett Decl. Ex. 3; Bauer Dep. at 9, 61-63, 108-22, 175.  The launcher fires 40-

millimeter "high energy" munitions designed to cause pain when the munition's "energy is

transferred . . . to the fluid mass of the body." K. Bennet Decl. Ex. 4 [Docket No. 122] at

MPLS_MARKS007652, 007700-08. The munitions are intended to "leave[] the body surface

intact, but cause[] sufficient injury to incapacitate the subject." Id. at MPLS_MARKS007703.

Officer Bauer's launcher was loaded with a Direct Impact #6320 OC round, which is a chemical-

filled projectile that travels 295 feet per second out of the launcher's barrel. Id. at

MPLS_MARKS007707; K. Bennett Decl. Ex. 5 at 24, 40.

     Although the launcher is categorized as a "less lethal" weapon, it is not non-lethal. The

manufacturer's warning expressly states that "This product may cause serious injury or death to

you or others." Bauer Dep. at 23. The training provided by the MPD similarly instructs that the

less lethal launcher "can be considered a deadly force." Id. at 24. As a result, the MPD trains its

SWAT officers to consider three impact areas or "Zones" on the body when deciding where to

shoot. See K. Bennet Decl. Ex. 4 [Docket No. 122] at MPLS_MARKS007712-15.

     Zone 1 consists of large muscle groups and encompasses the buttocks, thigh, and calf. Id.

at MPLS_MARKS007713. This training instructs that "[w]here the threat level is appropriate

and this zone is viable, [Zone 1] should be considered first." Id. Zone 2 consists of medium

muscle groups and encompasses the abdominal area. Id. at MPLS_MARKS007714. Zone 3

encompasses the chest (also referred to as "center mass" in the training materials), spine, head

and neck. Id. at MPLS_MARKS007715. This Zone "carries the greatest potential for serious or

fatal injury" and "should only be considered when maximum effectiveness is desired to meet a

level of threat escalating to deadly force." Id.

     The minimum safe standoff range for the OC round is 5 feet, and the optimal deployment

range is between 10 and 90 feet. Id. at MPLS_MARKS007707. If Zone 3 is targeted, the

minimum safe range is irrelevant. K. Bennett Decl. Ex. Ex. 5 (Angerhofer Dep.) at 77.

**C.  Officer Bauer's Training and Proficiency with the Less Lethal Weapon**

To be qualified to carry and use the launcher, Officer Bauer was required to undergo annual training and written tests as well as field testing where officers fire the launcher at designated targets.  Bauer Dep. at 62-64, 74; K. Bennett Decl. Ex. 4 [Docket No. 122] at MPLS_MARKS007653-55.  In some qualifying field exercises, officers are not permitted to miss; others require hitting small targets from more than 50 feet away.  Bauer Dep. at 98-99. The goal of the training is to ensure that SWAT members are "more proficient" with their weapons than regular MPD officers.  Id. at 89.

Officer Bauer had been qualified to carry and use the launcher for approximately six years when he shot Marks.  Id. at 12.  He admits that the launcher is an accurate weapon.  Id. at 14.  Officer Bauer has established himself as an accurate shooter.  Before becoming a police officer, Officer Bauer served in the military and was rated as a Marksman with his M4 rifle.  Id. at 90.  Months after he shot Marks, Officer Bauer fired his launcher from 50 feet away at a suspect who was scaling a fence at night and hit the suspect where intended, in the buttocks.  Id. at 16, 65-66.

Officer Bauer contends that when he fired the launcher at Marks he was aiming for "center mass . . . [i]n the torso area," which he describes as "Zone 2-ish," but that he hit Marks in the face instead because Marks was "kind of falling."  Id. at 118, 143, 154-55, 194.

Marks disagrees and argues that the BWC video and a twitter video show that Officer Bauer tracked Marks' head with the launcher before firing.  Marks further notes that Officer Bauer's own shooting reconstruction expert testified in his deposition that Officer Bauer raised the launcher from a "low-ready position, and elevate[d] the gun, ultimately ending in Zone 3." K. Bennett Decl. Ex. 18 (Noedel Dep.) at 40.  The expert also testified that videos do not show

Officer Bauer aiming at Zone 1 or Zone 2, and that "at the time of discharge, [the gun] ha[d] been elevated into Zone 3." Id. at 41. Officer Bauer's forensic video expert similarly testified in his deposition that Officer Bauer was not pointing at Zone 1 or Zone 2 at the time he fired. K. Bennett Decl. Ex. 12 (Ward Dep.) at 49.

### III.  DISCUSSION

**A. Summary Judgment Motion**

**1. Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted). If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id.

**2. Qualified Immunity**

Bauer's summary judgment motion is premised upon his argument that he is entitled to qualified immunity against Marks' claim of excessive force. Qualified immunity shields government officials from § 1983 lawsuits and liability "unless the official's conduct violates a

9

clearly established constitutional or statutory right of which a reasonable person would have known."  LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013).  A summary judgment motion based on qualified immunity must be denied if:  "(1) the evidence, viewed in the light most favorable to [Marks], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable officer would have known that his actions were unlawful."  Banks v. Hawkins, 999 F.3d 521, 524 (8th Cir. 2021), cert. denied, 142 S. Ct. 2674 (2022).  Conversely, if either of those two prongs cannot be established, qualified immunity applies and summary judgment should be granted.

### a. Violation of a Constitutional Right

The constitutional right at issue here is Marks' Fourth Amendment right to be free from unreasonable seizure.  "To establish a Fourth Amendment violation, the claimant must demonstrate a seizure occurred and the seizure was unreasonable."  Quraishi v. St. Charles Cnty., Missouri, 986 F.3d 831, 839 (8th Cir. 2021) (internal quotation marks omitted).

### i. Seizure

As an initial matter, Officer Bauer argues for the first time in his reply brief that a Fourth Amendment seizure did not occur.  Officer Bauer contends that Marks was not seized because Officer Bauer did not tell Marks he could not leave the scene, did not attempt to detain Marks, and did not limit his path to leave.  As such, Officer Bauer argues that he merely used force to repel Marks away from Officer Pobuda, and that such force does not constitute a seizure under the Fourth Amendment.

Not only is the argument untimely,[2] it fails on the merits.  "A seizure is an 'application of physical force to restrain movement, even when it is ultimately unsuccessful.'" Quraishi v. St. Charles Cnty., Mo., 986 F.3d 831, 839 (8th Cir. 2021) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)); see also Torres v. Madrid, 141 S. Ct. 989, 1003 (2021) ("[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued.").  "[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980).  When an officer restrains a person's freedom of movement through physical force, it "would make little sense to ask whether [that] person felt free to leave . . . because the force itself necessarily---if only briefly---restrained the person's liberty." Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1209 (8th Cir. 2013) (quotation marks and alterations omitted).

Here, Officer Bauer applied physical force to restrain Marks' movement by shooting him in the face with a projectile at close range to stop him from re-engaging with Officer Pobuda. Bauer Dep. at 154.  The force applied by Officer Bauer knocked Marks to the ground on impact, causing his freedom of movement to be restrained, even if only briefly.  Bauer Dep. at 162, 185. When interviewed about the incident, Officer Bauer stated that there were not enough officers to arrest Marks because he was fleeing the scene. K. Bennett Decl. Ex. 16 [Docket No. 122, Attach.

---

[2] Local Rule 7.1(c)(3)(B) provides:  "A reply memorandum must not raise new grounds for relief or present matters that do not relate to the opposing party's response."  D. Minn. LR 7.1(c)(3)(B); see also Barham v. Reliance Standard Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006) ("As a general rule, we will not consider arguments raised for the first time in a reply brief."); Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd., 491 F. Supp. 2d 871, 878 (D. Minn. 2007) ("[F]ederal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief.").

1] at MPLS_MARKS007338.  These facts, viewed in the light most favorable to Marks, are sufficient to establish that a seizure occurred the moment Officer Bauer shot Marks in the face.

The cases cited by Officer Bauer do not compel a different result because all involve force used to disperse or repel individuals from restricted areas rather than force used to restrain movement.  See Dundon v. Kirchmeier, 2017 WL 5894552, at *3, *18 (D.N.D. Feb. 7, 2017), aff'd mem., 701. F. App'x 538 (8th Cir. 2017) (holding officers' use of rubber bullets and projectiles to disperse a crowd of protesters was not a seizure); Martinez v. Sasse, 37 F.4th 506, 509-10 (8th Cir. 2022) (holding officer's push of plaintiff to prevent her from entering a building was not a seizure because the alleged push did not "restrain" plaintiff but instead "repelled" plaintiff from entering the building).  Officer Bauer has stated that he did not use the 40-millimeter launcher as a dispersal tool.  See K. Bennett Decl. Ex. 16 [Docket No. 122, Attach. 1] at MPLS_MARKS007335.  He also described Marks as "fleeing," rather than dispersing, which further shows that Officer Bauer used force to restrain Marks and not to repel him.  Id. at MPLS_MARKS007338.  A person who is free to leave or who is complying with an officer's dispersal efforts is typically not described as "fleeing the scene."  Id.

The context and circumstances establish that Officer Bauer restrained Marks' movement by freezing him in place through physical force, and that there were not sufficient officers to pursue a fleeing suspect in an unruly crowd.  In Torres v. Madrid, the Supreme Court found that officers' shooting at Torres was "physical force [applied] to her body [which] objectively manifested an intent to restrain her" and was therefore a seizure "for the instant that the bullets struck her."  Torres, 141 S. Ct. at 999.  Similarly, Marks was "seized" by Officer Bauer when the less-lethal projectile toppled him to the ground.  Accordingly, Marks was seized within the meaning of the Fourth Amendment.

## ii.  Reasonableness of Seizure

Having determined a Fourth Amendment seizure occurred, the Court next examines whether the seizure was reasonable.  Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 388 (1989).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397.

The reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments---in circumstances that are tense, uncertain, and rapidly evolving---about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97.

## A.  Deadly Force

In framing their use-of-force arguments, the parties disagree over whether Officer Bauer used deadly force.  "[D]eadly force is "such force that creates a substantial risk of causing death or serious bodily harm."  Anderson v. Avond, --- F. Supp. 3d ---, No. 20-CV-1147 (KMM/LIB), 2022 WL 4540125, at *5 (D. Minn. Sept. 28, 2022) (quoting Church v. Anderson, 249 F. Supp. 3d 963, 968 (N.D. Iowa 2017), aff'd 898 F.3d 830 (8th Cir. 2018)).  Unless an officer has "probable cause . . . to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable."  Cole Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir. 2020).  On a motion for summary judgment, if disputed facts could lead a reasonable juror to find that an officer's conduct amounted to deadly force, the

issue must be decided by the jury.  <u>Anderson</u>, 2022 WL 4540125, at *6; <u>see also</u> <u>Ludwig v.</u>

<u>Anderson</u>, 54 F.3d 465, 473 (8th Cir. 1995) (denying summary judgment because issues of

material fact precluded the court from determining whether an officer's attempt to hit an

individual with a moving squad car amounted to deadly force).

      Significantly, Officer Bauer does not argue that the use of deadly force would have been

objectively reasonable under the circumstances of this case.  Indeed, Officer Bauer's own

defense witnesses concede that deadly force was not justified.  Pobuda Dep. at 33-34;

Angerhofer Dep. at 63; Gard Dep. at 80.

      Rather than arguing that the use of deadly force was objectively reasonable, Officer

Bauer insists that he did not use deadly force because he intended to hit Marks in the torso, but

that Marks' body dropped suddenly before the launcher was deployed, causing the projectile to

hit Marks in the face.  This argument is unconvincing because the force that Officer Bauer

<u>intended</u> to apply is not relevant to the reasonableness inquiry.  The Supreme Court has long

made clear that "the question is whether the officers' actions are 'objectively reasonable' in light

of the facts and circumstances confronting them, <u>without regard to their underlying intent or</u>

<u>motivation</u>."  <u>Graham</u>, 490 U.S. at 397 (emphasis added).  As such, "[a]n officer's evil intentions

will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor

will an officer's good intentions make an objectively unreasonable use of force constitutional."

<u>Id.</u>  Stated differently, "consideration of whether the individual officers acted in 'good faith' or

'maliciously and sadistically for the very purpose of causing harm,' is incompatible with a

proper Fourth Amendment analysis."  <u>Id.</u>

      Here, the actual force used by Officer Bauer consisted of shooting a less lethal launcher

from close range into Marks' face---an area which "carries the greatest potential for serious or

fatal injury." K. Bennett Decl. Ex. 4 [Docket No. 122] at MPLS_MARKS007715.  Thus, regardless of Officer Bauer's subjective intent or motivation, he used force capable of causing serious or fatal injury on Marks, who was unarmed, had been pushed several feet away from Officer Pobuda, and was stumbling backwards when he was shot.  Under these circumstances, the Court cannot conclude that Officer Bauer's use of force was objectively reasonable.

Officer Bauer argues that his "mistaken placement of a less-lethal weapon" was objectively reasonable and does not give rise to a constitutional violation.  Def. Mem. Opp'n Summ. J. [Docket No. 105] at 38.  However, this argument is simply another way of saying that he underlined intended to aim his weapon elsewhere.  Officer Bauer's intent and motivation are not relevant to the Fourth Amendment analysis.

Even if Officer Bauer's subjective intent were relevant, a genuine dispute of material fact exists concerning whether Officer Bauer intended to use deadly force when he shot Marks in the face.  Marks argues that Officer Bauer intentionally aimed for Zone 3, whereas Officer Bauer argues that he was aiming for Marks' torso but unintentionally hit Marks in the face because Marks was falling as the weapon discharged.

Viewing the record in the light most favorable to Marks, sufficient evidence exists from which a reasonable jury could find that Marks aimed for Zone 3.  Significantly, Officer Bauer is an experienced military marksman and was trained to be accurate and proficient with the less lethal launcher.  Days after the incident with Marks, Officer Bauer succeeded in hitting his intended moving target---the buttocks of a man scaling a wall---from 50 yards away in the dark of night.  Bauer Dep. at 16, 65-66.  Here, Officer Bauer was five to 10 feet away when he shot Marks in the face in broad daylight.

Officer Bauer also provided unclear deposition testimony about where he was aiming that would allow a reasonable juror to resolve this factual disagreement in Marks' favor.  For example, Officer Bauer testified that he aimed for "center mass," which he described as the "whole torso area," and which he believed was "[p]robably around like . . . Zone 2-ish."  Bauer Dep. at 118-119, 154, 194.  However, the SWAT training that Officer Bauer was required to complete on a yearly basis instructs that Zone 2 encompasses the abdominal area, and that "center mass" is the chest and is located in Zone 3.  K. Bennett Decl. Ex. 4 [Docket No. 122] at MPLS_MARKS007715.  Thus, a reasonable jury could find that Officer Bauer was aiming for an area on Marks' body that carried the potential for serious injury or death.

A review of the video footage of the incident also permits a reasonable inference that Officer Bauer was aiming the launcher at Zone 3 when he deployed the launcher.  Two of Officer Bauer's' own experts testified that the video footage does not show Officer Bauer aiming at Zone 1 or Zone 2 before he fired the launcher.  See Ward Dep. at 49; Noedel Dep. at 41.  The Court has repeatedly viewed the video footage and photo images of the incident, including the angle of the launcher and Marks' body position, and whether or not Officer Bauer was aiming for Zone 3 when he shot Marks remains uncertain.

In an effort to show he was not aiming for Zone 3, Officer Bauer relies on an expert report from forensic video specialist Paris Ward ("Ward").  See K. Bennett Decl. Ex. 31 (Ward Report).  Ward stabilized and enlarged certain frames of Officer Bauer's body-worn camera and determined that the stabilized video shows that Marks' hip rose in elevation and then dropped down several inches in the fraction of a second before Marks was shot.  Id. at 9.  Ward concludes that the sudden downward movement occurred 0.23 seconds before Marks was shot, and "could explain why he was hit in the head instead of the upper torso."  Id. at 13.  Ward's report does not

16

quantify the distance that Marks' body dropped, but Ward testified in his deposition that Marks' body "may have dropped as much as 10 inches, even 10 to 12 inches." Id. at 62.

Even if a reasonable jury were to credit Ward's report and testimony about the sudden drop in Marks' body position, the jury could still conclude that Officer Bauer was aiming in Zone 3 to begin with, and that Marks' fall simply caused Officer Bauer to hit Marks higher in Zone 3 than intended. According to the estimations of Officer Bauer's own shooting reconstruction expert, Matthew Noedel ("Noedel"), the area located 10 inches below Marks' eyes is his chest. See R. Bennet Decl. Ex. F (Noedel Report) [Docket No. 91-1] at 6 (Figure 3) (stating the approximate 10-inch height difference "shows the height differential in hitting the chest versus the right eye of Mr. Marks") (emphasis added). As Bauer acknowledges and the MPD training materials instruct, the chest is located in Zone 3. See Bauer Dep. at 65 ("Zone 3 would be from the chest up, sir.").

In further arguing that he did not aim at Marks' head, Officer Bauer relies on calculations performed by Noedel showing that to hit Marks in the eye instead of the "upper torso area," the launcher would only need to be rotated approximately 5 degrees upward. Noedel Report at 2, 6 (Figure 3), 7 (Figure 4). Officer Bauer urges that this minor difference in rotation is nearly imperceptible and could explain why he hit Marks in the eye even though he was not aiming at Marks' head.

This proffered explanation is not sufficient to resolve the fact issue of whether or not Officer Bauer was aiming for Zone 3 when he shot Marks. To begin, a reasonable jury could find that Officer Bauer---an experienced marksman---was capable of adjusting for minor rotations in the launcher that would otherwise cause him to miss a close-range target by 10 inches or more. Additionally, as already stated, Noedel considers the "upper torso area" to be

the chest, which is in Zone 3.  Further, when Noedel calculated the rotational changes to the angle of the launcher, he used a shooting distance of 10 feet.  Id. at 2.  However, the record includes evidence from which a reasonable jury could find that the shooting distance between Officer Bauer and Marks was a shorter distance, which would require a greater degree of rotation needed to hit Marks in the eye instead of the torso.  For example, a statement made by Officer Bauer during an interview about the incident suggests that he shot from just beyond the minimum safe standoff range of five feet.[3]  Additionally, forensic video specialist Ward estimates that the distance between the launcher's muzzle and Marks' head was between 70 and 80 inches.[4]  Adding 25 inches to Ward's figures to account for the length of the launcher results in an estimated shooting distance ranging from 7 feet, two inches to eight feet, nine inches.

In sum, to the extent if any that Officer Bauer's intended point of aim is relevant to the deadly force analysis, a reasonable jury could conclude that Officer Bauer intended to use deadly force based on his proficiency with the less lethal launcher, his varied testimony about where he was aiming, the shot placement to the eye (near the top of Zone 3), and the close firing distance.[5]

---

[3] When questioning Officer Bauer about the details concerning his deployment of the launcher, the interviewer asked:  "Okay, uh, and based on your training, distance and everything?"  Officer Bauer responded:  "Yep so the, the minimum standoff is 5 feet and just, uh, beyond 5 feet."  K. Bennett Decl. Ex. 16 [Docket No. 122-1] at MPLS_MARKS007338.  Officer Bauer contends that he was simply stating the minimum standoff when giving this answer.  Bauer Dep. at 142.  However, a reasonable jury could interpret the answer to mean that the minimum standoff is five feet and that Officer Bauer was just beyond five feet when he deployed the launcher.

[4] Ward multiplied a 28-to-32-inch range by 2.5, resulting in 70 to 80 inches.  Ward Report at 11.

[5] Officer Bauer argues that Minnesota's statutory definition of deadly force expressly excludes the firearms loaded with less lethal munitions.  The statute provides in relevant part:

> [D]eadly force" means force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm. The intentional discharge of a firearm, other than a firearm loaded with less lethal munitions and used by a peace officer within the

## B.  Non-deadly Force

Even if the force used by Officer Bauer was found not to be deadly force, the evidence viewed in the light most favorable to Marks supports a conclusion that the force used on Marks was unreasonable in light of the facts and circumstances confronting Officer Bauer.  In evaluating the reasonableness of the force, a court "must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest."  Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012) (citing Graham, 490 U.S. at 396).

With respect to the severity of the crime, Officer Bauer argues that Marks was committing the serious crimes of assaulting and attempting to disarm a police officer.  Although the BWC video shows that Marks hit Officer Pobuda and briefly grasped his baton, it took Officer Pobuda no more than three seconds to push the unarmed Marks away and send him stumbling backwards several feet.  Officer Pobuda, who was the recipient of Marks' aggression, did not think that Mark's actions warranted an arrest.  Pobuda Dep. at 42 .  Two independent prosecutors who viewed the video footage similarly determined that Marks' conduct was insufficient to support even misdemeanor charges.  See R. Bennett Decl. Exs. J, K [Docket No. 91, Attachs. 4, 5].  While a jury may endorse Officer Bauer's characterization of the incident as a "bad assault," evidence exists to the contrary, and a reasonable jury could find that the force

---

scope of official duties, in the direction of another person, or at a vehicle in which another person is believed to be, constitutes deadly force.

Minn. Stat. § 609.066.  This statute merely specifies that, unlike lethal firearms, the intentional discharge of a less lethal firearm is not per se deadly force.  Accordingly, the statute does not preclude a jury from finding that Officer Bauer used deadly force when he struck Marks in the face with the less lethal firearm by using force which he knew creates a substantial risk of causing death or great bodily harm.

Officer Bauer used in response to the brief altercation was excessive.  <u>See</u>  <u>Rohrbough v. Hall</u>,

586 F.3d 582, 586 (8th Cir. 2009) (holding that a jury could conclude that an officer's use of

force was excessive, even where the plaintiff pushed the officer, because the plaintiff's push may

have been inconsequential).

As to whether Marks posed an immediate threat, a reasonable jury could find that at the

time Marks was shot he no longer posed an immediate threat to Officer Pobuda or to the injured

person the officers were trying to evacuate.  Although frames from the BWC video show that

Marks' fist remained clenched after Officer Pobuda had pushed him away, the push had created

several feet of space between Marks and Officer Pobuda, and an individual had stepped into the

space between them.  After this separation, Officer Pobuda did not think that further use of force

on Marks was necessary.  Pobuda Dep. at 42.  Marks was not holding a weapon and was

stumbling backwards at the time he was shot.  Given these circumstances, a reasonably jury

could conclude that the threat had been extinguished.  <u>See</u> <u>Cole ex rel. Est. of Richards v.</u>

<u>Hutchins</u>, 959 F.3d 1127, 1132 (8th Cir. 2020) ("[T]he requirement that the threat be reasonably

perceived as 'immediate' means that if the threat has passed, so too has the justification for the

use of deadly force.").  To the extent that Officer Bauer was concerned that Marks might try to

re-engage with Officer Pobuda, "[a] future hypothetical—plausible or not—is not a justification

for the use of significant force because a threat cannot be immediate when it has not yet

materialized."  <u>Anderson</u>, 2022 WL 4540125, at *12.

Regarding the final factor, Marks was not actively resisting arrest at the time Officer

Bauer fired and did not flee the scene until after he had been shot.

In addition to these factors, the severity of injuries sustained by a plaintiff is a relevant,

though not dispositive, factor in determining the reasonableness of the force used.  <u>Montoya v.</u>

City of Flandreau, 669 F.3d 867, 872 (8th Cir. 2012).  Here, the high degree of force employed by Officer Bauer---shooting a chemical-filled projectile into Marks' face from 5 to 10 feet away---caused severe injuries to Marks, including a shattered eye socket, ruptured eye globe, traumatic brain injury, and permanent blindness in his right eye.

Officer Bauer argues he was facing a tense, uncertain, and rapidly evolving situation because the officers were heavily outnumbered by a hostile crowd and were engaged in a chaotic medical rescue.  According to Officer Bauer, he made a split-second decision to shoot because an immediate response was necessary, and waiting could have been disastrous.  However, Officer Pobuda was experiencing the same circumstances and did not believe further force was necessary.  See Duy Ngo v. Storlie, No. 03-3376 (RHK/JJG), 2006 WL 1579873, at *5 (D. Minn. June 2, 2006)  (denying qualified immunity where two officers "reacted differently under identical circumstances"), aff'd sub nom. Ngo v. Storlie, 495 F.3d 597 (8th Cir. 2007). Additionally, there was no need to rush to Officer Pobuda's aid, because Officer Bauer could see that Marks was no longer engaged with Officer Pobuda and was stumbling away from him as a result of Officer Pobuda's effective push.  See Banks v. Hawkins, 999 F.3d 521, 530 n.8 (8th Cir. 2021), cert. denied, 142 S. Ct. 2674 (2022) ("Even when making 'split-second judgments' in 'tense, uncertain, and rapidly evolving' circumstances, . . . officers cannot ignore what they know.") (quoting Graham, 490 U.S. at 397). .

Viewing the record in the light most favorable to Marks and drawing all justifiable inferences in his favor, while also viewing the facts from the perspective of a reasonable officer on the scene, the Court cannot conclude that Officer Bauer's use of force was objectively reasonable as a matter of law.  Although a jury may agree with Officer Bauer's assessment of the

incident at trial, the evidence viewed in the light most favorable to Marks shows that Officer

Bauer violated Marks' constitutional right to be free from excessive force.

### 2. Clearly Established Right

To overcome qualified immunity, Marks must also establish that the right in question was

clearly established.  To be "clearly established," the contours of the constitutional right "must be

sufficiently clear that a reasonable official would understand that what he is doing violates that

right." Hope v. Pelzer, 536 U.S. 730, 739–40 (2002) (quotation marks omitted).  Stated

differently, "existing law must have placed the constitutionality of the officer's conduct beyond

debate."  D.C. v. Wesby, 199 L. Ed. 2d 453, 138 S. Ct. 577, 589 (2018) (quotation marks

omitted).

To show that a right was clearly established, a plaintiff can:  (1) "point to existing circuit

precedent that involves sufficiently similar facts to squarely govern the officer's actions such that

the officer had notice that his specific use of force was unlawful;" (2) "present a robust

consensus of cases of persuasive authority doing the same;" or (3) "demonstrate that a general

constitutional rule applied with obvious clarity to the facts at issue."  Boudoin v. Harsson, 962

F.3d 1034, 1040 (8th Cir. 2020) (internal quotation marks, alterations, and citations omitted).

Here, it would have been clear to a reasonable officer on May 28, 2020, that shooting a

high velocity projectile from close range and without warning into the face of an unarmed

individual who did not present an immediate threat of death or serious injury amounted to

unconstitutional excessive force.  Existing precedent has long recognized that deadly force is

appropriate only in response to "a significant threat of death or serious physical injury to the

officer or others."  Ellison v. Lesher, 796 F.3d 910, 917 (8th Cir. 2015) (quoting Craighead v.

Lee, 399 F.3d 954, 962 (8th Cir.2005)).  This is true even where a suspect had previously been

fighting with officers.  See id. (holding officers did not have reasonable grounds to believe suspect posed a threat of death or serious injury where he was "empty-handed," despite earlier fighting with officers).  There was no basis to conclude that the unarmed Marks posed a significant threat of death or seriously bodily injury to Officer Pobuda or others, and even if there were, the threat had extinguished by the time Officer Bauer fired.

The outcome would be the same even if Officer Bauer could arguably be considered to have used less than deadly force by supposedly aiming for Marks' torso.  The evidence, when viewed in the light most favorable to Marks, shows that Marks no longer posed a threat to the officers or others at the time he was shot because he was unarmed, had been pushed several feet away by Officer Pobuda, and was stumbling backwards.  Officer Bauer knew from his training that a shotgun-propelled round fired from close range, even if not aimed at the face, would cause significant blunt-force trauma and thus requires substantial justification to be reasonable.  It would have been clear to a reasonable officer in Officer Bauer's position that such a high degree of force was disproportionate to the threat before him.  See Montoya, 669 F.3d at 869-72 (holding leg sweep improper where plaintiff acted aggressively but was ten to fifteen feet away from officer); Johnson v. Carroll, 658 F.3d 819, 827-28 (8th Cir. 2011) (holding that macing and throwing suspect to ground was excessive where plaintiff was unarmed and "posed at most a minimal safety threat to the officers"); Rohrbough v. Hall, 586 F.3d 582, 586-87 (8th Cir. 2009) (holding a reasonable officer would have known that a forceful takedown was unlawful despite plaintiff having pushed officer).

Resisting this conclusion, Officer Bauer argues that pre-existing caselaw holds that officers may use less-lethal projectiles on a person who presents a threat to officer safety "without any stated limitation about where the projectile strikes the subject."  Def. Mem. Spp.

Summ. J. at 39-40 (citing <u>White v. Jackson</u>, 865 F.3d 1064, 1073, 1079-80 (8th Cir. 2017);

<u>Bernini v. City of St. Paul</u>, 665 F.3d 997, 1001 (8th Cir. 2012)).  This argument fails for at least

two reasons.  First, this broad proposition ignores clear and longstanding precedent instructing

that the "proper application" of the test for reasonableness "requires careful attention to the facts

and circumstances of <u>each particular case</u>." <u>Graham</u>, 490 U.S. at 396 (emphasis added).

Additionally, the facts and circumstances of this case, when viewed in the light most favorable to

Marks, show that he no longer presented a threat at the time Officer Bauer directly used

substantial force on him.  As such, the cases relied on by Officer Bauer are distinguishable.  <u>See</u>

<u>White</u>, 865 F.3d at 1073, 1079-80 (holding use of projectiles was reasonable where protester

continued approaching skirmish line after officers commanded him to stop); <u>Bernini</u>, 665 F.3d at

1006 (affirming qualified immunity where the record did "not show that any of the defendants

directly used force against any of the plaintiffs").  Regardless of whether substantially similar

factual precedent existed at the time of this incident, Officer Bauer would not have needed to

"consult a casebook to recognize the unreasonableness of using [such] force . . . against a man"

who posed no threat at the time of the shot.  <u>Atkinson</u>, 709 F.3d at 1212 (internal quotation

marks, citation, and alteration omitted).

Accordingly, Officer Bauer's motion for summary judgment based on his qualified

immunity defense is denied.

## B.  Daubert Motions

Both parties have filed motions to exclude expert testimony under Federal Rule of

Evidence 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) .

### 1. **Legal Standard**

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the gatekeeper to ensure that the proffered testimony is reliable and relevant.  Daubert, 509 U.S. at 589; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).  A trial court has broad discretion in fulfilling its gatekeeping role.  Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006).  The proffered testimony must be useful to the fact-finder, the expert must be qualified, and the proposed evidence must be reliable.  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  The proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that the testimony is admissible.  Id.

"[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011) (internal quotations and alterations omitted).  "Only if the expert's opinion is so fundamentally unsupported that it

can offer no assistance to the jury must such testimony be excluded." <u>Bonner v. ISP Techs., Inc.</u>, 259 F.3d 924, 929-30 (8th Cir. 2001).  Doubts about the usefulness of an expert's testimony should generally be resolved in favor of admissibility.  <u>Marmo v. Tyson Fresh Meats, Inc.</u>, 457 F.3d 748, 758 (8th Cir. 2006).

### 2. Expert Report and Testimony of Christopher Gard

Marks moves to exclude the expert report and testimony of Christopher Gard ("Gard") pertaining to Officer Bauer's use of force.  Marks argues that Gard's opinion is flawed because (1) his opinions include bare legal conclusions; (2) he purports to resolve disputed factual issues and make credibility determinations that are the province of the jury; and (3) his police-practice standards are unsupported and unreliable.

Gard has a 25-year career in law enforcement and currently serves as the chief of police for the city of Orting, Washington police department.  R. Bennett Decl. Ex. D (Gard Report) [Docket No. 89-4] at 3, 12.[6]  He begins his report with five "Professional Conclusions":

- Ofc. Bauer reported seeing a man punching at police officers who were providing security for officers attempting to load and remove a woman in apparent need of emergency medical attention. Video recordings confirmed Ofc. Bauer's perception as a man later identified as Ethan Marks was recorded quickly approaching Ofc. Pobuda ordering Ofc. Pobuda to "back up bitch," reaching toward Ofc. Pobuda, grabbing Ofc. Pobuda's riot baton, and punching Ofc. Pobuda. It would have been reasonable for an officer witnessing this conduct to believe that Mr. Marks posed an immediate threat of bodily injury to Ofc. Pobuda.

- It would have been reasonable for an officer witnessing Mr. Marks' conduct to believe that Mr. Marks was interfering with the time-sensitive rescue efforts of the police officers involved.

- <u>It would have been reasonable</u> for an officer witnessing Mr. Marks' conduct <u>to believe that force was necessary</u> to decisively stop the threat and overcome the resistance posed by Mr. Marks.

---

[6]  Page citations to the Gard Report are to the page number in the CM/ECF banner at the top of the page.

- There was nothing depicted in the video evidence to indicate that Mr. Marks has affirmatively surrendered, was incapacitated, or was compliant prior to the discharge of the impact weapon.

- A reasonable officer could have believed that the use of the 40mm impact round was a reasonable response to immediately and decisively stop the threat posed by Mr. Marks.

Gard Report at 4 (emphases added). The report also includes a section titled "Utilization of Weapon was Reasonable and Authorized" in which Gard states: "Ofc. Bauer's use of the impact round to stop Mr. Marks' apparent assault and to prevent him from reinitiating that assault was reasonable and consistent with generally accepted law enforcement practices." Id. at 7 (emphasis added).

Marks argues that the third and fifth Professional Conclusions and the statement in the Utilization of Weapon section constitute bare legal conclusions on the reasonableness of Officer Bauer's force in light of the Fourth Amendment. Officer Bauer responds that Gard's use of the phrase "reasonable" or "necessary" is merely "short hand" for saying that the officers acted in a manner consistent with generally accepted police principles. Def. Mem. Opp'n Mot. Exclude [Docket No. 130] at 32. Officer Bauer contends that "Gard is not making purely legal conclusions, he is simply expressing his fact-based opinions using the language that police officers use---language that happens to mirror legal language." Id.

An expert's opinion on the reasonableness of police conduct in light of Fourth Amendment standards is an impermissible legal conclusion and is not admissible. Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir.2009); Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995); Redd v. Abla–Reyes, Civ. No. 12–465, 2013 WL 6036697, at *2 (D. Minn. Nov. 14, 2013). The Court finds that Gard's conclusions about the reasonableness of Officer Bauer's force constitute bare legal conclusions. As a result, they must be excluded from Gard's report and from his testimony at trial.

Marks also argues that Gard purports to resolve factual disputes and make credibility determinations, thereby usurping the role of the jury.  Regarding factual disputes, Marks contends that Gard's interpretation of the video evidence directly contradicts the record by:  (1) characterizing the brief altercation between Marks and Officer Pobuda as a violent and aggressive assault, Gard Report at 6; (2) speculating that Marks intended to "assault" Officer Pobuda again after Marks had been pushed away, id.; and (3) stating that the BWC video footage shows that Marks' backwards motion caused his "head to dip."  Id.  Marks' first two concerns can be properly addressed by cross examining Gard as to these characterizations and conclusions.  The third interpretation is unsupported by the record because Marks' head is not depicted in Officer Bauer's BWC video footage.  As such, this statement must be excluded.

Marks also argues that Gard should be precluded from testifying as he did in his deposition that Officer Bauer did not intend to shoot Marks in the eye.  See K. Bennett Decl. Ex. 14 (Gard Dep.) at 15-17, 47, 55-56, 69, 78, 92, 97.  Any testimony by Gard about where Officer Bauer intended to strike Marks is impermissible and will not be allowed at trial.  The probative value of such testimony is also strongly outweighed by its possible prejudice given the "very real danger that the proffered expert testimony could either confuse the jury or cause it to substitute the expert's credibility assessment for its own."  United States v. Kime, 99 F.3d 870, 884 (8th Cir. 1996).  As such, Gard is precluded from testifying about Officer Bauer's subjective intent.

Marks further argues that Gard's testimony is unreliable because Gard does not cite a source for the generally accepted police-practice standards he uses in his opinions, and Gard has stated that the standards come from his own personal experience.  Officer Bauer responds that Gard's opinions are based on a reliable methodology because Gard cites to cases and scholarly publications for some of the generally accepted police-practice standards, and the other standards

are based on Gard's research and years of experience.  The Court concludes that Gard does include some support for his testimony regarding police-practice standards.  And, his methodology is not so fundamentally unsupported that it can offer no assistance to the jury. However, many of Gard's "conclusions" and assertions of "generally accepted standards" rest on shaky foundation which may result in objections being sustained at trial.

Accordingly, Marks' motion to exclude Gard's expert opinion and testimony is granted in part and denied in part.

### 3.  Expert Testimony of Parris Ward

Marks also moves to exclude the expert testimony of Parris Ward ("Ward").  Ward is a forensic video specialist with decades of experience in the forensic analysis of video recordings, forensic enhancement of video images, and development of scientific visualizations for injury events such as shooting incidents.  See Ward Report at Attach. A.  Although Marks does not challenge Ward's qualifications, he argues that Ward's proffered opinions must be excluded because they would not aid the jury and are unreliable.  Marks further argues that even if Ward's proffered opinions pass muster under Rule 702, they must be excluded under Federal Rule of Evidence 403 because their probative value is substantially outweighed by the danger of confusing or misleading the jury.

In preparing his report, Ward was given four videos (a twitter video and the body worn camera ("BWC") videos of Officer Bauer, Officer Pobuda, and a third MPD officer) and was asked "to analyze the videos to determine what information could be derived from them" regarding Marks' shooting.  Ward Report at 3.  Ward enhanced the videos by brightening and stabilizing them, preparing slow motion versions, breaking the videos down by frame number, and synchronizing them.  Id. at 3-4, 7-11.  Marks does not object to these enhancements.

Ward's report includes analyzing Marks' movements as he stumbled backward. Id. at 8-10. In his analysis, Ward compared frames from the stabilized video and noted that "the elevation of Mr. Marks' body dropped several inches just prior to the launcher being fired." Id. at 9. Ward illustrated the changing elevation by focusing on a reference point on Marks' hip and tracking that point over time. Id. at 9-10. Ward concluded that "Marks' body initially dropped down, rose up, then dropped again a fraction of a second before he was struck." Id. at 13. Ward states that Marks' "sudden drop could explain why he was hit in the head instead of the upper torso." Id.

Ward also analyzed a still-frame photo of Officer Pobuda's BWC video that shows the muzzle of the launcher and Marks the moment immediately before the launcher was deployed. Ward determined from the photo that the distance between the muzzle tip and Marks' head was more than five feet. Id. at 11-12. Ward reached this conclusion by estimating the length of Marks' outstretched arm in the photo to be 28 to 32 inches, and determining that the distance between the muzzle tip and Marks' head "is about two and a half times that." Id. at 11.

Marks argues that Ward's report would not aid the jury because the jury is capable of watching the videos and drawing their own conclusions about what the videos show. Marks also argues that Ward's opinion that Marks was struck in the head because he was falling is unreliable because the only support for it comes from tracking Marks' hip, and the video does not show Marks' head. Marks contends that the drop of Marks' hip does not necessarily equate to a drop of Marks' head. Marks further argues that Ward's distance calculation is unreliable because Ward was using imprecise estimates of how many arm-lengths Marks was from the muzzle and how long Marks' arm is.

The Court finds that Ward's video enhancements and analysis would be helpful in assisting the jury with considering time-sensitive inquiries such as how rapidly the events were unfolding. The video analysis also helps the jury to understand the totality of the circumstances at the time Marks was shot. While Marks' challenges to Ward's conclusions about Marks' body movement and the estimated distance between Marks and the launcher are appropriate subjects for cross examination, the Court finds that Ward's opinion is not so fundamentally unsupported that it can offer no assistance to the jury.

Marks also argues that references in Ward's report to Officer Bauer purportedly "intend[ing]" to aim for Marks' "upper torso" are not admissible because Ward does not know where Officer Bauer was aiming, and because Officer Bauer's intent is not relevant to whether his actions were objectively reasonable. Marks contends that these references must be excluded under Federal Rule of Evidence 403 because their danger of misleading or confusing the jury substantially outweighs their probative value. Officer Bauer responds that his intent is relevant to any claim for punitive damages that Marks may attempt to make. Marks' concerns can be addressed through a pretrial motion in limine[7] or objections during trial, but are not a basis to exclude Ward's expert opinions and testimony in their entirety.

Accordingly, Marks' motion to exclude Ward's expert testimony is denied.

### 4. Expert Testimony of Matthew Noedel

Marks also moves to exclude the expert testimony of Matthew Noedel (Noedel). Noedel is a forensic scientist with over 20 years of experience performing shooting scene reconstruction. Noedel Report at Curriculum Vitae. Marks does not challenge Noedel's qualifications, but argues that Noedel's proffered opinions must be excluded because they would not aid the jury

---

[7] Marks intends to bring a motion in limine on this issue before trial. See Mem. Supp. Mot. Exclude [Docket No. 87] at 22 n.5.

and are unreliable.  Marks further argues that even if Noedel's proffered opinions are admissible

under Rule 702, they must be excluded under Federal Rule of Evidence 403 because their

probative value is substantially outweighed by the danger of confusing or misleading the jury.

In preparing his report, Noedel relied on documentation including police reports, expert

testimony, police body worn camera video, scene photographs, and other data connected to the

incident.  Noedel Report at 1.  Noedel's shooting reconstruction analysis included consideration

of the "point of aim difference required to hit the eye rather than the upper torso area of Mr.

Marks."  Id. at 2.  To calculate the point of aim difference, Noedel relied on the following

measurements:  an estimated distance of 10 inches between Marks' right eye and his "upper

torso area," a distance of 10 feet between Officer Bauer and Marks, and a gun length of 25

inches.  Id. at 2.  Noedel then used right triangle trigonometry to calculate degree to which the

gun needed to be rotated to hit Marks' eye instead of  upper torso, and concluded that the gun

would need to be rotated approximately 5 degrees upward.  Id. at 2-3.

Marks argues that Noedel's opinion is not helpful to the jury because several of his

conclusions are simply recitations of matters in the record, such as the length of the launcher, the

level nature of the terrain where the shot was delivered, that the projectile struck Marks in his

right eye, and that Officer Bauer reported that he intended to shoot Marks' torso.  Marks also

argues that it is common sense that when a shooter changes the point of aim with a firearm he

can strike a different spot with his projectile.  However, the Court finds that Noedel's opinion

will aid the jury in understanding and assessing how the degree of rotation affects the trajectory

of a projectile.

Marks also argues that Noedel's trigonometry calculations are unreliable because they are

based on speculative measurements such as the distance between Officer Bauer and Marks, and

the distance from Marks' upper torso to his eye.  For example, Marks' other expert, Ward, estimated that the distance from the muzzle to Mark was only 70 to 80 inches.  After adding 25 inches for the length of the launcher, the total distance is still less than the 10-foot distance relied on by Noedel.  Additionally, the 10-inch distance between Marks' eye and his upper torso is merely an estimate that Noedel arrived at by measuring his own body.  Marks thus contends that Noedel's opinions are simply vague theorizing disguised as precise math.

Marks' complaints about the approximations of Noedel's data points go to the weight of the testimony rather than the methodology used.  As such, while Marks is free to cross-examine Noedel on the factual basis for his conclusions, Noedel's expert report and testimony are not so fundamentally unsupported that they can offer no assistance to the jury.

Marks also argues that Noedel's opinions must be excluded under Rule 403 because their probative value is substantially outweighed by their danger of confusing or misleading the jury. Marks contends that Noedel's opinions about Officer Bauer's "unintentional" rotation of the launcher are speculative, legally irrelevant, and contradictory to Noedel's deposition testimony in which he admitted that the only place Officer Bauer ever pointed was to Zone 3.  These concerns can be addressed through a pretrial motion in limine or objections during trial, but are not a basis to exclude Noedel's  expert report and testimony in their entirety.

Accordingly, Marks' motion to exclude Noedel's expert testimony is denied.

### 5. Expert Rebuttal Report and Testimony of Thomas Martin

Officer Bauer moves to exclude the expert rebuttal report and any related testimony by Thomas Martin ("Martin").  K. Bennett Decl. Ex. 17 (Martin Report) [Docket No. 122, Attach. 2].  Martin is a shooting reconstructionist with over 30 years of training and experience, and was

engaged by Marks as a rebuttal expert to review and evaluate the opinions of Ward and Noedel. Id. at 1.

To rebut Noedel's opinions regarding the point-of-aim difference that would arguably account for striking Marks in the eye instead of his upper torso, Martin applies the same right-angle methodology but uses different measurements from the record. For example, instead of the 10-foot shooting distance used by Noedel to calculate the point-of-aim difference, Martin performed the calculations using 70 inches (Ward's low-end estimate of the shooting distance) and 80 inches (Ward's high-end estimate). Martin Report at 10. In doing so, Martin demonstrates that Noedel's model will produce substantially different results depending on what estimate is used to represent the distance between Officer Bauer and Marks at the time of the shot. Id. at 10-11.

Officer Bauer argues that Martin's methodology is flawed because he did not include the 25-inch length of the launcher when performing his calculations. Officer Bauer contends that including the length of the launcher is necessary because the pivot point is at the butt of the launcher, and thus the launcher itself is part of the right triangle calculation. These concerns go to the weight of Martin's testimony rather than its admissibility. Martin's opinions will aid the jury in understanding how different measurements and estimates can impact the point-of-aim differentials. As such, his opinions and testimony on this topic is admissible.

Martin's rebuttal report includes a conclusion that the preferred area for Officer Bauer to have targeted was Zone 1, and that Officer Bauer's BWC video shows that Zone 1 was available to be targeted. Id. at 5-7, 10, 12-13. Officer Bauer argues that Martin is not qualified to give this opinion because he has never used or been trained on a less-lethal launcher and has never had any training on when an officer should aim at Zones 1, 2, or 3 with a less-lethal launcher.

Officer Bauer thus contends that Martin lacks expertise in this area and is no more knowledgeable about point of aim decisions for less-lethal launchers than a prospective juror. Officer Bauer further argues that the topic of Zones 1 through 3 was not addressed by Ward or Noedel in their expert reports, and thus Martin's opinions constitute new arguments and legal theories which are improper rebuttal material.

Marks concedes that Martin has no knowledge, education, training, experience, or expertise with respect to point of aim decisions involving less-lethal projectiles and Zones 1 through 3 prior to his involvement in this litigation. However, he argues that Martin's incorporation of target zones into his testimony is an appropriate application of his expertise in reconstructing officer-involved shootings to the facts of the case.

Although gaps in an expert's qualifications or knowledge generally go to the weight of the witness's testimony rather than its admissibility, "Rule 702 does require that the area of the witness's competence matches the subject matter of the witness's testimony." Robinson, 447 F.3d at 1101 (quotations omitted). That Martin is qualified to determine angles and trajectories as a shooting reconstructionist is not sufficient to allow him to testify as an expert on the wholly distinct topic of which Zone an officer should or must aim at when deploying a less lethal projectile. Additionally, because MPD training and Zones 1 through 3 are not addressed by experts Ward or Noedel, Martin's opinions on these topics are not proper rebuttal material. For these reasons, Martin is precluded from offering opinions and testimony on point-of-aim decisions involving less-lethal projectiles and Zones 1 through 3.

 Martin's report also offers a colloquial definition of "point blank range," which Martin defines as "can't miss distance." Id. at 13. This definition is provided in response to Noedel's report, which specifies the technical definition of the term. See Noedel Report at 3. Officer

Bauer argues that Martin should not be allowed to opine on the colloquial definition of "point blank" because it is equally within the knowledge of the jury, and because Martin does not offer any basis for how he determined that the colloquial meaning is "can't miss distance." The Court will not exclude this portion of Martin's opinion at this juncture, but Officer Bauer may renew the argument in a motion <u>in limine</u> before the trial or through an objection at trial.

Accordingly, Officer Bauer's motion to exclude Martin's expert opinion and rebuttal testimony is granted in part and denied in part.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant Benjamin Bauer's Motion for Summary Judgment [Docket No 100] is **DENIED**;

2.  Bauer's Motion to Exclude the Report and Testimony of Thomas Martin [Docket No. 97] is **GRANTED IN PART and DENIED IN PART**;

3.  Plaintiff Ethan Daniel Mark's Motion to Exclude the Testimony of Defense Expert Christopher Gard [Docket No. 81] is **GRANTED IN PART and DENIED IN PART**; and

4.  Marks' Motion to Exclude the Testimony of Defense Experts Parris Ward and Matthew Noedel [Docket No. 85] is **DENIED.**

BY THE COURT:

s/Ann D. Montgomery
Dated: February 1, 2022                    ANN D. MONTGOMERY
                                           U.S. DISTRICT COURT